## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| RAND LOGISTICS, INC., *et al.*,[1] | ) | |
| | ) | Case No. 18-_____ (___) |
| Debtors. | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MARK S. HILTWEIN IN SUPPORT OF
## CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

I, Mark S. Hiltwein, hereby declare under penalty of perjury, pursuant to section 1746 of

title 28 of the United States Code, as follows:

1.      I am the Chief Financial Officer of Rand Logistics, Inc. ("Rand"), one of the

debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and,

together with the Non-Debtor Affiliates,[2] the "Company") and the ultimate parent of each of the

other Debtors and Non-Debtor Affiliates (as defined herein), and have served in this position

since May 2015. In this capacity, I am generally familiar with the Debtors' day-to-day

operations, business and financial affairs, and books and records. I am above 18 years of age, and

I am competent to testify.

2.      Prior to joining Rand, from August 2012 through September 2014, I served as

President of Envelope Group of Cenveo, a world leader in the management and distribution of

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Rand Logistics, Inc. (5343); Lower Lakes Transportation Company (5364); Grand River Navigation Company, Inc. (5146); Black Creek Shipping Company, Inc. (5474); Rand LL Holdings Corp. (6352); Rand Finance Corp. (1847); and Black Creek Shipping Holding Company, Inc. (5313).  The service address for each of the above Debtors is 333 Washington Street, Suite 201, Jersey City, NJ 07302.

[2]    As discussed in further detail herein, the Debtors are comprised of Rand and certain of its domestic direct and indirect subsidiaries.  Rand's (a) indirect foreign subsidiaries, Lower Lakes Towing Ltd. and Lower Lakes Ship Repair Company Ltd., and (b) indirect domestic subsidiary, Conneaut Creek Ship Repair, Inc. (collectively, the "Non-Debtor Affiliates") have not commenced chapter 11 cases.

custom print, packaging, labels and envelopes. I was Chief Financial Officer of Cenveo from July 2007 to August 2012. From July 2005 to July 2007, I was President of Smartshipper.com, an online third party logistics company. From February 2002 through July 2005, I was Executive Vice President and Chief Financial Officer of Moore Wallace Incorporated, a $3.5 billion printing company. Prior to that, I served as Senior Vice President and Controller of Moore Wallace from December 2000 to February 2002. I served in a number of financial positions from 1992 through 2000 with L.P. Thebault Company, a commercial printing company, and as Chief Financial Officer from 1997 through 2000. I began at Mortenson and Associates, a regional public accounting firm where I held various positions in the audit department. I received my Bachelor's degree in Accounting from Kean University.

3.      This declaration (the "Declaration") is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and I am authorized by Rand's Board of Directors to submit it on behalf of the Debtors. All facts set forth herein are based upon my personal knowledge of the Debtors' business and finances, information learned from my review of relevant documents, and/or information supplied to me by other members of the Debtors' management and the Debtors' advisors. If called upon to testify, I would testify to the facts set forth herein on that basis.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition (collectively, the "Chapter 11 Petitions") to commence with the United States Bankruptcy Court for the District of Delaware (the "Court") a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Each Debtor is operating its business and managing its properties as a debtor in possession pursuant to

Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of this Declaration, the Debtors have requested that the Chapter 11 Cases be consolidated for procedural purposes.

5.      I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Cases, and in support of (a) the filing of the Debtors' Chapter 11 Petitions and (b) the emergency relief that the Debtors have requested from the Court pursuant to the motions described in Part V of this Declaration (the "First Day Motions").  The facts set forth in each First Day Motion are incorporated herein by reference.

6.      I have organized this Declaration into five (5) parts. Part I outlines the proposed restructuring. Part II describes the Company's background, including its history, corporate structure and business. Part III provides an overview of the pre-petition capital structure. Part IV details the circumstances surrounding the commencement of the Chapter 11 Cases. Part V summarizes the relief requested in the First Day Motions.

**I.      Overview of the Restructuring**

7.      The Debtors and their Non-Debtor Affiliates comprise one of the largest providers of bulk freight shipping services in the Great Lakes region. As described in more detail below, several factors—including, among other issues, the volatility in the valuation of the U.S. dollar relative to the Canadian dollar and increased costs of repairing, maintaining and certifying vessels—have combined to make the Debtors' capital structure unsustainable and contributed to the Debtors' decision to pursue a restructuring.

8.      The Debtors commenced the Chapter 11 Cases to effectuate a comprehensive restructuring of the Debtors' consolidated balance sheet as embodied in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended, modified or

supplemented, the "Plan"),[3] which was filed contemporaneously herewith, in addition to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "Disclosure Statement").

9.     The Plan has been negotiated with and has the support of the agent and sole lender under the Second Lien Credit Agreement (as defined below), Lightship Capital LLC ("Lightship").  The Disclosure Statement, the Plan and the accompanying documents have been extensively negotiated with the legal and financial advisors to Lightship.

10.     Following extensive, good-faith and arm's-length negotiations with Lightship, the Plan embodies a settlement among the Debtors and their key stakeholders on a consensual deleveraging transaction which provides for the implementation of a restructuring through an expedited chapter 11 process. The key terms of the Plan include, without limitation, the following:

- payment in full, in the ordinary course of business, or reinstatement of Allowed General Unsecured Claims, including those held by trade vendors, suppliers and customers;

- payment in full, in Cash, of all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed statutory fee Claims, Allowed DIP Claims, Allowed Other Priority Claims and Allowed Other Secured Claims;

- payment in full, in Cash, of all Allowed First Lien Claims;

- conversion of Allowed Second Lien Claims into 100% of the New Common Stock, subject to dilution on account of the Equity Incentive Program, resulting in the elimination of approximately $92 million of debt;

- cancellation of the Existing Preferred Shares and the Existing Common Shares;

- entry into the Exit Facility Credit Agreement to ensure adequate liquidity at exit; and

---

[3]     Unless otherwise defined in this Declaration, all capitalized terms used, but not otherwise defined, in this Declaration will have the meanings ascribed to them in the Plan.

- prompt emergence from the Chapter 11 Cases.

11.     Overall, the Plan is designed to augment the Debtors' liquidity, continue the Debtors' operations with minimal disruption, preserve the going-concern value of the Debtors' business, maximize recoveries for stakeholders and protect the jobs of the Debtors' employees. Additionally, the Plan provides for certain releases of Claims against, among others, (i) the Debtors, the DIP Lender, the Exit Facility Agent, the Exit Facility Lenders, the First Lien Agent, the holders of First Lien Claims, the Second Lien Agent, and the holders of Second Lien Claims, and (ii) each of their respective current and former managed and controlled affiliates, subsidiaries, officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

12.     I believe that the compromise contemplated under the Plan is fair and equitable, maximizes value of the estates and provides the best recovery to Claim holders. At this time, I believe that it is the best available alternative for completing the Chapter 11 Cases.

## II.     Company Background

13.     The Company comprises one of the largest providers of bulk freight shipping services in the Great Lakes region. The Company transports construction aggregates, salt, grain, coal, iron ore and other dry bulk commodities for customers in the construction, electric utility, food and integrated steel industries.

14.     The Company operates a fleet of cargo-carrying vessels in the United States and Canada in compliance with the Jones Act, the Canada Shipping Act, 2001, SC 2001 c 26 and the

Coasting Trade Act, SC 1992, c 31.[4] Generally, the Jones Act governs domestic waterborne commerce with respect to vessels that are U.S. owned, built and crewed, while the Coasting Trade Act is the main legislation that governs domestic waterborne commerce with respect to Canadian registered and crewed vessels that operate between Canadian ports.

15.      The Company has corporate offices in Jersey City, New Jersey and the Company utilizes warehouse space and additional office space in Port Dover, Ontario and Traverse City, Michigan.

### A.      Corporate History

16.      Rand was incorporated in the State of Delaware on June 2, 2004 under the name Grand Slam Acquisition Corporation. Rand changed its name to Rand Acquisition Corporation on June 14, 2004 and completed its initial public offering in November 2004 as a blank check company without any operating business.  Rand is the ultimate parent company of each of the Debtors and Non-Debtor Affiliates.

17.      In 2006, Rand acquired all of the outstanding shares of capital stock of Lower Lakes Towing Ltd. ("Lower Lakes Towing") with its subsidiary Lower Lakes Transportation Company ("Lower Lakes Transportation") and its affiliate, Grand River Navigation Company, Inc. ("Grand River"). Rand, which changed its name to Rand Logistics, Inc. concurrently with this acquisition, is a holding company with common stock that was traded on the Nasdaq stock market ("NASDAQ") under the symbol "RLOG" until trading of such common stock was suspended by NASDAQ effective as of January 5, 2018.

18.      On December 27, 2012, Lower Lakes Ship Repair Company Ltd. ("Lower Lakes Ship Repair"), a wholly-owned subsidiary of Lower Lakes Towing, was incorporated under the laws of Canada. Lower Lakes Ship Repair provides ship repair services exclusively to the

---

[4]    The Company operated fourteen vessels during 2017, with one vessel inactive.

Company. On March 11, 2014, Lower Lakes Towing (17) Ltd. ("Lower Lakes (17)"), a wholly-owned subsidiary of Lower Lakes Towing, was incorporated under the laws of Canada. As of November 7, 2016, Lower Lakes (17) was amalgamated with and into Lower Lakes Towing, with Lower Lakes Towing continuing as the surviving entity. The Company's shipping business is operated in Canada by Lower Lakes Towing and in the United States by Lower Lakes Transportation.

19.    On December 18, 2017, Conneaut Creek Ship Repair Company, Inc. was incorporated in the State of Delaware. In order to minimize the cost of these Chapter 11 Cases and disruption to the Company's business, and to ensure that the Plan is consummated as expeditiously as possible, the Company has determined not to file Chapter 11 Petitions for the following Non-Debtor Affiliates: (i) Conneaut Creek Ship Repair Company, Inc.; (ii) Lower Lakes Towing; and (iii) Lower Lakes Ship Repair Company Ltd. During the pendency of these Chapter 11 Cases, the Company intends to continue honoring its obligations and pay employees, trade creditors and other unsecured creditors in full in accordance with existing business terms.

**B.    Corporate Structure**

20.    A diagram presenting the corporate structure of the Company, including each Debtor and each Non-Debtor Affiliate, is set forth on **Exhibit A** hereto.

**C.    Fleet**

21.    The Company has grown to become one of the largest bulk shipping companies operating on the Great Lakes and a leading service provider in the River Class market segment.[5] The Company's growth was facilitated by the acquisition of several additional vessels operating

---

[5]    River Class vessels represent the smaller end of Great Lakes vessels, with maximum dimensions of approximately 665 feet in length and 78 feet in beam and carrying capacities of 15,000 to 28,000 tons, and are ideal for customers seeking to move significant quantities of dry bulk product to or from ports that restrict non-River Class vessels due to size and capacity constraints.

or capable of operating on the Great Lakes.   These acquisitions positioned the Company to provide improved service to its customers and strengthen those customer relationships. Presently, the Company operates a fleet of four conventional bulk carriers and eleven self-unloading bulk carriers, which includes three tug/barge units.

22.    The Company's shipping business is operated in Canada by Lower Lakes Towing and in the United States by Lower Lakes Transportation. Its U.S.-flagged vessels are owned by Grand River and Black Creek Shipping Company, Inc. ("Black Creek") and its Canadian-flagged vessels are owned by Lower Lakes Towing.

### D.    Customers

23.    Presently, the Company services approximately fifty customers in a variety of end markets by shipping dry bulk commodities. The Company's top ten customers accounted for approximately 69%, 67% and 64% of its revenue during the fiscal years ended March 31, 2017, 2016 and 2015 respectively. The Company is the sole-source shipping provider to several of its customers. With few exceptions, the Company's customers are under long-term contracts which typically average three to five years in duration and provide for minimum and maximum annual tonnage requirements, annual price escalation features and fuel surcharge adjustments. Certain of the Company's customer contracts also provide for water-level adjustments, demurrage and discharge provisions.

### E.    Competition

24.    The Company faces competition from other marine and land-based transporters of dry bulk commodities in and around the Great Lakes area. In the River Class market segment, the Company generally faces competition from Algoma Central Corporation, Interlake Steamship Company, Great Lakes Fleet and American Steamship Company. The Company believes that industry participants compete on the basis of customer relationships, price and

service, and that the ability to meet a customer's schedule and offer shipping flexibility is a key competitive factor. Moreover, the Company believes that customers are generally willing to continue to use the same carrier assuming such carrier provides satisfactory service with competitive pricing.

### F.     Employees

25.     As of December 31, 2017, the Company had 501 full-time employees, 107 of whom were shoreside, including the Company's officers ("Management"), and 405 of whom were shipside employees. Of the 501 employees, the Debtors employ 196 employees and the Non-Debtor Affiliates employ 305 employees. Shipside employees on the Company's U.S.-flagged vessels are unionized with the International Organization of Masters, Mates and Pilots, AFL-CIO.

### G.     Government Regulations

26.     The Company's marine transportation operations are subject to United States Coast Guard ("USCG") and Environmental Protection Agency legislative oversight, and to other federal, state and Canadian legislation and certain international conventions.

27.     Businesses that involve maritime transportation between points in a country (known as marine cabotage services or coastwise trade) are subject to applicable legislation in the countries in which they operate. The Company's Canadian business is subject to the Coasting Trade Act and other Canadian statutes that restrict maritime transportation between points in Canada to duty-paid vessels that are registered in Canada and manned by Canadian citizens. The Company's United States business is subject to the Jones Act, which limits the carriage of goods between U.S. ports to vessels of U.S. registry that have additional Jones Act "coastwise endorsements." These coastwise endorsements require USCG determinations that the vessel has been "built in the U.S." and is "owned by U.S. citizens." Sections 2(a) and 2(c) of the Shipping

9

Act, 1916 (now codified as 46 U.S.C. 50501 (a), (b) and (d)), and the USCG regulations at 46 CFR Ch. I, "Subpart C - Citizenship Requirements for Vessel Documentation," govern the USCG "owned by U.S. citizens" determinations (the "Citizenship Standards").

28.     The Debtors' certificate of incorporation and by-laws are consistent with these Citizenship Standards, and the Debtors implement the policies that the USCG recommends for compliance with these Citizenship Standards by publicly traded corporations. Compliance with United States and Canadian domestic trade requirements are important to the operations of the Company. The loss of Jones Act status could have a material negative effect on the Debtors. Accordingly, the Debtors monitor the citizenship of their employees and stockholders.

29.     The Company's operations are also subject to various environmental protection legislation enacted by the United States and Canadian governments, Great Lakes and St. Lawrence River states and provinces and companion regulations. Additional discussion of the regulatory environment of the Company's business can be found in the Company's Form 10-K for the fiscal year ended March 31, 2017, filed with the SEC on July 6, 2017.

**H.     Prepetition Litigation**

30.     The Debtors are not involved in any prepetition legal proceedings which the Debtors expect to have a material adverse effect on the Debtors' business, financial position, results of operations or liquidity, nor are the Debtors aware of any proceedings that are pending or threatened which they believe may have a material adverse effect on the Debtors' business, financial position, results of operations or liquidity.

31.     From time to time, the Debtors may be subject to ordinary routine litigation and claims incidental to the business (the "Routine Litigation"), principally involving commercial charter party disputes, and claims for alleged property damages, personal injuries and other matters. Routine Litigation, even if lacking merit, could result in the expenditure of significant

financial and managerial resources. It is expected that larger Routine Litigation would be covered by insurance, subject to customary deductibles, if they involve liabilities that may arise from collision, other marine casualty, damages to cargoes, oil pollution, death, or personal injuries to crew.

32.    The Company routinely records an estimated loss in its SEC filings for any Routine Litigation when it is probable that a liability has been incurred and the amount of the loss can reasonably be estimated. As of September 30, 2017, an accrual of $145,000 was recorded on account of various Routine Litigation. The Debtors believe that they have recorded adequate reserves and believe that the they have adequate insurance coverage or have meritorious defenses for any Routine Litigation; however, the Debtors cannot assure that such reserves will be sufficient to cover all costs incurred, or that insurance will be available or sufficient, or that any defenses asserted by the Debtors will be successful.

## III.    Summary of Prepetition Capital Structure

### A.    Indebtedness

33.    As of December 31, 2017, the Debtors had total debt outstanding of approximately $235.9 million, including amounts principal outstanding under the First Lien Credit Agreement (defined below) of approximately $149 million and amounts outstanding under the Second Lien Credit Agreement (defined below) of approximately $86.9 million.

34.    *First Lien Credit Agreement*. On March 27, 2015, Rand and certain of its subsidiaries entered into a credit agreement (as amended from time to time, the "First Lien Credit Agreement") with Bank of America, N.A., as agent (the "First Lien Agent") and certain other lenders party thereto. Lower Lakes Towing, Lower Lakes Transportation, Grand River, and Black Creek are borrowers (the "First Lien Borrowers") under the First Lien Credit Agreement. Black Creek, Lower Lakes Transportation, Grand River, Black Creek Holdings, Rand LL

Holdings Corp. and Rand Finance Corp. are guarantors of all United States and Canadian obligations under the First Lien Credit Agreement (collectively, the "First Lien U.S. Guarantors"). Lower Lakes Ship Repair is a guarantor of all Canadian obligations under the First Lien Credit Agreement (the "First Lien Canadian Guarantor" and, together with the First Lien U.S. Guarantors, the "First Lien Guarantors"). The proceeds of the First Lien Credit Agreement were used to extinguish certain then-existing indebtedness and to provide working capital financing and funds for other general corporate and permitted purposes.

35.    The credit facilities under the First Lien Credit Agreement include: (i) a revolving credit facility under which Lower Lakes Towing may borrow up to USD $80 million (CDN or USD currency to be selected by Lower Lakes Towing) with a final maturity date of September 30, 2019 (the "Canadian Revolving Facility"); (ii) a revolving credit facility under which Lower Lakes Transportation, Grand River and Black Creek may borrow up to USD $90 million with a final maturity date of September 30, 2019 (the "U.S. Revolving Facility"); (iii) a swing line facility under which Lower Lakes Towing may borrow up to the lesser of CDN $8 million and the CDN maximum borrowing availability less the outstanding balance of the Canadian Revolving Facility at such time, with a final maturity date of September 30, 2019 (the "Canadian Swing Line Facility"); and (iv) a swing line facility under which Lower Lakes Transportation, Grand River and Black Creek may borrow up to USD $9 million, less the outstanding balance of the U.S. Revolving Facility at such time, with a final maturity date of September 30, 2019 (the "U.S. Swing Line Facility").

36.    The obligations under the First Lien Credit Agreement are secured by first-priority liens on, and a first-priority security interest in, substantially all of the assets of the First Lien Borrowers and the First Lien Guarantors party to the agreement, including a pledge of all or

a portion of the equity interests of the First Lien Borrowers and the First Lien Guarantors. The security interests are evidenced by pledge, security and guaranty agreements and other related agreements, including certain fleet mortgages. The indebtedness of each domestic First Lien Borrower is unconditionally guaranteed by each other domestic First Lien Borrower and by the First Lien Guarantors which are domestic subsidiaries. Each guaranty is secured by a lien on substantially all of the assets of each First Lien Borrower and each First Lien Guarantor. Each domestic First Lien Borrower also guarantees the obligations of the Canadian First Lien Borrower and each Canadian First Lien Guarantor guarantees the obligations of the Canadian First Lien Borrower.

37.    On June 1, 2017, the parties to the First Lien Credit Agreement entered into an amendment and waiver agreement ("First Lien Amendment No. 4"), pursuant to which the First Lien Lenders waived, during a specified waiver period (the "First Lien Waiver Period"), the Company's failure to deliver its audited financial statements for the fiscal year ending March 31, 2017 by May 31, 2017 (the "Specified Default").[6] Under First Lien Amendment No. 4, the First Lien Waiver Period was to end on the earliest to occur of (i) any event of default (other than the Specified Default) under the First Lien Credit Agreement or the Second Lien Credit Agreement, (ii) the commencement of any legal proceeding by any of the Debtors which would enjoin the First Lien Agent or First Lien Lenders from enforcing their rights under the waiver, (iii) three business days following the termination of negotiations among the Company and Lightship of a potential recapitalization transaction involving the Debtors and (iv) June 14, 2017.[7] The First

---

[6]    From time to time, the parties to the First Lien Credit Agreement have entered into amendments to the credit agreement. Prior to the execution of First Lien Amendment No. 4, the parties to the First Lien Credit Agreement executed: (i) a first amendment and waiver agreement on February 9, 2016; (ii) a second amendment and waiver agreement on August 26, 2016; and (iii) a third amendment on September 13, 2016.

[7]    First Lien Amendment No. 4 additionally provided for: (i) enhanced or new restrictions on certain of the Debtors' activities not in the ordinary course of business, including with respect to consummating a merger or

Lien Waiver Period was initially extended to June 30, 2017 and subsequently extended to July 14, 2017. The First Lien Waiver Period expired on July 14, 2017 without further extension.

38. _Second Lien Credit Agreement_. On March 11, 2014, Rand and certain of its subsidiaries entered into a credit agreement (as amended from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements") with Guggenheim Corporate Funding, LLC ("Guggenheim"), as agent, as collateral agent and as co-arranger, Barclays Capital, Inc., as co-arranger, and the lenders signatory thereto from time to time (the "Second Lien Lenders").[8] Lower Lakes Towing, Lower Lakes Transportation, Grand River, and Black Creek are borrowers (the "Second Lien Borrowers") under the Second Lien Credit Agreement. Black Creek, Lower Lakes Transportation, Grand River, Black Creek Shipping Holding Company, Inc., Rand LL Holdings Corp., Rand Finance Corp. and Rand are guarantors of all United States and Canadian obligations under the First Lien Credit Agreement (collectively, the "Second Lien U.S. Guarantors"). Lower Lakes Ship Repair is a guarantor of all Canadian obligations under the Second Lien Credit Agreement (the "Second Lien Canadian Guarantor" and, together with the Second Lien U.S. Guarantors, the "Second Lien Guarantors").

39. Pursuant to that certain Resignation and Assignment Agreement, dated November 27, 2017, between Guggenheim, in its capacity as resigning agent, Lightship, in its capacity as successor agent, the Second Lien Borrowers and the Second Lien Guarantors, Lightship was

---

sale, making certain intercompany payments, or incurring new liens or indebtedness (other than under the First Lien Credit Agreement); (ii) continuation of certain rights of the First Lien Agent applicable during an event of default during the First Lien Waiver Period (notwithstanding waiver of the Specified Default), including with respect to (a) reimbursement of fees and expenses, (b) entitlement to default interest and (c) enhanced entitlement to the Debtors' access and reporting; and (iii) restrictions on the Debtors' right to designate a LIBOR-based interest rate for new loans under the First Lien Credit Agreement. It also provided for an event of default under the First Lien Credit Agreement if the Debtors had not agreed to a recapitalization transaction with Lightship by June 30, 2017, on terms reasonably satisfactory to the First Lien Agent.

[8]    On April 21, 2017, Lightship became the sole lender under the Second Lien Credit Agreement.

appointed as successor agent, including as collateral agent, pursuant to Section 9.7 of the Second Lien Credit Agreement (the "Second Lien Agent")

40.    The Second Lien Credit Agreement initially provided for: (i) a U.S. Dollar denominated term loan facility under which Lower Lakes Towing was obligated to the lenders in the amount of $34.2 million (the "Second Lien CDN Term Loan"); (ii) a U.S. dollar denominated term loan facility under which Grand River and Black Creek were obligated to Lightship in the amount of $38.3 million (the "Second Lien U.S. Term Loan"); and (iii) an uncommitted incremental term loan facility of up to $32.5 million as of March 27, 2015.

41.    The obligations under the Second Lien Credit Agreement are secured by second-priority liens and security interests in substantially all of the assets of the Second Lien Borrowers and the Second Lien Guarantors, including a pledge of all or a portion of the equity interests of the Second Lien Borrowers and the Second Lien Guarantors. The security interests are evidenced by pledge, security, and guaranty agreements and other related agreements, including fleet mortgages.   The indebtedness of each domestic Second Lien Borrower is unconditionally guaranteed by each other domestic Second Lien Borrower and by the Second Lien Guarantors which are domestic subsidiaries and such guaranty is secured by a lien on substantially all of the assets of each Second Lien Borrower and each Second Lien Guarantor. Each domestic Second Lien Borrower also guarantees the obligations of the Canadian Second Lien Borrower and each Canadian Second Lien Guarantor guarantees the obligations of the Canadian Second Lien Borrower.

42.    As described below, the obligations of the Second Lien Borrowers and the liens of Lightship are subject to the terms of the Intercreditor Agreement.

43.     On June 1, 2017, the parties under the Second Lien Credit Agreement entered into an amendment and waiver ("Second Lien Amendment No. 5"), pursuant to which Lightship, as sole lender under the Second Lien Credit Agreement, waived, during a specified waiver period (the "Second Lien Waiver Period"), the Specified Default.[9] Under Second Lien Amendment No. 5, the Second Lien Waiver Period was to end on the earliest to occur of (i) any event of default (other than the Specified Default) under the First Lien Credit Agreement or the Second Lien Credit Agreement, (ii) the commencement of any legal proceeding by any of the Debtors which would enjoin Lightship from enforcing its rights under the Second Lien Waiver, (iii) three (3) business days following the termination of negotiations among the Company and Lightship of a potential recapitalization transaction involving the Debtors and (iv) June 14, 2017.[10] The Second Lien Waiver Period was extended to June 30, 2017 and subsequently extended to July 14, 2017. The Second Lien Waiver Period expired on July 14, 2017 without further extension.

44.     *Intercreditor Agreement*.  In connection with the First Lien Credit Agreement and the Second Lien Credit Agreement described above, on March 27, 2015, the First Lien Agent, for itself and on behalf of the First Lien Lenders, and the Second Lien Agent, for itself and on behalf of the Second Lien Lenders, entered into an intercreditor agreement (the "Intercreditor

---

[9]     From time to time, the parties to the Second Lien Credit Agreement have entered into amendments to the credit agreement.  Prior to the execution of Second Lien Amendment No. 5, the parties to the Second Lien Credit Agreement executed: (i) a first amendment on April 11, 2014; (ii) a second amendment on March 27, 2015; (iii) a third amendment and waiver agreement on February 9, 2016; and (iv) a fourth amendment and waiver agreement on August 26, 2016.

[10]    Second Lien Amendment No. 5, among other things, additionally provided for: (i) enhanced or new restrictions on certain of the Debtors' activities not in the ordinary course of business, including with respect to consummating a merger or sale, making certain intercompany payments, or incurring new liens or indebtedness (other than under the First Lien Credit Agreement); (ii) extension of certain rights of the Second Lien Agent applicable during an event of default during the Second Lien Waiver Period to Lightship and continuation of certain of such rights during the Second Lien Waiver Period (notwithstanding waiver of the Specified Default), including with respect to (a) reimbursement of fees and expenses, (b) entitlement to default interest and (c) enhanced entitlement to the Debtors' access and reporting; and (iii) restrictions on the Debtors' right to designate a LIBOR-based interest rate for new loans under the Second Lien Credit Agreement. It also provided for an event of default under the Second Lien Credit Agreement if the Debtors had not agreed to a recapitalization transaction with Lightship by June 30, 2017.

Agreement"), which was acknowledged and agreed by Rand and certain of its subsidiaries. Pursuant to the Intercreditor Agreement, (i) liens granted under the Second Lien Credit Agreement are subordinated to those granted under the First Lien Credit Agreement, and (ii) regularly scheduled principal and interest payments due under the Second Lien Credit Agreement may be paid by the Debtors absent the occurrence of an event of default under the First Lien Credit Agreement.

45.     *Other Debt*. As of January 22, 2018, the Debtors' outstanding principal unsecured indebtedness of approximately $3.0 million consists of (i) capital expenditures of approximately $1.4 million, (ii) accounts payable of approximately $650,000, and (iii) accrued expenses and other liabilities of approximately $960,000. The Debtors also have regular and recurring compensation and benefit obligations to their employees, which are current and are paid in the ordinary course of business.

**B.     Stockholders' Equity**

46.     *Common Stock.* As of December 31, 2017, 18,633,149 shares of Existing Common Shares, par value $.0001, totaling $1,000,000, were issued and outstanding (out of 50,000,000 shares authorized). As of July 5, 2017, there were 162 holders of record of the Existing Common Shares. The Debtors have not paid any dividends on the Existing Common Shares to date.

47.     On September 20, 2016, Rand received a letter from NASDAQ providing notification that, for the previous 30 consecutive business days, the bid price for its Existing Common Shares had closed below the minimum $1.00 per share requirement for continued listing on NASDAQ under NASDAQ Listing Rule 5550(a)(2). Rand received an initial grace period until March 20, 2017 to regain compliance, which was later extended by 180 days to September 18, 2017.

48.     On September 20, 2017, Rand received a letter from NASDAQ stating that, due to ongoing non-compliance with the NASDAQ listing requirements, its Existing Common Shares would be suspended from trading on NASDAQ at the opening of business on September 29, 2017, unless the Debtors requested an appeal to the NASDAQ Hearings Panel (the "Panel"). Rand appealed the delisting notice and appeared in front of the Panel on November 16, 2017. The Panel issued a decision on December 4, 2017 continuing Rand's listing, conditioned upon, among other things, Rand's ability to implement a reverse stock split and demonstrate compliance with Listing Rule 5550(a)(2) by March 19, 2018. Rand informed the Panel on January 2, 2018 that it would be unable to meet the requirements of the Panel's decision. On January 3, 2018, Rand received written notification from the Panel that the Panel had determined to delist Rand's Existing Common Shares from NASDAQ and the suspension of trading would be effective at the open of business on January 5, 2018. Rand does not intend to appeal the Panel's determination. Rand's Existing Common Shares may be eligible to be quoted on the OTC Bulletin Board (the "OTCBB") or in the "Pink Sheets." OTCBB or Pink Sheets trading may occur only if a market maker applies to quote Rand's Existing Common Shares and Rand is current in its reporting obligations under the Securities Exchange Act of 1934.

49.     *Preferred Stock.* Rand issued 300,000 shares of Existing Preferred Shares in 2006. As of September 30, 2017, 295,480 shares of its Existing Preferred Shares, par value $.0001, totaling $14,674,000, were issued and outstanding (out of 1,000,000 shares authorized) pursuant to the Amended and Restated Certificate of Designations of Series A Convertible Preferred Stock of Rand Logistics, Inc., dated as of August 8, 2006.

50.     Existing Preferred Shares rank senior to Existing Common Shares with respect to liquidation and dividends. Existing Preferred Shares may be redeemed or obligated to be

redeemed by Rand in connection with certain change of control or acquisition transactions, and may be converted into common shares at the election of the holder. The holders of Existing Preferred Shares vote on corporate matters on an as-converted basis with the Existing Common Shares and as a separate class. As of December 31, 2017, the accrued preferred stock dividends payable were approximately $5,033,586.44 million and the effective dividend rate of the Existing Preferred Shares was 10.75%.

## IV.    Events Leading to the Chapter 11 Cases of the Debtors

### A.    Market and Capital Challenges

51.    A number of factors have contributed to the Company's decision to pursue a restructuring, including, among other issues, volatility in the valuation of the U.S. dollar relative to the Canadian dollar and increased costs of repairing, maintaining and certifying vessels—all of which combined have made the Company's capital structure unsustainable.

52.    *Foreign Currency Fluctuations*. The Company has struggled as a result of the weakening of the Canadian dollar versus the U.S. dollar.  During the two years following March 2014, when the Debtors entered into the Second Lien Credit Agreement, the Canadian dollar weakened against the U.S. dollar by approximately 30%. Despite annual earnings improvements in the Company's Canadian operations, such improvements were insufficient to offset the weakening Canadian dollar and, accordingly, the Company's reported results in U.S. dollars depicted declining financial performance.

53.    Approximately 60% of the Company's operating profits are generated in Canadian dollars. Conversely, approximately 70% of the Company's indebtedness, including all of its borrowings and 100% of its interest expense under the Second Lien Credit Agreement, are denominated in U.S. dollars. As a result of this mismatch, upon conversion of the Company's Canadian earnings and debt to U.S. dollars, there was a larger proportional decrease in U.S.-

19

denominated earnings than there was in U.S.-denominated debt. The Company's debt covenants are reported in U.S. dollars for covenant compliance purposes and were not designed to withstand the dramatic decrease in the Canadian dollar. As a result, financial covenant defaults occurred under the terms of the Credit Agreements.

54.     Moreover, as the Canadian dollar continues to stabilize against the U.S. dollar, the Company's leverage ratio has worsened. The Canadian debt balance in the numerator of the leverage ratio calculation is expressed as a relatively higher amount because it is converted at a contemporaneous (stronger) Canadian dollar exchange rate, while the trailing twelve-month EBITDA in the denominator of the leverage ratio is expressed as a relatively lower amount because it is converted at an older (weaker) Canadian dollar exchange rate. The impact results in a higher leverage ratio calculation at a time when the covenants under the Credit Agreements require lower and reducing leverage ratios. The impact of foreign currency fluctuations on EBITDA calculations for purposes of calculating financial covenants could not be hedged and the Company could not meet its financial covenant obligations under the Credit Agreements, as described herein.

55.     Additionally, the Company's contract with a third-party shipyard to manufacture the Canadian-flagged *M/V Manitoulin* required payment in U.S. dollars. The vessel's operating and financial performance has met expectation. However, due to the decline in the Canadian dollar, its earnings when converted into U.S. dollars for covenant purposes are less than were projected. Further, when measured against the U.S.-denominated debt incurred, the contract resulted in a significant negative impact in the Company's ability to meet its financial covenants.

56.    *Capital Expenditure Costs.* From January 2017 through September 2017, the Company incurred approximately $29.2 million of capital expenditures and dry dock costs on its fleet, an amount that is nearly double the historical average for such costs on an annual basis.

57.    The primary reason for the high costs was related to expenditures on three U.S.-flagged vessels, the *Calumet II*, *Manitowoc* and *Menominee*, which all required substantial steel renewal work as part of their USCG-required Special Survey. The substantial steel renewal was precipitated by historical deferral of repair and maintenance investment in these particular vessels. It also related to the Company's election to convert certain of these vessels from Lloyd's Register to ABS Group marine safety and regulatory certification standards.  This conversion required closer inspection standards than anticipated and resulted in unplanned capital spending to increase the thickness of steel in several locations of the vessels to bring them to ABS Group standards and to comply with regulatory requirements for operations.

**B.    Mounting Liquidity Challenges**

58.    In the fall of 2016, in response to the events described above, the Company initiated efforts to raise liquidity for itself and to de-lever its balance sheet. The Company, with the assistance of certain of its advisors, began outreach to certain investors regarding the possibility of a sale.  Through their advisors, the Company contacted 38 potential investors, negotiated and executed 25 non-disclosure agreements, and sent private-side materials to 23 of such potential investors.  Despite these efforts, these contacts and engaged discussions did not result in a viable solution for the Company.

59.    Simultaneously, the Company embarked on a number of cost-reduction and operating efficiency initiatives, which primarily included the streamlining of certain functions, locations and the management structure to support the business and implementing the necessary system changes to support these initiatives.

60.    Notwithstanding continual improvements in the Company's operating and financial performance, the Company has struggled to satisfy certain leverage-related financial covenants under the First Lien Credit Agreement and Second Lien Credit Agreement as described in more detail herein. On July 14, 2017, waivers previously obtained from the First Lien Lenders and Lightship expired, resulting in the reinstatement of the previously-waived events of default under the First Lien Credit Agreement and Second Lien Credit Agreement, respectively. Following expiration of the waivers, the Company was permitted, on an interim basis, to borrow funds under the First Lien Credit Agreement at the discretion of the First Lien Lenders. The First Lien Lenders reserved their rights to the pending defaults and instituted a $15 million availability reserve on the Company's borrowing ability, and have additionally exercised their rights to control and apply the Company's receipts against the outstanding indebtedness under the First Lien Credit Agreement.

61.    During that period, the Company, as described in more detail below, also engaged with Lightship and began discussions with respect to a potential recapitalization transaction.

### C.    Formation of the Special Committee

62.    On October 31, 2017, the board of directors of Rand (the "Board") authorized and approved a special committee (the "Special Committee") comprised of three independent members of the Board to consider and explore various strategic alternatives potentially available to the Debtors in order to maximize the value of their assets.

63.    Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as legal counsel, and Miller Buckfire & Co., LLC, along with its affiliate Stifel Financial Corp. ("Miller Buckfire"), as investment banker and financial advisor, were retained to assist the Debtors in connection with considering and exploring strategic alternatives and additional matters. As described below, the Board granted authority to the Special Committee to pursue a sale process with a third party

purchaser and to engage in negotiations with Lightship regarding a debt for equity restructuring transaction.

### D.    The Approved Sale Process

64.    As part of their engagement to assist the Company with the exploration of strategic alternatives, Miller Buckfire, in consultation with the Board, Management and Akin Gump, began marketing the Company for sale on August 24, 2017. Miller Buckfire contacted over 40 strategic and financial parties, 18 of whom signed confidentiality agreements. Miller Buckfire provided such restricted parties with (i) a process letter, which specified a deadline of September 21, 2017 to submit indications of interest ("IOIs"), and (ii) access to a confidential data room. Approximately 18 of those parties conducted additional diligence and actively communicated with Miller Buckfire.

65.    On or about August 21, 2017, the Company received two IOIs to acquire the Debtors—one from a strategic party and the other from a financial party. Miller Buckfire conducted follow-up calls with both bidders to ask clarifying questions.  Subsequent to the performance of diligence, it was determined that neither bid was sufficient to provide value to holders of Existing Common Shares and Existing Preferred Shares. After consultation with the Board and Management, Miller Buckfire informed bidders that their bids were insufficient due to low value and/or incompleteness. Nevertheless, the bidders were invited to participate in further diligence meetings. The strategic bidder subsequently participated in a diligence call with Management but no further proposal was made based on incremental information received.

66.    Based on feedback received in the initial process and knowledge of the industry as a whole, Miller Buckfire observed that many strategic buyers were interested in only the U.S. business or the Canadian business, rather than in the Company consolidated as a whole. After reviewing the IOIs with the Board and Management, the Company decided to approach certain

strategic buyers about purchasing either the Company's U.S. business or the Company's Canadian business. Beginning on October 25, 2017, Miller Buckfire contacted eight parties in connection with this new marketing approach and provided a deadline of November 10, 2017 to submit IOIs. Subsequently, Management conducted three additional diligence calls to facilitate bidders' understanding of the Company's business.

67.     As of November 14, 2017, the Company had received two IOIs for certain assets of the U.S. business and two IOIs for certain assets of the Canadian business. Miller Buckfire reviewed the bids received with the Special Committee, the Board and Management. Having reviewed both the consolidated bids and the aggregate bids received to date, the Special Committee and the Board, in consultation with Management and the Company's advisors, determined that the transaction proposed by Lightship in the Company's restructuring negotiations represented the most value maximizing option available to the Company. The Board authorized the Debtors to sign the RSA described below, which allowed the Company to, concurrently with their efforts to pursue the Plan in accordance with the timeframes set forth in the RSA, continue the marketing process previously initiated by the Company to pursue a sale of the Debtors' assets or equity (the "Approved Sale Process") in a transaction that would: (i) fund the treatment under the Plan for Allowed Administrative Claims, Other Priority Claims and Allowed General Unsecured Claims; (ii) pay in Cash in full all of the Claims of the First Lien Lenders and Lightship; and (iii) pay any additional consideration to the Existing Common Shares and Existing Preferred Shares. Pursuant to the RSA, the Company was permitted to continue the Approved Sale Process through and until December 31, 2017.

68.     Following the execution of the RSA, Miller Buckfire notified bidders that the RSA had been signed and that bidders had until the end of the year to submit improved offers.

The Approved Sale Process ended at the end of 2017 and, pursuant to the RSA, the Company's marketing efforts in connection with the Approved Sale Process concluded without any further developments.

### E.    The RSA

69.    As described above, the Company engaged in negotiations with Lightship regarding a consensual deleveraging restructuring transaction while simultaneously pursuing a third party sales process. In connection therewith, the Board granted authority to the Special Committee to negotiate the RSA, the related restructuring term sheet, and transactions contemplated thereto and thereby, subject to final approval thereof by the Board.   During November 2017, the Special Committee, in consultation with its advisors, determined that the Company's liquidity did not permit the payment of a $2.8 million interest payment due on November 17, 2017 under the Second Lien Credit Agreement.

70.    Concurrently, on November 17, 2017, after many weeks of intensive negotiations, the Company and Lightship entered into the RSA.  The parties to the RSA committed to support a plan of reorganization on the terms set forth in an attached term sheet, which contemplated: (i) conversion of the Second Lien Claims to new common stock to be issued by Rand; (ii) cancellation of all existing equity interests in Rand without any distribution; and (iii) payment in Cash in full of all other claims.   The Plan ultimately filed by the Debtors reflects these fundamental terms.  In connection with the restructuring transactions contemplated by the RSA and the Chapter 11 Cases, the Company retained Conway MacKenzie Management Services, LLC ("Conway MacKenzie"), as financial advisor, and Michael S. Correra of Conway MacKenzie was appointed Chief Restructuring Officer to the Company.

71.    Although the Debtors did not commence the Chapter 11 Cases in accordance with the original milestones as set forth in the RSA, the RSA has not been terminated by either the

Debtors or Lightship.  Instead, the Debtors and Lightship negotiated a revised timetable that is reflected in the terms of the DIP Facility.  Pursuant to certain provisions in the DIP Facility, as described below, if the Debtors do not consummate the Plan by March 16, 2018, the interest rate on the DIP Facility will increase and a fee will become payable to the DIP Lender.

> **F.**     **The DIP Facility**

72.     Lightship has committed to provide a new money debtor-in-possession credit facility of up to $25 million (the "<u>DIP Facility</u>"), which will provide the Debtors with much needed liquidity to fund the working capital and operational needs of the Company, as well as the administrative and transaction costs of the Chapter 11 Cases.  The DIP Facility will be secured by liens on substantially all of the Debtors' assets on a subordinated basis to liens granted under the First Lien Credit Agreement.  Under the terms of the DIP Facility, if the Plan is not consummated by March 16, 2018, (i) the interest rate of the DIP Facility increases from 6.0% to 12.0% and shifts from payable in kind to payable in Cash, and (ii) a $500,000 fee becomes payable in kind.  Further, from the Petition Date through March 16, 2018, the First Lien Lenders have agreed to, among other things, (i) forbear from taking any enforcement action with respect to the Canadian Subsidiaries, and (ii) hold all cash collateral, both of the Debtors and the Non-Debtor Affiliates, in reserve.

> **G.**     **The Exit Facility**

73.     On the Effective Date of the Plan, the Reorganized Debtors and certain of the Non-Debtor Affiliates shall enter into the Exit Facility.  The terms of the Exit Facility will be set forth in the Exit Facility Documents, which will be consistent with the Exit Facility Term Sheet, attached to the Disclosure Statement as Exhibit F, and otherwise in form and substance acceptable to the Debtors and Lightship.

**H.      The Chapter 11 Cases**

74.      The Company operates in a seasonal waterway system. The cold weather patterns on the Great Lakes during the winter season contribute to lock closures, waterway ice, and customer facility closings.   These conditions typically shut down Great Lakes shipping for a period of up to approximately ninety days, commencing from late December until late March or early April, depending on weather conditions. During the winter seasons, the Company's vessels have limited operations and reduced personnel on board while it completes the fit-out process. By mid-March, personnel return to the vessels and supplies are provisioned in anticipation of commencing routine revenue-generating operations for the sailing season.   Accordingly, the Debtors believe it is crucial for the Plan to be consummated well in advance of the commencement of the sailing season, which historically occurs on or about April 1, so that the Debtors' fleet can transition smoothly to the sailing season.

75.      Accordingly, filing the Chapter 11 Petitions on the Petition Date, with the decreased shipping activity on the Great Lakes, should minimize any disruptions to the Debtors' customers, suppliers, vendors and employees, and should allow the Debtors to emerge from the Chapter 11 Cases by the spring of 2018 with a healthy balance sheet.

**V.      First Day Motions**

76.      To enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their ongoing business operations, the Debtors have requested various forms of relief in their First Day Motions.   Summaries of the First Day Motions, and the facts necessary to support the First Day Motions, are set forth in **Exhibit B**.   Generally, the First Day Motions seek authority to, among other things, obtain debtor-in-possession financing on an interim basis and ensure the continuation of the Debtors' cash management system and other business operations without interruption.   Obtaining Court approval of the relief sought in the

27

First Day Motions is essential to the Debtors' ability to work toward a successful restructuring that will benefit all of the Debtors' constituents, preserve customer relationships, and maintain employee morale.

77.      Several of the First Day Motions request authority to satisfy certain prepetition obligations.  I am advised by counsel that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have tailored their requests for immediate authority to pay certain prepetition claims in those circumstances where failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

78.      I have reviewed each of the First Day Motions.  The facts stated therein and in **Exhibit B** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in restructuring the Debtors' business successfully.

79.      For the reasons stated in **Exhibit B** and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in their entirety, together with such other and further relief as this Court deems just, proper, and equitable.

*(Remainder of page intentionally left blank)*

28

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: January 29, 2018

Respectfully submitted,

Mark S. Hiltwein

## Exhibit A

### Organizational Structure Chart

**EXHIBIT A**



## **Exhibit B**

**First Day Motion Summaries**

# FIRST DAY MOTIONS[1]

## I.    Financing Motions

**A.    Motion of Debtors for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Adequate Protection to the Prepetition Second Lien Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "DIP Motion")**

1.    By the DIP Motion, the Debtors request entry of interim and final orders (collectively, the "DIP Orders"), authorizing the Debtors to enter into a new money debtor-in-possession credit facility of up to $25 million (the "DIP Facility") with Lightship as DIP Lender. The Debtors request authority to borrow the full $25 million on an interim basis, with (a) $10 million to be immediately funded upon entry of the Interim Order to meet the Debtors' immediate cash needs, and (b) the remainder becoming available on the terms and conditions set forth in the DIP Credit Agreement. The DIP Facility will be secured by liens on substantially all of the Debtors' assets on a subordinated basis to liens granted under the First Lien Credit Agreement.  The DIP Motion does not seek the use of cash collateral; rather, from the Petition Date through March 16, 2018, the First Lien Lenders have agreed to, among other things, hold all cash collateral, both of the Debtors and the Non-Debtor Affiliates, in reserve subject to all parties reserving their respective rights.

2.     The Debtors are unable to continue their business operations absent debtor-in possession financing.  The DIP Facility will provide the Debtors with much needed liquidity to fund the working capital and operational needs of the Company, as well as the administrative and transaction costs of the Chapter 11 Cases.  Attached to the Interim DIP Order as Exhibit 2 and incorporated herein by reference is a budget reflecting the Debtors' projected cash receipts and

---

[1]    Capitalized terms used but not otherwise defined in the summaries of the First Day Motions provided in this Exhibit B shall have the meanings ascribed to such terms in the relevant First Day Motion.

disbursements through the week of March 16, 2018. These projections demonstrate that the Debtors could not pay their necessary expenses during the pendency of these Chapter 11 Cases, which include their obligations to their employees, consultants, vendors, and other working capital and operational needs. The Debtors need debtor-in-possession financing to continue operating and complete the de-leveraging restructuring pursuant to the Plan that will maximize value for the Debtors' estates. Absent the relief requested in the DIP Motion, the Debtors will not have sufficient cash on hand to satisfy payroll and other obligations and, accordingly, the Debtors have an immediate need for access to the DIP Facility.

3.     The Debtors require immediate access to the full amount available under the DIP Facility because the Debtors will not have access to cash collateral through March 16, 2018 subject to the agreement with the Prepetition First Lien Secured Parties described above. Such relief is particularly important because, under the terms of the DIP Facility, if the Plan is not consummated by March 16, 2018, (i) the interest rate of the DIP Facility increases from 6.0% to 12.0% and shifts from payable in kind to payable in Cash, and (ii) a $500,000 fee becomes payable in kind. The Debtors intend to consummate the Plan by March 16, 2018 and to accomplish all of the tasks necessary to achieve that result within that timeframe.

4.     I believe that the DIP Credit Agreement represents the best terms currently available to the Debtors. Without access to the DIP Facility, I believe that the Debtors will not be able to meet their direct operating expenses and would suffer a severe disruption of their operations. For the reasons set forth above, in the DIP Motion, and in the declaration of Kevin Haggard submitted in support of the DIP Motion, the Debtors submit, and I believe, that the relief requested in this motion is in the best interests of the Debtors, their estates, and their creditors, and therefore should be approved.

2

**B.    Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions, (B) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests, and (C) Granting Related Relief (the "<u>Cash Management Motion</u>").**

5.    By the Cash Management Motion, the Debtors seek (a) authority to (i) continue to operate their Cash Management System (defined below), (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms, and (iv) continue to perform intercompany transactions and granting administrative expenses status; (b) to direct the Debtors' banks to honor all related payment requests; and (c) related relief.

6.    The Debtors, together with their Non-Debtor Affiliates, maintain an integrated cash management system (as described herein, the "<u>Cash Management System</u>") to operate their business in the ordinary course.  The Cash Management System is comparable to the centralized cash management system used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors and their Non-Debtor Affiliates use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' accounting department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

7.    The Debtors and their Non-Debtor Affiliates conduct business in both the United States and Canada and have receivables and payables in both countries and currencies.  The Debtors receive funds from customers and pay funds to creditors by wire, ACH transfer, and other similar means, as well as by check.  The Debtors also utilize credit card accounts through

3

American Express Credit Card Company and PNC (as defined below) to pay for travel, small purchases from vendors, and other small miscellaneous purchases. The Debtors also conduct transactions between and among themselves and the Non-Debtor Affiliates through wires, cash transfers and automated debits and credits.

8.     The Debtors' Cash Management System is comprised of 12 bank accounts (the "Bank Accounts"), located at various financial institutions (collectively, the "Banks"). The Debtors maintain Bank Accounts at two banks in the United States: Bank of America, NA ("Bank of America") and PNC Bank, National Association ("PNC"), with the majority of the Bank Accounts residing at Bank of America. The Bank Accounts center on a concentration account that received deposits and advances under the First Lien Credit Agreement prior to the Petition Date. The Debtors disburse funds from the concentration account to pay for day-to-day operations of the Debtors' businesses, as described below.

### i.     Bank Accounts

9.     *Concentration Account*: The Debtors maintain a concentration account at Bank of America (Account *9678) (the "Concentration Account") that is owned by Lower Lakes Transportation. Funds are transferred from the Concentration Account either (a) physically by the controller to one disbursement account, or (b) automatically to various zero balance disbursement accounts (collectively, the "Disbursement Accounts") to fund petty cash, payroll, vendor payments, credit cards and other day-to-day operations of the various Debtor entities.

10.     *Bank of America Disbursement Accounts*: The Debtors maintain various Disbursement Accounts at Bank of America that are described below:

- A disbursement account (Account *3888) owned by Lower Lakes Transportation that receives funds from the Concentration Account for paying expenses associated with Lower Lakes Transportation operations.

- A disbursement account (Account *3901) owned by Grand River that receives funds from the Concentration Account for paying expenses associated with Grand River operations.

- A disbursement account (Account *9692) owned by Rand Finance Corp. ("RFC") that receives funds from the Concentration Account for paying expenses associated with RFC operations.

- A disbursement account (Account *9697) owned by Rand that receives funds from the Concentration Account for paying expenses associated with Rand operations.

- A disbursement account (Account *9710) owned by Black Creek Shipping Company, Inc. and a disbursement account (Account *9715) owned by Black Creek Shipping Holding Company, Inc., both of which have minimal account activity

11.    *Bank of America Lockbox Account*:   The blocked lockbox account (Account *9673) (the "Lockbox Account") owned by Lower Lakes Transportation is used as a collection account for customer deposits (ACH transfers, wires, and checks).   Prior to the Petition Date, funds deposited into the Lockbox account were automatically swept to pay down amounts outstanding under the First Lien Credit Agreement.   I understand that, pursuant to an agreement among the Debtors and their prepetition secured lenders regarding the use of cash collateral, the funds that are received in the Lockbox Account will be held in reserve pending further order of the Court.

12.    *PNC Bank Accounts*:   The Debtors also maintain Bank Accounts at PNC, including a deposit account and three zero balance disbursement accounts, described below.

- A deposit account (Account *9024) owned by Lower Lakes Transportation (the "PNC Deposit Account") that receives customer deposits.   Deposits into this account are either transferred to the Concentration Account for purposes described above or transferred to one of the disbursement accounts described below.

- A zero balance disbursement account (Account *9016) owned by Lower Lakes Transportation that receives funds from the PNC Deposit Account for paying expenses associated with Lower Lakes Transportation operations.

5

- A disbursement account (Account *9008) owned by Grand River that receives funds from the PNC Deposit Account and Concentration Account, and is used to pay down PNC credit cards in USD.  In addition, funds in this disbursement account can be automatically exchanged from USD to CAD and transferred to a CAD zero balance disbursement account (Account *3565) for paying Grand River vendors in CAD.

13.    *Non-Debtor Affiliate Accounts*.  As noted above, the Debtors and the Non-Debtor Affiliates conduct business in both the United States and Canada.  The Non-Debtor Affiliates maintain numerous bank accounts at institutions in Canada and, as set forth in greater detail below, the Debtors periodically transfer money from the Bank Accounts maintained by the Debtors to those maintained by the Non-Debtor Affiliates and vice versa.  Such intercompany transfers are critical to the operation of the Company's business.

14.    *Business Forms*.  As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of the Chapter 11 Cases, I believe it is in the best interests of the Debtors to continue use of all correspondence and Business Forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

15.    *Intercompany Transactions*. In the ordinary course of business, the Debtors maintain business relationships and engage in transactions with the other Debtors and the Non-Debtor Affiliates resulting in intercompany receivables and payables in the ordinary course of

6

business (the "<u>Intercompany Transactions</u>" and claims arising from such Intercompany Transactions, the "<u>Intercompany Claims</u>").    The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.    The Debtors monitor the cash balances of the Bank Accounts daily in light of anticipated cash receipts and payment obligations.    If the funds in one of the Bank Accounts are determined to be insufficient to meet anticipated payment obligations, the Debtors will make a transfer from another Bank Account that it deems appropriate.

16.    In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or by one Debtor to a Non-Debtor Affiliate.    Certain Intercompany Claims are settled in cash while most are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.    By including domestic and foreign bank accounts owned by both the Debtors and the Non-Debtor Affiliates, I believe the Cash Management System supports the Debtors' U.S. and Canadian operations by increasing the Debtors' operational efficiency and ensuring compliance with local laws and regulations in both the U.S. and Canada.    Moreover, because the Non-Debtor Affiliates are subsidiaries of the Debtors, continuing to keep those entities financially secure generally inures to the benefit of the Debtors' estates and creditors.    I believe that if Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

## II.    Operational Motions

**C.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, (B) Pay Prepetition Payroll Taxes and Benefits and Continue Benefit Programs in the**

**Ordinary Course, and (C) Direct Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing (the "<u>Wages Motion</u>")**

17.     By the Wages Motion, the Debtors seek authority to (i) pay prepetition wages, salaries, and other compensation, (ii) pay prepetition payroll taxes and benefits and continue benefit programs in the ordinary course, and (iii) direct banks and financial institutions to pay all checks and electronic payment requests made by the Debtors relating to the foregoing.

18.     In the ordinary course of business, the Debtors rely on the services of employed personnel (each, an "<u>Employee</u>") and contracted personnel (each, an "<u>Independent Contractor</u>") to conduct the operations of their business.

19.     As of the Petition Date, the Debtors employ approximately 196 Employees.[2]  The majority of the Employees provide operational and maintenance services to the Debtors' vessels, with the remaining Employees providing a variety of management, administrative, and other support services, primarily at the Debtors' headquarters in Jersey City, New Jersey.  The Employees' skills and knowledge of the Debtors' operations are essential to the Debtors' business.  Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible.

20.     Employees work on a full or part-time basis and are compensated by an annual salary, hourly wage, or daily rate, as applicable.  The Debtors' shipside Employees are unionized (the "<u>Unionized Employees</u>") with the International Organization of Masters, Mates and Pilots, AFL-CIO ("<u>MMP</u>").

21.     From time to time and in the ordinary course of business, the Debtors also contract with Independent Contractors for various services.  As of the Petition Date, the Debtors employ one Independent Contractor.

---

[2]     Collectively with the Non-Debtor Affiliates, the Debtors employ approximately 501 Employees.

22.    The Debtors estimate that they owe an aggregate of approximately $670,600 on

account of Payment and Program Obligations (as defined below) incurred prior to the Petition

Date, which the Debtors seek authority to pay pursuant to the Wages Motion.  These prepetition

obligations are summarized in the following chart, and the specific types of Payment and

Program Obligations are described in further detail below.

| Prepetition Obligations | Category[3] | Description | Interim Relief Requested |
|---|---|---|---|
| Payment Obligations | Workforce Compensation | Employees' and Independent Contractors' salaries, wages, and other compensation | $335,700 |
| | Expense Reimbursements | Prepayment or reimbursement of certain expenses that Employees and Independent Contractors incur in performing their business-related duties | $3,000 |
| | Payroll Taxes and Withholdings | Certain withholdings including payroll taxes owed pursuant to local, state, federal, and foreign law | $232,000 |
| Program Obligations | Employee Benefit Programs | Certain health insurance, welfare, and related benefit plans | $100,000 |
| **TOTAL** | | | **$670,600** |

23.    *Payment Obligations*.  The Debtors provide certain wages, salaries, and other

compensation to Employees and Independent Contractors (exclusive of the applicable deductions

and exclusions detailed below, the "Workforce Compensation").   In addition, the Debtors

provide certain allocations and/or reimbursements for expenses incurred while the Employees

and  Independent  Contractors  perform  their  business-related  duties  (the  "Expense

Reimbursements").  Workforce Compensation and Expense Reimbursements, collectively with

---

[3]    Capitalized terms not defined in the chart are defined below.

the Payroll Taxes and Withholdings (each defined below), and any related obligations and administrative expenses, are referred to as the "Payment Obligations."

24.     The Debtors' next regularly-scheduled payroll run will occur on January 31, 2018.   Employees are paid on a bi-monthly basis.   I understand that the Debtors' average aggregate net compensation (i.e., exclusive of the applicable Payroll Taxes and Withholdings noted below) for wages and salaries per pay period is approximately $844,453.   As of the Petition Date, I understand that a total of approximately $290,000 in Workforce Compensation, exclusive of Payroll Taxes and other Withholdings, has accrued but remains unpaid.

25.     The Debtors pay approximately $5,000, in the aggregate, in salary each month for the services of Independent Contractors.   As of the Petition Date, I understand that the Debtors do not believe that any Workforce Compensation with regard to the Independent Contractors has accrued and remains unpaid.

26.     *Service Awards*.    The Debtors pay the Unionized Employees additional Workforce Compensation to award length of service with the Debtors (the "Service Awards Program").   The Unionized Employees earn the awards on each anniversary of their start date after two years of service has accrued.   As of the Petition Date, the Debtors estimate that there exists $44,100 in accrued but unpaid Service Awards Program bonuses payable to approximately 60 Employees, which the Debtors seek authority to continue paying in the ordinary course of business.

27.     *Expense Reimbursements*.   In the ordinary course of business, the Debtors provide their Employees and certain other compensated individuals with Expense Reimbursements to either prepay or reimburse those individuals for certain expenses incurred while performing their duties on the Debtors' behalf (the "Reimbursable Expenses").   The Debtors estimate that they

10

spend approximately $8,000 in Expense Reimbursements per week.  As of the Petition Date, I understand that the Debtors have received, but not paid, Expense Reimbursements requests totaling approximately $3,000.

28.    *Payroll Taxes and Other Withholdings*.    For each applicable pay period, the Debtors are required by law to (i) withhold certain amounts from Employees' wages on account of, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, local, or foreign taxing authorities, and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (collectively, the "Payroll Taxes").    The Debtors estimate that they withhold, on average, approximately $338,000 per month in Payroll Taxes from Employees' paychecks, collectively. The Debtors estimate that, as of the Petition Date, there are accrued but unpaid Payroll Taxes in the amount of approximately $221,000.

29.    In the ordinary course of processing payroll checks for Employees, the Debtors may be required by law to withhold from certain Employees' wages amounts for garnishments, including tax levies, child support, court-ordered garnishments, and allotments (collectively, "the Withholdings").  I understand that the Debtors withhold approximately $11,000 per month for these obligations, and estimate that, as of the Petition Date, there are withholdings totaling approximately $11,000 that have been withheld from Workforce Compensation but have not yet been remitted to the applicable third party.

30.    *Board Compensation*.    Board Members of the Board of Rand each receive compensation for their service (collectively, the "Board Compensation").  The Board Members, with the exception of Edward Levy (who also serves as Rand Chief Executive Officer and

President), are not included in the Employee headcount given above.  For fiscal year 2018, each Board Member, other than the chairman of the Board, will receive an annual retainer equal to $80,000, of which approximately 37.5% will be share-based compensation.  For fiscal year 2018, the chairman of the Board will receive $125,000, of which approximately 32% will be share-based compensation.   Board Compensation is paid on a quarterly basis.

31.     The Debtors anticipate that they will be required to pay Board Compensation in the amount of approximately $150,000 in March 2018.  While the Debtors do not expect this amount to come due during the pendency of the Chapter 11 Cases, the Debtors are seeking authority to pay the Board Compensation as part of the Wages Motion.

32.     *Employee Programs*.  The Debtors also provide certain Employees (and their dependents) with access to a variety of benefits programs.  These Employee benefits programs (collectively, the "Employee Programs" and, together with the Payment Obligations, the "Payment and Program Obligations") include, but are not limited to: (i) medical, prescription drug, dental, and vision care insurance and health savings plans; (ii) life, accidental death and dismemberment, short-term disability, and long-term disability insurance; (iii) workers' compensation insurance; and (iv) retirement investment plans.[4]   As of the Petition Date, I understand the Debtors estimate that the aggregate accrued and unpaid obligations in connection with the Employee Programs total approximately $100,000.

33.     *Medical and Other Health Plans*.  The Debtors have two medical plans: (i) a plan provided by Oxford Health (the "Oxford Plan"); and (ii) a plan provided by MMP (the "MMP Plan" and, together with the Oxford Plan, the "Employee Medical Plans").   The Employee

---

[4]     Where required under applicable non-bankruptcy law, including COBRA, the Debtors provide eligible Employees with the opportunity to continue participating in the applicable Employee Programs following their termination by the Debtors. The Debtors intend for the relief requested herein to apply to such former employees consistent with the Debtors' prepetition practices and the requirements of applicable law.

Medical Plans provide certain Employees with prescription drug, dental, and vision coverage and health savings plans, among other benefits.  The Debtors estimate their monthly premium payments, including monthly administrative fees, under the Oxford Plan to be approximately $60,000.  The MMP Plan's monthly premiums total approximately $100,000.  There are currently approximately 34 Employees enrolled in the Oxford Plan and 210 Employees enrolled in the MMP Plan.

34.    As of the Petition Date, I understand that the Debtors estimate that they owe approximately $100,000 on account of accrued but unpaid claims, fees, and other obligations under the Employee Medical Plans.

35.    *Life, Accidental Death and Dismemberment, and STD and LTD Insurance.*  The Debtors provide basic life, accidental death and dismemberment, short-term disability, and long-term disability insurance plans (collectively, the "Insurance Plans") to certain Employees. Principal Financial Group and Desjardins Group administer the Insurance Plans.  Approximately 39 Employees are enrolled in the Insurance Plans.

36.    The Debtors' monthly premiums on account of the Insurance Plans total approximately $85,000.  As of the Petition Date, the Debtors do not currently estimate that they owe any amount in accrued but unpaid obligations on account of the Insurance Plans.

37.    *Retirement Investment Plans*.  The Debtors maintain 401(k) plans (the "401(k) Plans") for the benefit of certain eligible Employees.  ADP administers the 401(k) Plans.  As of the Petition Date, 95 eligible Employees participate in the 401(k) Plans.  The Debtors match Employees' contributions under the 401(k) Plans, and estimate that they will spend $1,230,450 in matching contributions in 2018.  As of the Petition Date, the Debtors estimate that they owe $113,052 in matching contributions on account of the 401(k) Plans.  The Debtors pay ADP

13

approximately $7,000 a year in fees to administer the 401(k) Plans.  As of the Petition Date, I understand that the Debtors do not estimate that any amounts in connection with the 401(k) Plans have accrued but remain unpaid.

38.      Through the requested relief in the Wages Motion, the Debtors seek to honor their Payment and Program Obligations.  I believe the vast majority of the Employees rely exclusively on their compensation to pay their daily living expenses.  The Payment and Program Obligations are critical components of the Employees' total compensation package, and if the Debtors are not permitted to honor their outstanding Employee obligations, I believe many Employees will be exposed to significant financial difficulties.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale will be jeopardized at a time when Employee support is critical. Any resulting loss in workforce could significantly hinder the Debtors' efforts to successfully reorganize in a controlled, efficient and value-maximizing manner.  It is essential that the Debtors continue to honor their Payment and Program Obligations.

39.      I believe that the relief requested is in the best interests of the Debtors' estates and will enable the Debtors to avoid immediate and irreparable harm to their estates.  The Debtors cannot effectively reorganize on the terms set forth in the Plan absent the full cooperation and engagement of their Employees, which requires continuation of the Payment and Program Obligations.  Accordingly, I respectfully submit that the Wages Motion should be approved.

**D.      Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Claims in the Ordinary Course of Business and (B) Granting Related Relief (the "<u>Prepetition Claims Motion</u>")**

40.      By the Prepetition Claims Motion, the Debtors seek entry of an order authorizing them, in their sole discretion, to pay in the ordinary course of business allowed prepetition claims (collectively, the "<u>Claims</u>") of certain general unsecured creditors and creditors whose Claims may give rise to liens under certain state and federal laws (collectively, the "<u>Creditors</u>"),

14

including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships with Creditors.  Specifically, the Debtors seek authorization to pay prepetition amounts owed to the Creditors on account of the Claims in an aggregate amount not to exceed $3.010 million.

41.    Additionally, the Debtors seek that an order requiring that (a) a Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, contractual terms ("Customary Terms") during the pendency of the Chapter 11 Cases that are at least as favorable as those terms existing as of the Petition Date as a condition to receiving any payment under the order, and (b) if a Creditor, after receiving a payment under the order, ceases to provide its Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor and then take any and all appropriate steps to cause such Creditor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Creditor.

42.    *The Prepetition Claims*.  Certain of the Debtors' Creditors provide goods and services in the ordinary course of business including, among other things, parts, equipment and other marine supplies, marine fuel and petroleum products, shipping, warehousing, information technology and telecommunications services, financial services, leases of property and equipment, electricity, water, natural gas and other utility services, port access charges, fleet certification and licensing fees, vessel maintenance and repair services, food and other vessel provisions, legal services, human resources services, travel, consulting and advisory services, and other basic business necessities for the operation of the Debtors' business.  Correspondingly, I understand that the Debtors incur as Claims numerous fixed, liquidated, and undisputed

payment obligations to the Creditors in the ordinary course of business that aggregated to approximately $4.3 million per month on average for the six months prior to the Petition Date.

43.    The following table contains summary descriptions of the Claims and the Debtors' estimate of the amounts of the Claims accrued as of the Petition Date:

| Category | Description | Approximate Amount Accrued as of Petition Date[5] |
|---|---|---|
| Equipment, Supplies, and Services | Equipment, supplies, and services provided in the operation of the Debtors' vessels | $1.1 million |
| Capital Expenditures | Suppliers, service providers, and vendors relating to vessel capitalized maintenance and repairs | $1 million |
| Real Property | Real estate leasing and facilities maintenance and related expenses | $120,000 |
| Legal, Operations, Financial, and Human Resources | Legal firms and services, general operations, telecommunications, and human resource services, labor relations, accounting, audit, tax, and other financial services | $290,000 |
| Foreign Vendors | Manufactured goods and third party services | $400,000 |
| Other | Other vendors and suppliers | $100,000 |
| **Total** | | **$3,010,000** |

44.    The goods and services provided by the Creditors are essential for the continued and uninterrupted operation of the Debtors' business.  Failure to pay the Claims as they become due is likely to result in some Creditors refusing to provide essential goods and services and/or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.  Nonperformance by Creditors could materially disrupt the Debtors' operations and adversely impact the value of the Debtors' business to the detriment of all parties in interest in these Chapter 11 Cases.

---

[5]    Estimates are based on balances as of January 22, 2018, as adjusted for identified transactions and payments since that date.

16

45.     As of the Petition Date, I understand that the Debtors owe a total of approximately $3.010 million on account of undisputed Claims (other than amounts owing for wages, taxes, and insurance).[6]  The Debtors are not seeking to pay these amounts immediately; rather the Debtors will pay such amounts as they become due and payable in the ordinary course of the Debtors' business.

46.     The Debtors seek to pay through the order prepetition amounts owed to the Creditors on account of the Claims in an aggregate amount not to exceed $3.010 million.  Under the Plan, these undisputed Claims are unimpaired and will be paid in full or reinstated. Furthermore, I understand that certain Claims (i) will likely be entitled to statutory priority under the Bankruptcy Code or (ii) may give rise to maritime, shippers, warehousemen, mechanics, or other liens against the Debtors' property if the Debtors fail to satisfy such obligations. Accordingly, because the relief requested in the Prepetition Claims Motion seeks to alter only the timing, not the amount or priority, of such payments, I believe that granting the relief requested therein will not prejudice any other parties in interest, is in the best interests of the Debtors and their estates, and should be granted.

**E.     Motion of the Debtors for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities (the "<u>NOL Motion</u>")**

47.     By the NOL Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to establish notification and hearing procedures regarding the trading of, or declarations of worthlessness for federal or state tax purposes with respect to, certain Equity Securities of Rand, and (ii) ordering that any purchase, sale, or other transfer of, or declaration of

---

[6]     As described herein, the Debtors have separately filed motions requesting approval to pay amounts owing on account of prepetition wages, taxes, and insurance.

worthlessness with respect to, Equity Securities in violation of the procedures set forth below shall be void *ab initio*.

48.     *The Debtors' Net Operating Losses*.  I understand that the Debtors have incurred U.S. federal income tax net operating losses ("NOLs") amounting to approximately $69,266,039 as of the Petition Date.  Pursuant to sections 59(e) and 172(b) of the Internal Revenue Code of 1986, as amended (the "IRC") and the United States Department of Treasury Regulations promulgated thereunder (the "Treasury Regulations"), the Debtors may be able to carry back and then forward NOLs, tax credits, and other tax attributes (the "Tax Attributes") to offset future taxable income and tax liability so that they may obtain a cash refund and improved liquidity in the future.  The Debtors' NOLs consist of losses generated in individual tax years, each of which can be "carried forward" to offset the Debtors' future taxable income and reduce future aggregate tax obligations.  These NOLs could translate into future reductions of the Debtors' federal income tax liabilities.  These tax savings could substantially enhance the Debtors' cash position for the benefit of parties in interest and contribute to the Debtors' efforts to maximize value for the benefit of their stakeholders.

49.     The relief sought in the NOL Motion will protect and preserve the Debtors' valuable Tax Attributes, ultimately benefitting all stakeholders.  I understand that, if no restrictions on trading or worthlessness deductions are imposed by the Court, such trading or deductions could severely limit or even eliminate the Debtors' ability to use their Tax Attributes—a valuable asset of the Debtors' estates—which could lead to significant negative consequences for the Debtors, their estates, the Debtors' stakeholders, and the overall reorganization process.  Failure to obtain the relief sought in this motion will greatly increase the risk that the Debtors will be unable to make use of their Tax Attributes.

50.    *Equity Securities Trading Procedures and Restrictions*.   The Debtors' ability to use the Tax Attributes is subject to certain statutory limitations.  Section 382 of the IRC limits a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the IRC (such an ownership change, an "Ownership Change").  For example, if (a) too many 5% or greater blocks of any class of Equity Securities are created, or (b) too many shares are added to or sold from 5% or greater blocks of any class of a corporation's equity, such that, together with previous trading by 5% shareholders during the preceding three year period, an Ownership Change could be triggered prior to emergence from bankruptcy and outside the context of a confirmed chapter 11 plan.  Likewise, if a 50% or greater shareholder (a "50% Shareholder") of any class of Equity Securities were, for federal or state tax purposes, to treat such equity as having become worthless prior to the emergence from chapter 11 protection, such a claim could trigger an ownership change under IRC section 382(g)(4)(D), thus causing an adverse effect on any tax attributes.

51.    The relief requested in the NOL Motion would establish certain procedures (collectively, the "Equity Trading Procedures")  for continuously monitoring the trading of all classes of Equity Securities, so that the Debtors can preserve their ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of their Tax Attributes.  These Equity Trading Procedures are designed to protect the Debtors from losing the benefit of all or any portion of their NOLs in connection with transfers of Equity Securities that may trigger an Ownership Change and/or severely limit the Debtors' ability to use their NOLs to shelter any taxable income or gain resulting from any sale of assets in the course of the Chapter 11 Cases.

52.     The Debtors also seek authority to establish certain procedures (collectively, the "Worthless Stock Deduction Procedures") restricting the ability of a 50% Shareholder to claim a deduction for the worthlessness of those securities on their federal or state tax returns for a tax year ending before the Debtors emerge from chapter 11 protection.

53.     With respect to the Equity Trading Procedures and Worthless Stock Deduction Procedures, the Debtors have limited the relief requested in the NOL Motion to the extent necessary to preserve estate value.  Specifically:  (a) as to stock trading, the requested relief will affect only holders of 4.5% or more of each class of outstanding Equity Securities and parties who are interested in purchasing sufficient shares of any class of Equity Securities to result in such party becoming a holder of the equivalent of at least approximately 4.5% of the outstanding shares in that class of Equity Securities or who are interested in disposing of sufficient shares of any class of Equity Securities to result in such party ceasing to be a holder of 4.5% of such class of outstanding Equity Securities; and (b) as to worthless stock deductions, the proposed relief will affect only holders of the equivalent of fifty-percent (50%) or more of any class of the Debtors' Equity Securities.  Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

**F.      Motion of the Debtors for Entry of an Order (I) Authorizing the Payment of Certain Taxes; (II) Authorizing Financial Institutions to Honor and Process All Checks and Electronic Payment Requests Related to the Foregoing; and (III) Granting Related Relief (the "Taxes Motion")**

54.     By the Taxes Motion, the Debtors request authority to pay outstanding Taxes (as defined below).  The Debtors seek authority to pay $15,000 on account of Taxes that are due and owing as of the Petition Date.  The Debtors also seek authority pursuant to the Proposed Order to remit and pay any Taxes, regardless of whether those amounts accrued before the Petition Date, in the ordinary course of business.

55.     In the ordinary course of business, the Debtors (i) incur income, franchise, and other taxes (collectively, the "Taxes") in the operation of their business, and (ii) pay or remit such Taxes to various taxing and other governmental authorities (collectively, the "Authorities"). The Debtors pay or remit, as the case may be, the Taxes as incurred or monthly, quarterly, semi-annually, or annually to the respective Authorities, as required by applicable laws and regulations.

56.     The Taxes generally fall into the following categories, each as more fully described in the Taxes Motion: Income Taxes; Franchise Taxes; and Miscellaneous Taxes.  The Debtors estimate that approximately $15,000 is due and owing to the Authorities as of the Petition Date.

57.     As of the Petition Date, I understand that the Debtors (a) do not currently estimate any amounts due with respect to Income Taxes and Miscellaneous Taxes, and (b) estimate approximately $15,000 in Franchise Taxes relating to periods prior to the Petition Date is due and owing to the Taxing Authorities as of the Petition Date.  Accordingly, the Debtors seek authority to pay up to $15,000 on account of Taxes that are due and owing as of the Petition Date, and all remaining prepetition amounts in the ordinary course of business.  Additionally, out of an abundance of caution, to the extent that the Debtors have (i) miscalculated the amounts due, (ii) paid an amount that was less than is actually owed, or (iii) made any payments prepetition that were rejected, lost, or otherwise not received in full by any Authority, the Debtors request authority to pay any additional amounts that may come due.

58.     I understand that the Debtors' failure to pay the Taxes could adversely affect the Debtors' business operations because, among other things, (i) the Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their business which, even if unsuccessful,

would unnecessarily divert the Debtors' attention away from reorganization and the implementation of the Plan, (ii) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates, and (iii) certain directors and officers might be subject to personal liability—even if such a failure to pay such Taxes was not a result of malfeasance on their part—which could cause the Debtors' estates to incur indemnification liability or could deplete insurance policy proceeds, and would undoubtedly distract these key employees from their duties related to the Debtors' restructuring. Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

     **G.**     **Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Maintain their Existing Insurance Programs on an Uninterrupted Basis in Accordance with Historical Practices and (B) Pay All Premiums, Deductibles, Reimbursable Obligations and Advances, Fees, and Other Obligations in Respect thereof; (II) Authorizing Financial Institutions to Honor and Process All Checks and Electronic Payment Requests Related to the Foregoing; and (III) Granting Related Relief (the "<u>Insurance Motion</u>")**

59.     By the Insurance Motion, the Debtors request entry of an order (i) authorizing the Debtors to (a) maintain their existing insurance programs on an uninterrupted basis in accordance with their historical practices and (b) pay all premiums, deductibles, reimbursable obligations and advances, fees, and other obligations in respect thereof, (ii) authorizing financial institutions to honor and process all checks and electronic payment requests related to the foregoing, and (iii) granting related relief.

60.     *The Insurance Programs.*  In connection with the operation of their business, the Debtors maintain comprehensive insurance programs (collectively, the "<u>Insurance Programs</u>") administered by different insurance carriers and clubs (collectively, the "<u>Insurance Carriers</u>"). These Insurance Programs protect the Debtors' personnel and vessels against accident-related risks, potential business interruptions, and other inherent liabilities that arise from owning and

operating vessels in international trade.  These Insurance Programs include the following types of coverage, each as further described in the Insurance Motion: (i) protection and indemnity; (ii) hull and machinery; (iii) hull and machinery increased value; (iv) war risk; (v) commercial property; (vi) workers' compensation; and (vii) directors' and officers' policies.

61.     *The Insurance Obligations*.  During the ordinary course of business, the Debtors incur certain obligations relating to the Insurance Programs (the "Insurance Obligations").  The different categories of Insurance Obligations include the following: (i) fixed-rate premiums based on negotiated rates with each Insurance Carrier, which are generally payable on a quarterly or annual basis; (ii) deductibles and other fees related to the Insurance Programs; and (iii) payments to insurance broker Marsh & McLennen Companies, Inc., which assists the Debtors with the procurement and negotiation of the balance of the Insurance Programs.

62.     I understand that during the 12 months preceding the Petition Date, the Insurance Obligations paid by the Debtors include (i) approximately $1.5 million of premiums, (ii) approximately $100,000 in deductibles, and (iii) approximately $132,000 in broker's fees.  As of the Petition Date, the Debtors do not expect any prepetition amounts to be outstanding on account of the Insurance Obligations.  The Debtors are scheduled to pay approximately $176,000 of premiums in March 2018, and the Debtors expect to pay premiums, deductibles, reimbursable obligations and advances, and brokers' fees during the anticipated timeframe of these Chapter 11 Cases as and when they come due.

63.     I believe that the continuation of the Insurance Programs on an ongoing and uninterrupted basis is essential to the preservation of the value of the Debtors' business, properties, and assets, and to a successful reorganization of the business.  Moreover, in many cases, coverage provided by the Insurance Programs is required by the regulations, laws, and

contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee. Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

### III.     Procedural Motions

**A.     Motion of the Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) (the "Joint Administration Motion")**

64.      By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration and consolidation of the Chapter 11 Cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case of Rand. The Debtors also request an entry on the docket of Rand to reflect the joint administration of the Chapter 11 Cases.

65.      Numerous parties have interests in the cases of multiple Debtors. Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each and every Debtor entity. Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's valuable resources. Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency. No party in interest will be prejudiced by the joint administration of the Chapter 11 Cases. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted.

**B.     Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to File (I) a Consolidated List of Creditors and (II) a Consolidated List of Debtors' Top Twenty Creditors; (B) Extending the Deadline and, upon Plan Confirmation, Waiving the Requirement to File Schedules and Statements of**

24

**Financial Affairs; and (C) Waiving the Requirement to Convene the Section 341 Meeting (the "Consolidated Matrix and Waiver Motion")**

66.     By the Consolidated Matrix and Waiver Motion, the Debtors request entry of an order (i) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and a consolidated list of the Debtors' twenty largest unsecured creditors, (ii) extending the time for the Debtors to file schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") through and including March 30, 2018 (the "Schedules and Statements Deadline"), and waiving the requirement that the Debtors file their Schedules and Statements upon confirmation of the Plan if confirmation occurs on or before the Schedules and Statements Deadline, and (iii) waiving the requirement to convene the Section 341 Meeting if the Plan becomes effective on or before the Schedules and Statements Deadline.

67.     *The Debtors' List of Creditors*.  The Debtors regularly interact with hundreds of vendors and creditors in the ordinary course of their business.  The Debtors presently maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in the Chapter 11 Cases.  The lists are maintained in the Debtors' financial and accounting software systems as well as in the banking and cash management systems.  I believe that maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide the required notice to parties in interest and reduce the potential for duplicate mailings.

68.     *Extension and Waiver of Schedules and Statements.*  The operation of the Debtors' business requires the Debtors to maintain extensive books, records, and accounting systems.  As such, completing the Schedules and Statements would require the Debtors and their advisors to dedicate substantial time and resources at substantial cost, with little or no benefit to

the estate and creditors, as the Plan contemplates payment in full or reinstatement of all allowed claims (other than the Second Lien Claims).

69.     *Waiver of Section 341 Meeting.*  In these Chapter 11 Cases, the Debtors expect to have sufficient support for the Plan from the holder of the Second Lien Claims (the only impaired class under the Plan).  Further, the holders of General Unsecured Claims will be paid in full, or will have their claims reinstated, under the Plan.  Therefore, I believe that creditors are not likely to receive any benefit from a Section 341 Meeting.

**C.     Application of the Debtors for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent to the Debtors *Nunc Pro Tunc* to the Petition Date (the "<u>Claims and Noticing Agent Retention Application</u>")**

70.     By the Claims and Noticing Agent Retention Application, the Debtors request entry of an order authorizing the Debtors to employ and retain Kurtzman Carson Consultants LLC ("<u>KCC</u>") as the claims and noticing agent ("<u>Claims and Noticing Agent</u>") in the Chapter 11 Cases *nunc pro tunc* to the Petition Date.

71.     *Scope of services.*  The Claims and Noticing Agent Retention Application pertains only to the work to be performed by KCC under the delegation of duties from the Clerk of the Bankruptcy Court for the District of Delaware (the "<u>Clerk</u>") as permitted by 28 U.S.C. § 156(c) and Local Rules 2002-1(f).  Any work to be performed by KCC outside of this scope will be subject to a separate application.

72.     Subject to Court approval, at the request of the Debtors, and to the extent necessary, it is anticipated that KCC will perform the following tasks in its role as the Claims and Noticing Agent in these chapter 11 cases (collectively, the "<u>Claims and Noticing Services</u>"), as well as all quality control relating thereto:

>     (1)     Prepare and serve required notices and documents in these chapter 11 cases in accordance with the Bankruptcy Code and the

Bankruptcy Rules in the form and manner directed by the Debtors and/or the Court, including without limitation (i) notice of the commencement of these chapter 11 cases and the initial meeting of creditors under Bankruptcy Code § 341(a), (ii) notice of any claims bar date, (iii) notices of transfers of claims, (iv) notices of objections to claims and objections to transfers of claims, (v) notices of any hearings on a disclosure statement and confirmation of the Debtors' plan or plans of reorganization, including under Bankruptcy Rule 3017(d), (vi) notice of the effective date of any plan, and (vii) all other notices, orders, pleadings, publications, and other documents as the Debtors or Court may deem necessary or appropriate for an orderly administration of these chapter 11 cases;

(2)     Maintain an official copy of the Debtors' Schedules and Statements, listing the Debtors' known creditors and the amounts owed thereto (unless such requirement is waived);

(3)     Maintain (i) a list of all potential creditors, equity holders, and other parties in interest and (ii) a "core" service list consisting of all parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010 and update said lists and make said lists available upon request by a party-in-interest or the Clerk;

(4)     Furnish a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved by this Court, and notify such potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules and Statements, which may be effected by inclusion of such information (or the lack thereof, in cases where the Schedules and Statements indicate no debt due to the subject party) on a customized proof of claim form provided to potential creditors;

(5)     Maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

(6)     For all notices, motions, orders, or other pleadings or documents served, prepare and file, or cause to be filed, with the Clerk an affidavit or certificate of service within seven (7) business days of service which includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was served (in alphabetical order) with their mailing or email addresses as appropriate, (iii) the manner of service, and (iv) the date served;

(7)     Process all proofs of claim received, including those received by the Clerk, check said processing for accuracy, and maintain the original proofs of claim in a secure area;

(8)     Maintain the official claims register for each Debtor (collectively, the "Claims Registers") on behalf of the Clerk; upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed (i) the claim

27

number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (e.g., secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

(9)     Implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

(10)    Record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

(11)    Relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of KCC, not less than weekly;

(12)    Upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

(13)    Monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed and make necessary notations on and/or changes to the Claims Registers and any service or mailing lists, including to identify and eliminate duplicative names and addresses from such lists;

(14)    Identify and correct any incomplete or incorrect addresses in any mailing or service lists;

(15)    Assist in the dissemination of information to the public and respond to requests for administrative information regarding these chapter 11 cases as directed by the Debtors or the Court, including through the use of a case website and/or call center;

(16)    Monitor the Court's docket in these chapter 11 cases and, when filings are made in error or containing errors, alert the filing party of such error and work with them to correct any such error;

(17)    If these chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, contact the Clerk's office within three (3) days of notice to KCC of entry of the order converting the cases;

(18)    Thirty (30) days prior to the close of these chapter 11 cases, to the extent practicable, request that the Debtors submit to the Court a proposed order dismissing KCC as Claims and Noticing Agent and terminating its services in such capacity upon completion of its duties and responsibilities and upon the closing of these chapter 11 cases;

(19)    Within seven (7) days of notice to KCC of entry of an order closing these chapter 11 cases, provide to the Court the final version of the Claims Registers as of the date immediately before the close of the chapter 11 cases; and

28

(20)    At the close of these chapter 11 cases, (i) box and transport all original documents, in proper format, as provided by the Clerk's office, to (A) the Philadelphia Federal Records Center, located at 14700 Townsend Road, Philadelphia, PA 19154, or (B) any other location requested by the Clerk's office, and (ii) docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

73.    The Claims Registers shall be open to the public for examination without charge during regular business hours and on a case-specific website maintained by KCC.