---

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RAND LOGISTICS, INC., *et al.*,[1] | ) | Case No. 18-_____(___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DISCLOSURE STATEMENT FOR THE DEBTORS'
## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Meredith A. Lahaie (*pro hac vice* pending)
Kevin Zuzolo (*pro hac vice* pending)
Zach Lanier (*pro hac vice* pending)
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Joanna F. Newdeck (*pro hac vice* pending)
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

**PEPPER HAMILTON LLP**
David B. Stratton (No. 960)
David M. Fournier (No. 2812)
Evelyn J. Meltzer (No. 4581)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

*Proposed Counsel for the Debtors and Debtors-in-Possession*

Dated: January 29, 2018

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Rand Logistics, Inc. (5343); Lower Lakes Transportation Company (5364); Grand River Navigation Company, Inc. (5146); Black Creek Shipping Company, Inc. (5474); Rand LL Holdings, Corp. (6352); Rand Finance Corp. (1847); and Black Creek Shipping Holding Company, Inc. (5313). The location of the Debtors' corporate headquarters and the Debtors' service address is: 333 Washington Street, Suite 201, Jersey City, NJ 07302.

Rand Logistics, Inc. ("Rand") and certain of its direct and indirect subsidiaries, as proposed chapter 11 debtors and debtors in possession (collectively, the "Debtors"), are sending you this document and the accompanying materials (the "Disclosure Statement") because you may be entitled to vote on the Debtors' Prepackaged Chapter 11 Plan of Reorganization, as the same may be amended from time to time (the "Plan").[2] To the extent you are entitled to vote on the Plan, the Debtors are commencing the solicitation of votes to approve the Plan (the "Solicitation") before the Debtors file voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors intend to file voluntary reorganization cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code to implement the Plan in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). In order to expedite the Debtors' reorganization, the Debtors intend to commence the Chapter 11 Cases prior to the Voting Deadline (as defined herein).

Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Bankruptcy Code section 1125(a). Following the commencement of the Chapter 11 Cases, the Debtors expect to seek an order of the Bankruptcy Court promptly to (a) approve this Disclosure Statement as having contained "adequate information," (b) approve Solicitation as having been in compliance with Bankruptcy Code section 1126(b) and (c) confirm the Plan pursuant to Bankruptcy Code section 1129. The Bankruptcy Court may order additional disclosures.

The deadline to accept or reject the Plan is 4:00 p.m. (prevailing Eastern Time) on February 6, 2018 (the "Voting Deadline") unless the Debtors, in consultation with Lightship, and from time to time, extend the Voting Deadline. To be counted, a ballot ("Ballot") indicating acceptance or rejection of the Plan must be *actually received* by Kurtzman Carson Consultants LLC, the Debtors' notice, claims and voting agent (the "Claims and Voting Agent"), no later than the Voting Deadline.

The Debtors cannot assure you that the Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases (i) will contain any of the terms described in this Disclosure Statement or (ii) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each holder of a Claim entitled to vote on the Plan to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under the "Risk Factors" section below) and to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to vote to accept or reject the Plan. A creditor entitled to vote on the Plan should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and Interests in, the Debtors (including, without limitation, those holders of Claims or Interests who do not submit Ballots to accept or reject the Plan, to the extent applicable, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

**SPECIAL NOTICE TO EMPLOYEES, TRADE CREDITORS,**
**AND OTHER HOLDERS OF GENERAL UNSECURED CLAIMS**

The Debtors intend to seek to obtain the necessary relief from the Bankruptcy Court to honor their obligations and pay employees, trade creditors and other General Unsecured Claims in full and in accordance with existing business terms.

---

[2]    Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement will have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

**Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued pursuant to the Plan are not the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law. The Debtors are relying on section 4(a)(2) of the Securities Act, and similar state securities law provisions, to exempt from registration under the Securities Act and state securities laws the offer to certain holders of Claims of new securities prior to filing of the Chapter 11 Cases, including, without limitation, in connection with Solicitation. After filing of the Chapter 11 Cases, the Debtors will rely on Bankruptcy Code section 1145(a) to exempt from registration under the Securities Act and state securities laws the offer, issuance, and distribution of such securities under the Plan. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither Solicitation of the Plan nor this Disclosure Statement constitutes an offer to sell nor the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION AND EXECUTIVE SUMMARY ................................................................1

II.     IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT .........................2

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT.................3
        A.      What is chapter 11?..............................................................................................................3
        B.      What is a "prepackaged" plan of reorganization?..............................................................3
        C.      Why are the Debtors sending me this Disclosure Statement?.............................................3
        D.      Am I entitled to vote on the Plan?.......................................................................................3
        E.      What will I receive from the Debtors if the Plan is consummated?.....................................5
        F.      What will holders of First Lien Claims receive under the Plan?.........................................5
        G.      What will holders of Second Lien Claims receive under the Plan? ....................................5
        H.      What will holders of Intercompany Claims receive under the Plan? ..................................5
        I.      What will holders of Existing Preferred Shares of Rand receive under the Plan? .............5
        J.      What will holders of Existing Common Shares of Rand receive under the Plan? ..............5
        K.      What will holders of General Unsecured Claims receive under the Plan?...........................5
        L.      Why are holders of General Unsecured Claims not entitled to vote on the Plan?...............6
        M.      How do I vote on the Plan and what is the Voting Deadline?..............................................6
        N.      What is meant by "Confirmation" and "Consummation"? .................................................6
        O.      If the Plan provides that I get a distribution, when do I get it? ..........................................6
        P.      What are the Debtors' Intercompany Claims? ....................................................................6
        Q.      Will there be releases granted to parties in interest as part of the Plan? ............................6
        R.      Why is the Bankruptcy Court holding a Confirmation Hearing and when is the
                Confirmation Hearing set to occur? ....................................................................................7
        S.      What is the purpose of the Confirmation Hearing?.............................................................7
        T.      What is the effect of the Plan on the Debtors' ongoing business? ......................................7
        U.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ..........................................................................................................................8
        V.      Do the Debtors recommend voting in favor of the Plan?.....................................................8

IV.     COMPANY BACKGROUND..........................................................................................................8
        A.      Corporate History.................................................................................................................9
        B.      Corporate Structure ..............................................................................................................9
        C.      Fleet ......................................................................................................................................9
        D.      Customers ...........................................................................................................................10
        E.      Competition.........................................................................................................................10
        F.      Employees...........................................................................................................................10
        G.      Government Regulations.....................................................................................................10
        H.      Prepetition Litigation .........................................................................................................11
        I.      Summary of Prepetition Capital Structure .........................................................................11
                1.      First Lien Credit Agreement ...................................................................................11
                2.      Second Lien Credit Agreement................................................................................12
                3.      Intercreditor Agreement..........................................................................................14
                4.      Other Debt ...............................................................................................................14
        J.      Stockholders' Equity..........................................................................................................14

V.      EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES.............15
        A.      Market and Capital Challenges...........................................................................................15
                1.      Foreign Currency Fluctuations ...............................................................................15
                2.      Capital Expenditure Costs.......................................................................................15
        B.      Mounting Liquidity Challenges ..........................................................................................16
        C.      Formation of the Special Committee ..................................................................................16
        D.      The Approved Sale Process ................................................................................................17
        E.      The RSA ..............................................................................................................................17

|  | F. | The DIP Facility | 18 |
|  | G. | The Exit Facility | 18 |
|  | H. | The Chapter 11 Cases | 18 |
| VI. |  | ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES | 18 |
|  | A. | Commencement of Chapter 11 Cases | 18 |
|  | B. | Stay of Litigation and Potential Removal of Pending Litigation Proceedings to the Bankruptcy Court | 19 |
|  | C. | Other Procedural Motions and Retention of Professionals | 19 |
|  | D. | Expected Timetable of the Chapter 11 Cases | 19 |
| VII. |  | SUMMARY OF THE PLAN | 20 |
|  | A. | General Basis for the Plan | 20 |
|  | B. | Treatment of Unclassified Claims | 20 |
|  |  | 1. Administrative Claims (other than Professional Fee Claims) | 20 |
|  |  | 2. Professional Fee Claims | 21 |
|  |  | 3. Priority Tax Claims | 21 |
|  |  | 4. Payment of Statutory Fees | 21 |
|  |  | 5. DIP Claims | 21 |
|  | C. | Classification and Treatment of Claims and Interests | 21 |
|  | D. | Means for Implementation of the Plan | 25 |
|  |  | 1. Transactions Effective as of the Effective Date | 25 |
|  |  | 2. Operations between the Confirmation Date and the Effective Date | 25 |
|  |  | 3. Continued Corporate Existence | 25 |
|  |  | 4. Certificates of Incorporation and Bylaws | 25 |
|  |  | 5. Plan Distributions and Working Capital | 25 |
|  |  | 6. Cancellation of Securities and Agreements | 27 |
|  |  | 7. Directors and Officers of the Reorganized Debtors | 27 |
|  |  | 8. Revesting of Assets | 27 |
|  |  | 9. Existing Indemnification Obligations; D&O Insurance Policies | 27 |
|  |  | 10. Exemption from Certain Transfer Taxes | 28 |
|  |  | 11. Corporate Action; Effectuating Documents | 28 |
|  |  | 12. Plan Supplement | 28 |
|  |  | 13. Preservation of Retained Causes of Action | 29 |
|  |  | 14. Fees and Expenses of Lightship and the First Lien Agent | 29 |
|  |  | 15. Canadian Subsidiaries | 29 |
|  | E. | Conditions Precedent to Effectiveness of the Plan | 30 |
|  |  | 1. Conditions to the Effective Date | 30 |
|  |  | 2. Waiver of Conditions | 31 |
|  |  | 3. Effect of Failure of Conditions | 31 |
|  | F. | Settlement, Release, Injunction and Related Provisions | 31 |
|  |  | 1. Discharge of Claims | 31 |
|  |  | 2. General Settlement of Claims and Interests | 31 |
|  |  | 3. Release of Liens | 32 |
|  |  | 4. Releases | 32 |
|  |  | 5. Exculpation and Limitation of Liability | 33 |
|  |  | 6. Injunction | 33 |
| VIII. |  | LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS AND VALUATION ANALYSIS | 34 |
|  | A. | Liquidation Analysis | 34 |
|  | B. | Financial Projections | 34 |
|  | C. | Valuation Analysis | 35 |
| IX. |  | RISK FACTORS | 35 |
|  | A. | General | 35 |
|  | B. | Certain Bankruptcy Law Considerations | 35 |
|  |  | 1. Parties in Interest May Object to the Debtors' Classification of Claims and Interests | 35 |

|  | 2. | The Debtors May Fail to Satisfy Solicitation Requirements Requiring a Re-Solicitation | 35 |
|  | 3. | DIP Facility | 36 |
|  | 4. | Risk of Non-Confirmation, Non-Occurrence or Delay of the Plan | 36 |
|  | 5. | Risk of Non-Occurrence of the Effective Date | 36 |
|  | 6. | Impact of the Chapter 11 Cases on the Debtors | 37 |
| C. | Industry-Specific Risk Factors to Be Considered | | 37 |
|  | 1. | Cyclical Nature of the Shipping Industry | 37 |
|  | 2. | Market Value of Vessels | 37 |
|  | 3. | Insurance Risks | 37 |
|  | 4. | Currency Exchange Rates | 37 |
| D. | Company-Specific Risk Factors to Be Considered | | 38 |
|  | 1. | Indebtedness of Reorganized Debtors | 38 |
|  | 2. | Cash Generation | 38 |
|  | 3. | Jones Act Compliance | 38 |
|  | 4. | Coasting Trade Act Compliance | 38 |
| E. | Additional Factors to Be Considered | | 39 |
|  | 1. | The Debtors Have No Duty to Update | 39 |
|  | 2. | No Representations Made Outside this Disclosure Statement Are Authorized | 39 |
|  | 3. | The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors | 39 |
|  | 4. | No Legal or Tax Advice Is Provided to You by this Disclosure Statement | 39 |
|  | 5. | No Admissions Are Made by this Disclosure Statement | 39 |
|  | 6. | Forward-Looking Statements in this Disclosure Statement | 40 |
| X. | SOLICITATION AND VOTING PROCEDURES | | 41 |
| A. | The Solicitation Materials | | 42 |
| B. | Voting Deadline | | 42 |
| C. | Voting Instructions | | 42 |
| D. | Voting Tabulation | | 43 |
| XI. | CONFIRMATION PROCEDURES | | 44 |
| A. | Requirements for Confirmation of the Plan | | 44 |
| B. | Best Interests of Creditors/Liquidation Analysis | | 44 |
| C. | Feasibility | | 44 |
| D. | Acceptance by Impaired Classes | | 44 |
| E. | Confirmation without Acceptance by All Impaired Classes | | 45 |
|  | 1. | No Unfair Discrimination | 45 |
|  | 2. | Fair and Equitable Test | 45 |
| F. | Valuation of the Debtors | | 45 |
| G. | Other Available Information | | 46 |
| XII. | SECURITIES LAW MATTERS | | 46 |
| A. | New Common Stock | | 46 |
| B. | Issuance of New Common Stock under Plan and Resale | | 46 |
| C. | Listing of New Common Stock | | 46 |
| XIII. | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | 46 |
| A. | Recent Tax Legislation | | 47 |
| B. | U.S. Federal Income Tax Consequences to the Debtors Under the Plan | | 48 |
|  | 1. | Cancellation of Indebtedness Income | 48 |
|  | 2. | Potential Limitations on NOL Carryforwards and Other Tax Attributes | 49 |
| C. | U.S. Federal Income Tax Consequences to U.S. Holders under the Plan | | 50 |
|  | 1. | Treatment of U.S. Holders of Second Lien Claims | 51 |
|  | 2. | Other Considerations for U.S. Holders | 51 |
| D. | Consequences of Ownership and Disposition of the New Common Stock | | 52 |
|  | 1. | Distributions on New Common Stock | 52 |
|  | 2. | Dispositions of New Common Stock | 52 |

E.      Information Reporting and Backup Withholding ..................................................... 53
F.      U.S. Federal Income Tax Considerations for Non-U.S. Holders ............................ 53
      1.      Gain Recognition ....................................................................................... 53
      2.      Interest ....................................................................................................... 53
G.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock ....................................................................................... 54
      1.      Dividends on New Common Stock ............................................................. 54
      2.      Sale, Redemption, or Repurchase of New Common Stock ......................... 54
      3.      FATCA ....................................................................................................... 55
XIV.      RECOMMENDATION AND CONCLUSION .................................................................. 55

## TABLE OF EXHIBITS

**Exhibit A:**      Debtors' Prepackaged Chapter 11 Plan

**Exhibit B:**      Corporate Structure

**Exhibit C:**      Liquidation Analysis

**Exhibit D:**      Financial Projections

**Exhibit E:**      Valuation Analysis

**Exhibit F**:      Exit Facility Term Sheet

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ANNEXED TO THIS
DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

The Debtors submit this Disclosure Statement pursuant to Bankruptcy Code section 1125 to certain holders of Claims against the Debtors in connection with Solicitation. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. This Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Interests, and also describes certain aspects of the Debtors' operations, financial projection and other related matters.

The Plan has been negotiated with and has the support of the agent and sole lender under the Second Lien Credit Agreement (as defined below), Lightship Capital LLC ("Lightship"). This Disclosure Statement, the Plan and the accompanying documents have been extensively negotiated with the legal and financial advisors to Lightship.

The Debtors are pleased to report that after extensive, good-faith and arm's-length negotiations with Lightship, the Plan embodies a settlement among the Debtors and their key stakeholders on a consensual deleveraging transaction which provides for the implementation of a restructuring through an expedited chapter 11 process. As explained in further detail in the Disclosure Statement, the key terms of the Plan include, without limitation, the following:

- payment in full, in the ordinary course of business, or reinstatement of Allowed General Unsecured Claims, including those held by trade vendors, suppliers and customers;

- payment in full, in Cash, of all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Statutory Fee Claims, Allowed DIP Claims, Allowed Other Priority Claims and Allowed Other Secured Claims;

- payment in full, in Cash, of all Allowed First Lien Claims;

- conversion of Allowed Second Lien Claims into 100% of the New Common Stock, subject to dilution on account of the Equity Incentive Program, resulting in the elimination of approximately $92 million of debt;

- cancellation of the Existing Preferred Shares and the Existing Common Shares;

- entry into the Exit Facility Credit Agreement to ensure adequate liquidity at exit; and

- prompt emergence from the Chapter 11 Cases.

Overall, the Plan is designed to augment the Debtors' liquidity, continue the Debtors' operations with minimal disruption, preserve the going-concern value of the Debtors' business, maximize recoveries for stakeholders and protect the jobs of the Debtors' employees.

**Additionally, the Plan provides for certain releases of Claims against, among others, (i) the Debtors, the DIP Lender, the Exit Facility Agent, the Exit Facility Lenders, the First Lien Agent, the holders of First Lien Claims, the Second Lien Agent, and the holders of Second Lien Claims and (ii) each of their respective current and former managed and controlled affiliates, subsidiaries, officers, directors, managers, managing members, principals, shareholders, members, partners, employees, agents, advisors, attorneys, professionals, accountants, investment bankers, consultants and other representatives and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.**

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTORS STRONGLY RECOMMEND THAT CREDITORS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## II.        IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of Claims entitled to vote on the Plan to accept the Plan.

The Confirmation and Consummation of the Plan are subject to certain material conditions precedent described herein and in the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Effective Date to occur will be satisfied (or waived).

***If you are a creditor entitled to vote on the Plan, you are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, and the section entitled "Risk Factors," before submitting your Ballot to vote on the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and any exhibits, schedules or amendments thereto, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan, and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been reviewed or approved by the SEC or any federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

The Debtors are relying on section 4(a)(2) of the Securities Act, and similar state securities law provisions, to exempt from registration under the Securities Act and state securities laws Solicitation to certain holders of Claims regarding new securities to be issued under the Plan prior to filing of the Chapter 11 Cases. After filing the Chapter 11 Cases, the Debtors will rely on Bankruptcy Code section 1145(a) to exempt from registration under the Securities Act and state securities laws the offer, issuance, and distribution of such securities under the Plan. Upon Confirmation of the Plan, the securities described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in Bankruptcy Code section 1145.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or

similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transactions described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

#### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

#### B.    What is a "prepackaged" plan of reorganization?

A "prepackaged" plan of reorganization is one in which a debtor solicits acceptance of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances takes place before the filing of the Chapter 11 Cases, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

#### C.    Why are the Debtors sending me this Disclosure Statement?

The Debtors will be seeking to obtain Bankruptcy Court approval of the Plan. In connection with soliciting acceptances of the Plan for Bankruptcy Court approval, Bankruptcy Code section 1125 requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement has been prepared in accordance with these requirements.

#### D.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to Bankruptcy Code section 1122(a), is referred to as a "Class." Each Class's respective voting status is set forth in the table below.

The table below designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are Impaired or Unimpaired by the Plan and the anticipated recoveries for holders of Allowed Claims and Interests under the Plan. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO ARTICLE III OF THE PLAN.

| Class | Claims or Interests | Status | Voting Rights | Estimated Recovery under the Plan |
|---|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 3 | First Lien Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 4 | Second Lien Claims | Impaired | Entitled to Vote | 37% [3] |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 6 | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| Class 7 | Existing Preferred Shares of Rand | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 8 | Existing Common Shares of Rand | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 9 | Interests in Debtors other than Rand | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |

The following Class of Claims is the only Class entitled to vote to accept or reject the plan:

| Class | Claims | Status |
|---|---|---|
| 4 | Second Lien Claims | Impaired |

The following Classes of Claims and Interests are either (i) Unimpaired under the Plan and are therefore not entitled to vote to accept or reject the Plan or (ii) Impaired under the Plan and are conclusively deemed to have rejected the plan:

| Class | Claims | Status |
|---|---|---|
| 1 | Other Priority Claims | Unimpaired |
| 2 | Other Secured Claims | Unimpaired |
| 3 | First Lien Claims | Unimpaired |
| 5 | General Unsecured Claims | Unimpaired |
| 6 | Intercompany Claims | Unimpaired |
| 7 | Existing Preferred Shares of Rand | Impaired |
| 8 | Existing Common Shares of Rand | Impaired |
| 9 | Interests in Debtors other than Rand | Unimpaired |

---

[3]    Estimated recovery to Second Lien Claims based on the claim balance as of the Petition Date, the Valuation Analysis (as defined in Section VIII) and a projected pro-forma debt balance of $170.2 million as of March 31, 2018.

**E.      What will I receive from the Debtors if the Plan is consummated?**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

**F.      What will holders of First Lien Claims receive under the Plan?**

Holders of Class 3 First Lien Claims, in full and complete satisfaction, settlement, discharge and release of each Allowed Class 3 First Lien Claim, shall receive (i) payment in full in Cash or (ii) such other treatment as may be agreed by the holder of such Allowed First Lien Claim and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable.

**G.      What will holders of Second Lien Claims receive under the Plan?**

Holders of Class 4 Second Lien Claims, in full and complete satisfaction, settlement, discharge and release of each Allowed Class 4 Second Lien Claim, shall receive their Pro Rata share of 100% of the New Common Stock, subject to dilution on account of the Equity Incentive Program.

**H.      What will holders of Intercompany Claims receive under the Plan?**

In full and complete satisfaction, settlement, discharge and release of each Allowed Class 6 Intercompany Claim, on the Effective Date, Allowed Intercompany Claims shall be adjusted, reinstated, discharged or otherwise settled in each instance as may be determined by the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable.

**I.      What will holders of Existing Preferred Shares of Rand receive under the Plan?**

In full satisfaction, settlement, release, and discharge of, and in exchange for such Existing Preferred Shares, on the Effective Date all Existing Preferred Shares shall be cancelled and of no further force and effect whether surrendered for cancellation or otherwise and the holders thereof shall not receive or retain any distribution on account of their Existing Preferred Shares.

**J.      What will holders of Existing Common Shares of Rand receive under the Plan?**

In full satisfaction, settlement, release, and discharge of, and in exchange for the Existing Common Shares, on the Effective Date all Existing Common Shares shall be cancelled and of no further force and effect, whether surrendered for cancellation or otherwise and the holders thereof shall not receive or retain any distribution on account of their Existing Common Shares of Rand.

**K.      What will holders of General Unsecured Claims receive under the Plan?**

The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall, to the extent such holder's Allowed General Unsecured Claim has not been previously paid in the ordinary course of business pursuant to an order of the Bankruptcy Court or otherwise, at the option of the Debtors, with the consent of Lightship: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, receive payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, be Reinstated; or (iii) receive treatment that otherwise renders the holder of such Allowed General Unsecured Claim Unimpaired.

**L.**     **Why are holders of General Unsecured Claims not entitled to vote on the Plan?**

The legal, equitable and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan, and therefore holders of General Unsecured Claims are Unimpaired. Only the Impaired Class of Claims is entitled to vote.

**M.**     **How do I vote on the Plan and what is the Voting Deadline?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed, signed and submitted so that it is actually received by the Claims and Voting Agent by 4:00 p.m. (prevailing Eastern Time) on February 6, 2018; provided that any holder of Claims who casts a Ballot prior to the time for filing any of the Debtors' chapter 11 petitions shall not be entitled to change their vote or cast a new Ballot after the Chapter 11 Cases are commenced. *See* "Solicitation and Voting Procedures" at Article X of this Disclosure Statement for additional information.

**N.**     **What is meant by "Confirmation" and "Consummation"?**

"Confirmation" of the Plan refers to the approval of the Plan by the Bankruptcy Court pursuant to Bankruptcy Code 1129. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. "Consummation" of the Plan refers to the occurrence of the "Effective Date," or the Business Day upon which all conditions to the Consummation of the Plan as set forth in Article 8.2 of the Plan have been satisfied or waived as provided in Article 8.3 of the Plan.

**O.**     **If the Plan provides that I get a distribution, when do I get it?**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtors, with the consent of Lightship, or the Reorganized Debtors, as the context may require, and the holder of the applicable Allowed Claim, the Reorganized Debtors shall make (i) initial distributions under the Plan on account of Allowed First Lien Claims and Allowed Second Lien Claims on the Effective Date and (ii) distributions on account of all other Allowed Claims in the ordinary course of business, in all cases subject to the Debtors' and Reorganized Debtors' right to object to Claims.

**P.**     **What are the Debtors' Intercompany Claims?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and Non-Debtor Affiliates and maintain business relationships with each other, resulting in Intercompany Claims. The Intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims.

The Plan's treatment of Intercompany Claims represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going-concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan. The Plan provides that Intercompany Claims will be adjusted, reinstated, discharged, or otherwise settled, in each instance as may be determined by the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable, and that each Company entity that holds an Intercompany Claim will be entitled to account for such Intercompany Claim in its books and records as an asset. The Debtors will also have the right to retain any Intercompany Claim, or effect such transfers and setoffs with respect to Intercompany Claims and Intercompany Interests as they deem appropriate for accounting, tax and commercial business purposes, to the fullest extent permitted by applicable law.

**Q.**     **Will there be releases granted to parties in interest as part of the Plan?**

Yes. Article VI of the Plan, which is incorporated herein by reference, provides for certain releases and other related provisions as described therein.

**R.    Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

Following commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned or continued from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served on the Debtors and certain other parties prior to the Confirmation Hearing in accordance with the notice of the Confirmation Hearing.

The Debtors will publish notice of the Confirmation Hearing, which will contain, among other things, the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The Wall Street Journal, U.S. Edition* to provide notification to those persons who may not receive notice by mail.

It is crucial that the Plan be consummated well in advance of the commencement of the sailing seasons, which historically occurs on or about April 1, so that the Debtors' fleet can transition smoothly from the current winter work season (when vessel have limited operations and have reduced personnel on board) to the fit-out process in mid-March (when personnel return to vessels and supplies are provisioned) in anticipation of commencing routine revenue-generating operations for the sailing season.  Minimizing disruption to the Debtors' customers, suppliers, vendors and employees will be important to optimizing the financial and operating performance of the Reorganized Debtors during FY 2019.

**S.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**T.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, subject to the occurrence of the Effective Date, Confirmation means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors and Consenting Parties that is a Business Day on or after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in Article 8.2 of the Plan have been satisfied, or if capable of being waived, waived.

On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Plan, may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**U.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, you may contact the Debtors' proposed counsel:

**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Attn:     Meredith A. Lahaie (Email: mlahaie@akingump.com)
          Kevin Zuzolo (Email: kzuzolo@akingump.com)
          Zach Lanier (Email: zlanier@akingump.com)

1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attn:     Joanna F. Newdeck (Email: jnewdeck@akingump.com)

-and-

**Pepper Hamilton LLP**
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Attn:     David B. Stratton (Email: strattod@pepperlaw.com)
          David M. Fournier (Email: fournied@pepperlaw.com)
          Evelyn J. Meltzer (Email: meltzere@pepperlaw.com)

Copies of the Plan and this Disclosure Statement may be obtained by (i) visiting the website maintained by the Claims and Voting Agent, located at http://www.kccllc.net/Rand, (ii) visiting the Bankruptcy Court's website located at http://www.deb.uscourts.gov, or (iii) contacting the Claims and Voting Agent by calling 877-725-7523 (domestic) or 424-236-7237 (international) or by emailing RandLogisticsInfo@kccllc.com.

**V.      Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interests of all creditors, and that other alternatives fail to realize or recognize the value inherent under the Plan.

**IV.      COMPANY BACKGROUND**

The Company comprises one of the largest providers of bulk freight shipping services in the Great Lakes region. The Company transports construction aggregates, salt, grain, coal, iron ore and other dry bulk commodities for customers in the construction, electric utility, food and integrated steel industries.

The Company operates a fleet of cargo-carrying vessels in the United States and Canada in compliance with the Jones Act, the Canada Shipping Act, 2001, SC 2001 c 26 and the Coasting Trade Act, SC 1992, c 31.[4] Generally, the Jones Act governs domestic waterborne commerce with respect to vessels that are U.S. owned, built and crewed, while the Coasting Trade Act is the main legislation that governs domestic waterborne commerce with respect to Canadian registered and crewed vessels that operate between Canadian ports.

---

[4]      The Debtors operated fourteen vessels during 2017, with one vessel inactive.

The Company has corporate offices in Jersey City, New Jersey and the Company utilizes warehouse space and additional office space in Port Dover, Ontario and Traverse City, Michigan.

### A.        Corporate History

Rand was incorporated in the State of Delaware on June 2, 2004 under the name Grand Slam Acquisition Corporation.  Rand changed its name to Rand Acquisition Corporation on June 14, 2004 and completed its initial public offering in November 2004 as a blank check company without any operating business. Rand is the ultimate parent company of each of the Debtors and Non-Debtor Affiliates.

In 2006, Rand acquired all of the outstanding shares of capital stock of Lower Lakes Towing Ltd. ("Lower Lakes Towing") with its subsidiary Lower Lakes Transportation Company ("Lower Lakes Transportation") and its affiliate, Grand River Navigation Company, Inc. ("Grand River"). Rand, which changed its name to Rand Logistics, Inc. concurrently with this acquisition, is a holding company with common stock that was traded on the Nasdaq stock market ("NASDAQ") under the symbol "RLOG" until trading of such common stock was suspended by NASDAQ effective as of January 5, 2018 (as described further in Article IV.J below).

On December 27, 2012, Lower Lakes Ship Repair Company Ltd. ("Lower Lakes Ship Repair"), a wholly-owned subsidiary of Lower Lakes Towing, was incorporated under the laws of Canada. Lower Lakes Ship Repair provides ship repair services exclusively to the Company. On March 11, 2014, Lower Lakes Towing (17) Ltd. ("Lower Lakes (17)"), a wholly-owned subsidiary of Lower Lakes Towing, was incorporated under the laws of Canada. As of November 7, 2016, Lower Lakes (17) was amalgamated with and into Lower Lakes Towing, with Lower Lakes Towing continuing as the surviving entity. The Company's shipping business is operated in Canada by Lower Lakes Towing and in the United States by Lower Lakes Transportation.

On December 18, 2017, Conneaut Creek Ship Repair Company, Inc. was incorporated in the State of Delaware.  In order to minimize the cost of these Chapter 11 Cases and disruption to the Company's business, and to ensure that the Plan is consummated as expeditiously as possible, the Company has determined not to file Chapter 11 Petitions for the following direct and indirect subsidiaries of Rand: (i) Conneaut Creek Ship Repair Company, Inc., (ii) Lower Lakes Towing and (iii) Lower Lakes Ship Repair Company Ltd (together, the "Non-Debtor Affiliates"). During the pendency of these Chapter 11 Cases, the Company (including the Non-Debtor Affiliates) intends to continue honoring its obligations and pay employees, trade creditors and other unsecured creditors in full in accordance with existing business terms.

### B.        Corporate Structure

A diagram presenting the corporate structure of the Company, including each Debtor and each Non-Debtor Affiliate, is attached hereto as **Exhibit B**.

### C.        Fleet

The Company has grown to become one of the largest bulk shipping companies operating on the Great Lakes and a leading service provider in the River Class market segment.[5]  The Company's growth was facilitated by the acquisition of several additional vessels operating or capable of operating on the Great Lakes.  These acquisitions positioned the Company to provide improved service to its customers and strengthen those customer relationships.  Presently, the Company operates a fleet of four conventional bulk carriers and eleven self-unloading bulk carriers, which includes three tug/barge units.

---

[5]    River Class vessels represent the smaller end of Great Lakes vessels, with maximum dimensions of approximately 665 feet in length and 78 feet in beam and carrying capacities of 15,000 to 28,000 tons, and are ideal for customers seeking to move significant quantities of dry bulk product to or from ports that restrict non-River Class vessels due to size and capacity constraints.

The Company's shipping business is operated in Canada by Lower Lakes Towing and in the United States by Lower Lakes Transportation.  Its U.S.-flagged vessels are owned by Grand River and Black Creek Shipping Company, Inc. ("Black Creek") and its Canadian-flagged vessels are owned by Lower Lakes Towing.

### D.    Customers

Presently, the Company services approximately fifty customers in a variety of end markets by shipping dry bulk commodities. The Company's top ten customers accounted for approximately 69%, 67% and 64% of their revenue during the fiscal years ended March 31, 2017, 2016 and 2015 respectively. The Company is the sole-source shipping provider to several of its customers. With few exceptions, the Company's customers are under long-term contracts which typically average three to five years in duration and provide for minimum and maximum annual tonnage requirements, annual price escalation features and fuel surcharge adjustments. Certain of the Company's customer contracts also provide for water-level adjustments, demurrage and discharge provisions.

### E.    Competition

The Company faces competition from other marine and land-based transporters of dry bulk commodities in and around the Great Lakes area. In the River Class market segment, the Company generally faces competition from Algoma Central Corporation, Interlake Steamship Company, Great Lakes Fleet and American Steamship Company. The Company believes that industry participants compete on the basis of customer relationships, price and service, and that the ability to meet a customer's schedule and offer shipping flexibility is a key competitive factor. Moreover, the Company believes that customers are generally willing to continue to use the same carrier assuming such carrier provides satisfactory service with competitive pricing.

### F.    Employees

As of December 31, 2017, the Company had 501 full-time employees, 107 of whom were shoreside, including the Company's officers ("Management"), and 405 of whom were shipside employees.  Of the 501 employees, the Debtors employ 196 employees and the Non-Debtor Affiliates employ 305 employees.  Shipside employees on the Company's U.S.-flagged vessels are unionized with the International Organization of Masters, Mates and Pilots, AFL-CIO.

### G.    Government Regulations

The Company's marine transportation operations are subject to United States Coast Guard ("USCG") and Environmental Protection Agency legislative oversight, and to other federal, state and Canadian legislation and certain international conventions.

Businesses that involve maritime transportation between points in a country (known as marine cabotage services or coastwise trade) are subject to applicable legislation in the countries in which they operate. The Company's Canadian business is subject to the Coasting Trade Act and other Canadian statutes that restrict maritime transportation between points in Canada to duty-paid vessels that are registered in Canada and manned by Canadian citizens.  The Company's United States business is subject to the Jones Act, which limits the carriage of goods between U.S. ports to vessels of U.S. registry that have additional Jones Act "coastwise endorsements." These coastwise endorsements require USCG determinations that the vessel has been "built in the U.S." and is "owned by U.S. citizens." Sections 2(a) and 2(c) of the Shipping Act, 1916 (now codified as 46 U.S.C. 50501 (a), (b) and (d)), and the USCG regulations at 46 CFR Ch. I, "Subpart C - Citizenship Requirements for Vessel Documentation," govern the USCG "owned by U.S. citizens" determinations (the "Citizenship Standards"). The Debtors' certificates of incorporation and by-laws are consistent with these Citizenship Standards, and the Debtors implement the policies that the USCG recommends for compliance with these Citizenship Standards by publicly traded corporations. Compliance with United States and Canadian domestic trade requirements are important to the operations of the Company. The loss of Jones Act status could have a material negative effect on the Debtors. Accordingly, the Debtors monitor the citizenship of their employees and stockholders.

The Company's operations are also subject to various environmental protection legislation enacted by the United States and Canadian governments, Great Lakes and St. Lawrence River states and provinces and companion regulations. Additional discussion of the regulatory environment of the Company's business can be found in the Company's Form 10-K for the fiscal year ended March 31, 2017, filed with the SEC on July 6, 2017.

### H.    Prepetition Litigation

The Debtors are not involved in any prepetition legal proceedings which the Debtors expect to have a material adverse effect on the Debtors' business, financial position, results of operations or liquidity, nor are the Debtors aware of any proceedings that are pending or threatened which they believe may have a material adverse effect on the Debtors' business, financial position, results of operations or liquidity.

From time to time, the Debtors may be subject to ordinary routine litigation and claims incidental to the business (the "Routine Litigation"), principally involving commercial charter party disputes, and claims for alleged property damages, personal injuries and other matters. Routine Litigation, even if lacking merit, could result in the expenditure of significant financial and managerial resources. It is expected that larger Routine Litigation would be covered by insurance, subject to customary deductibles, if they involve liabilities that may arise from collision, other marine casualty, damages to cargoes, oil pollution, death or personal injuries to crew.

The Company routinely records an estimated loss in its SEC filings for any Routine Litigation when it is probable that a liability has been incurred and the amount of the loss can reasonably be estimated. As of September 30, 2017, an accrual of $145,000 was recorded on account of various Routine Litigation.

The Debtors believe that they have recorded adequate reserves and believe that they have adequate insurance coverage or has meritorious defenses for any Routine Litigation; however, the Debtors cannot assure that such reserves will be sufficient to cover all costs incurred, or that insurance will be available or sufficient, or that any defenses asserted by the Debtors will be successful.

### I.    Summary of Prepetition Capital Structure

As of December 31, 2017, the Debtors had total debt outstanding of approximately $235.9 million, including amounts outstanding under the First Lien Credit Agreement (defined below) of approximately $149 million and amounts outstanding under the Second Lien Credit Agreement (defined below) of approximately $86.9 million.

#### 1.    First Lien Credit Agreement

On March 27, 2015, Rand and certain of its subsidiaries entered into a credit agreement (as amended from time to time, the "First Lien Credit Agreement") with the First Lien Agent and certain other lenders party thereto. Lower Lakes Towing, Lower Lakes Transportation, Grand River, and Black Creek are borrowers (the "First Lien Borrowers") under the First Lien Credit Agreement. Black Creek, Lower Lakes Transportation, Grand River, Black Creek Shipping Holding Company, Inc., Rand LL Holdings Corp., Rand Finance Corp. and Rand are guarantors of all United States and Canadian obligations under the First Lien Credit Agreement (collectively, the "First Lien U.S. Guarantors"). Lower Lakes Ship Repair is a guarantor of all Canadian obligations under the First Lien Credit Agreement (the "First Lien Canadian Guarantor" and, together with the First Lien U.S. Guarantors, the "First Lien Guarantors"). The proceeds of the First Lien Credit Agreement were used to extinguish certain then-existing indebtedness and to provide working capital financing and funds for other general corporate and permitted purposes.

The credit facilities under the First Lien Credit Agreement include: (i) a revolving credit facility under which Lower Lakes Towing may borrow up to US $80 million (CDN or USD currency to be selected by Lower Lakes Towing) with a final maturity date of September 30, 2019 (the "Canadian Revolving Facility"); (ii) a revolving credit facility under which Lower Lakes Transportation, Grand River and Black Creek may borrow up to USD $90 million with a final maturity date of September 30, 2019 (the "U.S. Revolving Facility"); (iii) a swing line facility under which Lower Lakes Towing may borrow up to the lesser of CDN $8 million and the CDN maximum borrowing availability less the outstanding balance of the Canadian Revolving Facility at such time, with a final

maturity date of September 30, 2019 (the "Canadian Swing Line Facility"); and (iv) a swing line facility under which Lower Lakes Transportation, Grand River and Black Creek may borrow up to USD $9 million, less the outstanding balance of the U.S. Revolving Facility at such time, with a final maturity date of September 30, 2019 (the "U.S. Swing Line Facility").

The obligations under the First Lien Credit Agreement are secured by first-priority liens on, and a first-priority security interest in, substantially all of the assets of the First Lien Borrowers and the First Lien Guarantors party to the agreement, including a pledge of all or a portion of the equity interests of the First Lien Borrowers and the First Lien Guarantors. The security interests are evidenced by pledge, security and guaranty agreements and other related agreements, including certain fleet mortgages. The indebtedness of each domestic First Lien Borrower is unconditionally guaranteed by each other domestic First Lien Borrower and by the First Lien Guarantors which are domestic subsidiaries. Each guaranty is secured by a lien on substantially all of the assets of each First Lien Borrower and each First Lien Guarantor. Each domestic First Lien Borrower also guarantees the obligations of the Canadian First Lien Borrower and each Canadian First Lien Guarantor guarantees the obligations of the Canadian First Lien Borrower.

On June 1, 2017, the parties to the First Lien Credit Agreement entered into an amendment and waiver agreement ("First Lien Amendment No. 4"), pursuant to which the First Lien Lenders waived, during a specified waiver period (the "First Lien Waiver Period"), the Company's failure to deliver its audited financial statements for the fiscal year ending March 31, 2017 by May 31, 2017 (the "Specified Default").[6] Under First Lien Amendment No. 4, the First Lien Waiver Period was to end on the earliest to occur of (i) any event of default (other than the Specified Default) under the First Lien Credit Agreement or the Second Lien Credit Agreement, (ii) the commencement of any legal proceeding by any of the Debtors which would enjoin the First Lien Agent or First Lien Lenders from enforcing their rights under the waiver, (iii) three business days following the termination of negotiations among the Company and Lightship of a potential recapitalization transaction involving the Debtors and (iv) June 14, 2017.

First Lien Amendment No. 4, among other things, further provided for (i) enhanced or new restrictions on certain of the Debtors' activities not in the ordinary course of business, including with respect to consummating a merger or sale, making certain intercompany payments, or incurring new liens or indebtedness (other than under the First Lien Credit Agreement), (ii) continuation of certain rights of the First Lien Agent applicable during an event of default during the First Lien Waiver Period (notwithstanding waiver of the Specified Default), including with respect to (a) reimbursement of fees and expenses, (b) entitlement to default interest and (c) enhanced entitlement to the Debtors' access and reporting, and (iii) restrictions on the Company's right to designate a LIBOR-based interest rate for new loans under the First Lien Credit Agreement. Finally, First Lien Amendment No. 4 provided for an event of default under the First Lien Credit Agreement if the Company had not agreed to a recapitalization transaction with Lightship by June 30, 2017, on terms reasonably satisfactory to the First Lien Agent.

The First Lien Waiver Period was extended to June 30, 2017 and subsequently extended to July 14, 2017. As described in more detail below in Article V.B, the First Lien Waiver Period expired on July 14, 2017 without further extension.

### 2.    Second Lien Credit Agreement

On March 11, 2014, Rand and certain of its subsidiaries entered into a credit agreement (as amended from time to time, the "Second Lien Credit Agreement" and, together with the First Lien Credit Agreement, the "Credit Agreements") with Guggenheim Corporate Funding, LLC ("Guggenheim"), as agent, as collateral agent and as co-arranger, Barclays Capital, Inc., as co-arranger, and the lenders signatory thereto from time to time (the "Second Lien Lenders").[7] Lower Lakes Towing, Lower Lakes Transportation, Grand River, and Black Creek are borrowers

---

[6]    From time to time, the parties to the First Lien Credit Agreement have entered into amendments to the credit agreement. Prior to the execution of First Lien Amendment No. 4, the parties to the First Lien Credit Agreement executed (i) a first amendment and waiver agreement on February 9, 2016, (ii) a second amendment and waiver agreement on August 26, 2016, and (iii) a third amendment on September 13, 2016.

[7]    On April 21, 2017, Lightship became the sole lender under the Second Lien Credit Agreement.

(the "Second Lien Borrowers") under the Second Lien Credit Agreement. Black Creek, Lower Lakes Transportation, Grand River, Black Creek Shipping Holding Company, Inc., Rand LL Holdings Corp., Rand Finance Corp. and Rand are guarantors of all United States and Canadian obligations under the First Lien Credit Agreement (collectively, the "Second Lien U.S. Guarantors"). Lower Lakes Ship Repair is a guarantor of all Canadian obligations under the Second Lien Credit Agreement (the "Second Lien Canadian Guarantor" and, together with the Second Lien U.S. Guarantors, the "Second Lien Guarantors").

Pursuant to that certain Resignation and Assignment Agreement, dated November 27, 2017, between Guggenheim, in its capacity as resigning agent, Lightship, in its capacity as successor agent, the Second Lien Borrowers and the Second Lien Guarantors, Lightship was appointed as successor agent, including as collateral agent, pursuant to Section 9.7 of the Second Lien Credit Agreement (the "Second Lien Agent").

The Second Lien Credit Agreement initially provided for: (i) a U.S. Dollar denominated term loan facility under which Lower Lakes Towing was obligated to the lenders in the amount of $34.2 million (the "Second Lien CDN Term Loan"); (ii) a U.S. dollar denominated term loan facility under which Grand River and Black Creek were obligated to Lightship in the amount of $38.3 million (the "Second Lien U.S. Term Loan"); and (iii) an uncommitted incremental term loan facility of up to $32.5 million as of March 27, 2015.

The obligations under the Second Lien Credit Agreement are secured by second-priority liens and security interests in substantially all of the assets of the Second Lien Borrowers and the Second Lien Guarantors, including a pledge of all or a portion of the equity interests of the Second Lien Borrowers and the Second Lien Guarantors. The security interests are evidenced by pledge, security and guaranty agreements and other related agreements, including certain fleet mortgages. The indebtedness of each domestic Second Lien Borrower is unconditionally guaranteed by each other domestic Second Lien Borrower and by the Second Lien Guarantors which are domestic subsidiaries and such guaranty is secured by a lien on substantially all of the assets of each Second Lien Borrower and each Second Lien Guarantor. Each domestic Second Lien Borrower also guarantees the obligations of the Canadian Second Lien Borrower and each Canadian Second Lien Guarantor guarantees the obligations of the Canadian Second Lien Borrower. As described below, the obligations of the Second Lien Borrowers and the liens of Lightship are subject to the terms of the Intercreditor Agreement.

On June 1, 2017, the parties under the Second Lien Credit Agreement entered in to an amendment and waiver ("Second Lien Amendment No. 5"), pursuant to which Lightship, as sole lender under the Second Lien Credit Agreement, waived, during a specified waiver period (the "Second Lien Waiver Period"), the Specified Default.[8] Under Second Lien Amendment No. 5, the Second Lien Waiver Period was to end on the earliest to occur of (i) any event of default (other than the Specified Default) under the First Lien Credit Agreement or the Second Lien Credit Agreement, (ii) the commencement of any legal proceeding by any of the Debtors which would enjoin Lightship from enforcing its rights under the Second Lien Waiver, (iii) three (3) business days following the termination of negotiations among the Debtors and Lightship of a potential recapitalization transaction involving the Company and (iv) June 14, 2017. Second Lien Amendment No. 5, among other things, further provided for (i) enhanced or new restrictions on certain of the Debtors' activities not in the ordinary course of business, including with respect to consummating a merger or sale, making certain intercompany payments, or incurring new liens or indebtedness (other than under the First Lien Credit Agreement), (ii) extension of certain rights of the Second Lien Agent applicable during an event of default during the Second Lien Waiver Period to Lightship and continuation of certain of such rights during the Second Lien Waiver Period (notwithstanding waiver of the Specified Default), including with respect to (a) reimbursement of fees and expenses, (b) entitlement to default interest and (c) enhanced entitlement to the Debtors' access and reporting, and (iii) restrictions on the Debtors' right to designate a LIBOR-based interest rate for new loans under the Second Lien Credit Agreement.

Second Lien Amendment No. 5 also provided for an event of default under the Second Lien Credit Agreement if the Debtors had not agreed to a recapitalization transaction with Lightship by June 30, 2017. The Second Lien Waiver Period was extended to June 30, 2017 and subsequently extended to July 14, 2017. As

---

[8]    From time to time, the parties to the Second Lien Credit Agreement have entered into amendments to the credit agreement. Prior to the execution of Second Lien Amendment No. 5, the parties to the Second Lien Credit Agreement executed (i) a first amendment on April 11, 2014, (ii) a second amendment on March 27, 2015, (iii) a third amendment and waiver agreement on February 9, 2016, and (iv) a fourth amendment and waiver agreement on August 26, 2016.

described in more detail below in Article V.B, the Second Lien Waiver Period expired on July 14, 2017 without further extension.

### 3. Intercreditor Agreement

In connection with the First Lien Credit Agreement and the Second Lien Credit Agreement described above, on March 27, 2015, the First Lien Agent, for itself and on behalf of the First Lien Lenders, and the Second Lien Agent, for itself and on behalf of the Second Lien Lenders, entered into an intercreditor agreement (the "Intercreditor Agreement"), which was acknowledged and agreed by Rand and certain of its subsidiaries. Pursuant to the Intercreditor Agreement, (i) liens granted under the Second Lien Credit Agreement are subordinated to those granted under the First Lien Credit Agreement, and (ii) regularly scheduled principal and interest payments due under the Second Lien Credit Agreement may be paid by the Debtors absent the occurrence of an event of default under the First Lien Credit Agreement.

### 4. Other Debt

As of January 22, 2018, the Debtors' outstanding principal unsecured indebtedness of approximately $3.0 million consists of (i) capital expenditures of approximately $1.4 million, (ii) accounts payable of approximately $650,000, and (iii) accrued expenses and other liabilities of approximately $960,000. The Debtors also have regular and recurring compensation and benefit obligations to their employees, which are current and are paid in the ordinary course of business.

### J. Stockholders' Equity

As of December 31, 2017, 18,633,149 shares of Existing Common Shares, par value $.0001, totaling $1,000,000, were issued and outstanding (out of 50,000,000 shares authorized). As of July 5, 2017, there were 162 holders of record of the Existing Common Shares. The Debtors have not paid any dividends on the Existing Common Shares to date.

On September 20, 2016, Rand received a letter from NASDAQ providing notification that, for the previous 30 consecutive business days, the bid price for the Existing Common Shares had closed below the minimum $1.00 per share requirement for continued listing on NASDAQ under NASDAQ Listing Rule 5550(a)(2). Rand received an initial grace period until March 20, 2017 to regain compliance, which was later extended by 180 days to September 18, 2017. On September 20, 2017, Rand received a letter from NASDAQ stating that, due to ongoing non-compliance with the NASDAQ listing requirements, its Existing Common Shares would be suspended from trading on NASDAQ at the opening of business on September 29, 2017, unless the Debtors requested an appeal to the NASDAQ Hearings Panel (the "Panel"). Rand appealed the delisting notice and appeared in front of the Panel on November 16, 2017. The Panel issued a decision on December 4, 2017 continuing Rand's listing, conditioned upon, among other things, Rand's ability to implement a reverse stock split and demonstrate compliance with Listing Rule 5550(a)(2) by March 19, 2018. Rand informed the Panel on January 2, 2018 that it would be unable to meet the requirements of the Panel's decision. On January 3, 2018, Rand received written notification from the Panel that the Panel had determined to delist Rand's Existing Common Shares from NASDAQ and the suspension of trading would be effective at the open of business on January 5, 2018. Rand will not appeal the Panel's determination. Rand's Existing Common Shares may be eligible to be quoted on the OTC Bulletin Board (the "OTCBB") or in the "Pink Sheets." OTCBB or Pink Sheets trading may occur only if a market maker applies to quote Rand's Existing Common Shares and Rand is current in its reporting obligations under the Securities Exchange Act of 1934.

Rand issued 300,000 shares of Existing Preferred Shares in 2006. As of September 30, 2017, 295,480 shares of Existing Preferred Shares, par value $.0001, totaling $14,674,000, were issued and outstanding (out of 1,000,000 shares authorized) pursuant to the Amended and Restated Certificate of Designations of Series A Convertible Preferred Stock of Rand Logistics, Inc., dated as of August 8, 2006.

Existing Preferred Shares rank senior to Existing Common Shares with respect to liquidation and dividends. Existing Preferred Shares may be redeemed or obligated to be redeemed by Rand in connection with certain change of control or acquisition transactions, and may be converted into common shares at the election of the

holder. The holders of the Existing Preferred Shares vote on corporate matters on an as-converted basis with the Existing Common Shares and as a separate class. As of December 31, 2017, the Existing Preferred Shares' accrued dividends payable were approximately $5,033,586.44 million and the effective dividend rate of the Existing Preferred Shares was 10.75%.

## V.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Market and Capital Challenges

A number of factors have contributed to the Company's decision to pursue a restructuring, including, among other issues, volatility in the valuation of the U.S. dollar relative to the Canadian dollar and increased costs of repairing, maintaining and certifying vessels – all of which combined have made the Company's capital structure unsustainable.

### 1.    Foreign Currency Fluctuations

The Company has struggled as a result of the weakening of the Canadian dollar versus the U.S. dollar. During the two years following March 2014, when the Debtors entered into the Second Lien Credit Agreement, the Canadian dollar weakened against the U.S. dollar by approximately 30%. Despite annual earnings improvements in the Company's Canadian operations, such improvements were insufficient to offset the weakening Canadian dollar and, accordingly, the Company's reported results in U.S. dollars depicted declining financial performance.

Approximately 60% of the Company's operating profits are generated in Canadian dollars. Conversely, approximately 70% of the Company's indebtedness, including all of its borrowings and 100% of its interest expense under the Second Lien Credit Agreement, are denominated in U.S. dollars. As a result of this mismatch, upon conversion of the Company's Canadian earnings and debt to U.S. dollars, there was a larger proportional decrease in U.S.-denominated earnings than there was in U.S.-denominated debt. The Company's debt covenants are reported in U.S. dollars for covenant compliance purposes and were not designed to withstand the dramatic decrease in the Canadian dollar. As a result, financial covenant defaults occurred under the terms of the Credit Agreements.

Moreover, as the Canadian dollar continues to stabilize against the U.S. dollar, the Company's leverage ratio has worsened. The Canadian debt balance in the numerator of the leverage ratio calculation is expressed as a relatively higher amount because it is converted at a contemporaneous (stronger) Canadian dollar exchange rate, while the trailing twelve-month EBITDA in the denominator of the leverage ratio is expressed as a relatively lower amount because it is converted at an older (weaker) Canadian dollar exchange rate.  The impact results in a higher leverage ratio calculation at a time when the covenants under the Credit Agreements require lower and reducing leverage ratios. The impact of foreign currency fluctuations on EBITDA calculations for purposes of calculating financial covenants could not be hedged and the Company could not meet its financial covenant obligations under the Credit Agreements, as described herein.

Additionally, the Company's contract with a third-party shipyard to manufacture the Canadian-flagged *M/V Manitoulin* required payment in U.S. dollars. The vessel's operating and financial performance has met expectation. However, due to the decline in the Canadian dollar, its earnings when converted into U.S. dollars for covenant purposes are less than were projected. Further, when measured against the U.S.-denominated debt incurred, the contract resulted in a significant negative impact in the Company's ability to meet its financial covenants.

### 2.    Capital Expenditure Costs

From January 2017 through September 2017, the Company incurred approximately $29.2 million of capital expenditures and dry dock costs on its fleet, an amount that is nearly double the historical average for such costs on an annual basis.

The primary reason for the high costs was related to expenditures on three U.S.-flagged vessels, the *Calumet II*, *Manitowoc*, and *Menominee*, which all required substantial steel renewal work as part of their USCG-required Special Survey. The substantial steel renewal was precipitated by historical deferral of repair and

maintenance investment in these particular vessels. It also related to the Company's election to convert certain of these vessels from Lloyd's Register to ABS Group marine safety and regulatory certification standards. This conversion required closer inspection standards than anticipated and resulted in unplanned capital spending to increase the thickness of steel in several locations of the vessels to bring them to ABS Group standards and to comply with regulatory requirements for operations.

### B.    Mounting Liquidity Challenges

In the fall of 2016, in response to the events described above, the Company initiated efforts to raise liquidity for itself and to de-lever its balance sheet. The Company, with the assistance of certain of its advisors, began outreach to certain investors on the possibility of a sale. Through their advisors, the Company contacted 38 potential investors, negotiated and executed 25 non-disclosure agreements, and sent private-side materials to 23 of such potential investors. Despite these efforts, these contacts and engaged discussions did not result in a viable solution for the Company.

Simultaneously, the Company embarked on a number of cost-reduction and operating efficiency initiatives, which primarily included the streamlining of certain functions, locations and the management structure to support the business and implementing the necessary system changes to support these initiatives.

Notwithstanding continual improvements in the Company's operating and financial performance, the Company has struggled to satisfy certain leverage-related financial covenants under the First Lien Credit Agreement and Second Lien Credit Agreement as described in more detail herein. On July 14, 2017, waivers previously obtained from the First Lien Lenders and Lightship expired, resulting in the reinstatement of the previously waived events of default under the First Lien Credit Agreement and Second Lien Credit Agreement, respectively. Following expiration of the waivers, the Company was permitted, on an interim basis, to borrow funds under the First Lien Credit Agreement at the discretion of the First Lien Lenders. The First Lien Lenders reserved their rights to the pending defaults and instituted a $15 million availability reserve on the Company's borrowing ability, and have additionally exercised their rights to control and apply the Company's receipts against the outstanding indebtedness under the First Lien Credit Agreement.

During that period, the Company, as described in more detail below, also engaged with Lightship and began discussions with respect to a potential recapitalization transaction.

### C.    Formation of the Special Committee

On October 31, 2017, the board of directors of Rand (the "Board") authorized and approved a special committee (the "Special Committee") comprised of three independent members of the Board to consider and explore various strategic alternatives potentially available to the Debtors in order to maximize the value of their assets.

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as legal counsel, and Miller Buckfire & Co., LLC ("Miller Buckfire"),[9] as investment banker, were retained to assist the Debtors in connection with considering and exploring strategic alternatives and additional matters. As described below, the Board granted authority to the Special Committee to pursue a sale process with a third party purchaser and to engage in negotiations with Lightship regarding a debt for equity restructuring transaction.

---

[9]    Miller Buckfire is an indirect, wholly owned investment banking subsidiary of Stifel Financial Corp. and an affiliate of Stifel Nicolaus & Company ("Stifel"). Stifel is an investment bank that provides strategic and financial advisory services across the globe to a number of industries in the middle market. The Stifel M&A practice has significant execution experience in both public-to-public as well as private transactions, including specific expertise in multi-faceted M&A assignments with a strong understanding of complex structural and tax issues. Stifel's M&A team matches or exceeds the experience and credibility of any banking team on Wall Street, and has an established culture of providing clients with superior advice. Stifel's parent company, Stifel Financial Corp., is a publicly-traded financial holding company listed on the New York Stock Exchange (ticker symbol: SF), headquartered in St. Louis. Stifel's professionals have recently provided M&A advisory services to the following companies: VICI Properties Inc., Talon Innovations Corporation, Exa Corporation, Centuri Construction Group, Silego Technology, Innova Global, Marvell, Genesis Energy, Corsair, NCI Inc., Quintel, Nations Equipment Finance, Jaguar Animal Health, Tangoe, Coast Crane Company, and MaxLinear, among others.

### D.      The Approved Sale Process

As part of their engagement to assist the Company with the exploration of strategic alternatives, Miller Buckfire, in consultation with the Board, Management and Akin Gump, began marketing the Company for sale on August 24, 2017. Miller Buckfire contacted over forty strategic and financial parties, eighteen of whom signed confidentiality agreements. Miller Buckfire provided such restricted parties with (i) a process letter, which specified a deadline of September 21, 2017 to submit indications of interest ("IOIs"), and (ii) access to a confidential data room. Approximately 18 of those parties conducted additional diligence and communicated with Miller Buckfire.

On or about August 21, 2017, the Company received two IOIs to acquire the Debtors: one from a strategic party and the other from a financial party. Miller Buckfire conducted follow-up calls with both bidders to ask clarifying questions. Subsequent to the performance of diligence, it was determined that both bids were insufficient to provide value to holders of Existing Common Shares and Existing Preferred Shares. After consultation with the Board and Management, Miller Buckfire informed bidders that their bids were insufficient due to low value and/or incompleteness. Nevertheless, the bidders were invited to participate in further diligence meetings. The strategic bidder subsequently participated in a diligence call with Management but no further proposal was made based on incremental information received.

Based on feedback received in the initial process and knowledge of the industry as a whole, Miller Buckfire observed that many strategic buyers were interested in only the U.S. business or the Canadian business, rather than in the Company consolidated as a whole. After reviewing the IOIs for the Company with the Board and Management, the Company decided to approach certain strategic buyers about purchasing either the Company's U.S. business or the Company's Canadian business. Beginning on October 25, 2017, Miller Buckfire contacted eight parties in connection with this new marketing approach and provided a deadline of November 10, 2017 to submit IOIs. Subsequently, Management conducted three additional diligence calls to facilitate bidders' understanding of the Company's business.

As of November 14, 2017, the Company had received two IOIs for certain assets of the U.S. business and two IOIs for certain assets of the Canadian business. Miller Buckfire reviewed the bids received with the Special Committee, the Board and Management. Having reviewed both the consolidated bids and the aggregate bids received to date, the Special Committee and the Board, in consultation with Management and the Company's advisors, determined that the transaction proposed by Lightship in the Company's restructuring negotiations represented the most value maximizing option available to the Company. The Board authorized the Company to sign the RSA described below, which allowed the Company to, concurrently with its efforts to consummate the Plan in accordance with the timeframes set forth in the RSA, continue the marketing process previously initiated by the Debtors to pursue a sale of the Company's assets or equity (the "Approved Sale Process") in a transaction that would (i) fund the treatment under the Plan for Allowed Administrative Claims, Other Priority Claims and Allowed General Unsecured Claims, (ii) pay in Cash in full all of the Claims of the First Lien Lenders and Lightship and (iii) pay any additional consideration to the Existing Common Shares and Existing Preferred Shares. Pursuant to the RSA, the Company was permitted to continue the Approved Sale Process through and until December 31, 2017. Following the execution of the RSA, Miller Buckfire notified bidders that the RSA had been signed and that bidders had until the end of the year to submit improved offers. The Approved Sale Process ended at the end of 2017 and, pursuant to the RSA, the Company's marketing efforts in connection with the Approved Sale Process concluded without any further developments.

### E.      The RSA

As noted above, the Company engaged in negotiations with Lightship regarding a consensual deleveraging restructuring transaction while simultaneously pursuing a third party sales process.  In connection therewith, the Board granted authority to the Special Committee to negotiate the RSA, the related restructuring term sheet (the "Restructuring Term Sheet") and transactions contemplated thereto and thereby, subject to final approval thereof by the Board.  During November 2017, the Special Committee, in consultation with its advisors, determined that the Company's liquidity did not permit the payment of a $2.8 million interest payment due on November 17, 2017 under the Second Lien Credit Agreement.

On November 17, 2017, after many weeks of intensive negotiations, the Company and Lightship entered into the RSA.  The parties to the RSA committed to support a plan of reorganization on the terms set forth in an attached term sheet, which contemplated (i) conversion of the Second Lien Claims to new common stock to be issued by Rand, (ii) cancellation of all existing equity interests in Rand without any distribution and (iii) payment in cash in full of all other claims.  The Plan ultimately filed by the Debtors reflects these fundamental terms. In connection with the restructuring transactions contemplated by the RSA and the Chapter 11 Cases, the Company retained Conway MacKenzie Management Services, LLC ("Conway MacKenzie"), as financial advisor, and Michael S. Correa of Conway MacKenzie was appointed Chief Restructuring Officer to the Company.

Although the Debtors did not commence the Chapter 11 Cases in accordance with the original milestones as set forth in the RSA, the RSA has not been terminated by either the Debtors or Lightship.  Instead, the Debtors and Lightship negotiated a revised timetable that is reflected in the terms of the DIP Facility.  Pursuant to certain provisions in the DIP Facility as described below, if the Debtors do not consummate the Plan by March 16, 2018, the interest rate on the DIP Facility will increase and a fee will become payable to the DIP Lender.

### F.        The DIP Facility

Lightship has committed to provide a new money debtor-in-possession credit facility of up to $25 million (the "DIP Facility"), which will provide the Debtors with much needed liquidity to fund the working capital and operational needs of the Company, as well as the administrative and transaction costs of the Chapter 11 Cases.  The DIP Facility will be secured by liens on substantially all of the Debtors' assets on a subordinated basis to liens granted under the First Lien Credit Agreement.  Under the terms of the DIP Facility, if the Plan is not consummated by March 16, 2018, (i) the interest rate of the DIP Facility increases from 6.0% to 12.0% and shifts from payable in kind to payable in Cash, and (ii) a $500,000 fee becomes payable in kind.  Further, from the Petition Date through March 16, 2018, the First Lien Lenders have agreed to, among other things, (i) forbear from taking any enforcement action with respect to the Canadian Subsidiaries, and (ii) hold all cash collateral, both of the Debtors and the Non-Debtor Affiliates, in reserve.

### G.        The Exit Facility

On the Effective Date of the Plan, the Reorganized Debtors and certain of the Non-Debtor Affiliates shall enter into the Exit Facility.  The terms of the Exit Facility will be set forth in the Exit Facility Documents.

### H.        The Chapter 11 Cases

The Company operates in a seasonal waterway system. The cold weather patterns on the Great Lakes during the winter season contribute to lock closures, waterway ice, and customer facility closings.  These conditions typically shut down Great Lakes shipping for a period of up to approximately ninety days, commencing from late December until late March or early April, depending on weather conditions. Accordingly, the Debtors believe that filing the Chapter 11 Petitions on the Petition Date, with decreased shipping activity on the Great Lakes, should allow the Debtors to emerge from the Chapter 11 Cases by the spring of 2018 with a healthy balance sheet and minimize any disruptions to the Company's business.

## VI.        ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

### A.        Commencement of Chapter 11 Cases

To implement the restructuring transactions contemplated in the Plan, each of the Debtors intends to commence a case under chapter 11 of the Bankruptcy Code on the Petition Date. The Debtors intend to commence the Chapter 11 Cases prior to the Voting Deadline. The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code. The Debtors intend to continue to operate their business in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Petition Date. On the Petition Date, to facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors'

operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and will request to have the Chapter 11 Cases jointly administered for procedural purposes.

The Debtors will also file various motions seeking important relief from the Bankruptcy Court to minimize any disruption to the Debtors' operations and to facilitate their reorganization. Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court. These requests will include, but are not limited to, orders permitting the Debtors to: (i) pay employee obligations, (ii) pay certain allowed unsecured claims in the ordinary course of business, (iii) continue use of their existing cash management system and (iv) utilize amounts loaned under the DIP Facility to fund operations and the payment of administrative expenses in the Chapter 11 Cases, as set forth in the applicable budget governing such proceeds. Such relief, if granted, will assist in the administration of the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant any or all of the relief sought.

Commencing the Chapter 11 Cases will enable the Debtors to reorganize on the terms set forth in the Plan. The Debtors believe that the transactions contemplated by the Plan will allow the Debtors to reorganize their business, stabilize their shipping operations and maximize the value of their estates. Additionally, to expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for a combined hearing to (i) approve the adequacy of the Disclosure Statement; (ii) approve the procedures for Solicitation; and (iii) confirm the Plan. The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearing.

**B.      Stay of Litigation and Potential Removal of Pending Litigation Proceedings to the Bankruptcy Court**

With certain exceptions, the filing of the Chapter 11 Cases would operate as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation that would be stayed by the commencement of the Chapter 11 Cases will be subject to discharge, settlement, and release upon Confirmation of the Plan, with certain exceptions. Therefore, litigation claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation. Further, the Debtors reserve their right pursuant to 28 U.S.C. § 1452 to remove any pending litigation proceedings to the Bankruptcy Court.

**C.      Other Procedural Motions and Retention of Professionals**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, and to minimize the impact on daily business operations, the Debtors intend to request the entry of certain procedural orders, including, but not limited to, (a) the joint administration of the Chapter 11 Cases; (b) authorization to prepare a list of creditors and file a consolidated list of the Debtors' thirty largest unsecured creditors; and (c) waiver of the requirement to file a statement of financial affairs schedules of assets and liabilities.

**D.      Expected Timetable of the Chapter 11 Cases**

Under the terms and conditions of the DIP Facility, the Debtors are required to proceed expeditiously through the Chapter 11 Cases in accordance with the milestones set forth therein. Pursuant to certain provisions in the DIP Facility, if the Debtors do not consummate the Plan by March 16, 2018, (i) the interest rate of the DIP Facility increases from 6.0% to 12.0% and shifts from payable in kind to payable in Cash, and (ii) a $500,000 fee becomes payable in kind.

The Debtors believe it is essential to emerge from the Chapter 11 Cases before the end of the winter season to minimize any potential business disruptions and to begin the spring sailing season with a healthy balance sheet. The expedited timetable for the Chapter 11 Cases accommodates the seasonal nature of the Company's business, and the terms and conditions of the DIP Facility and the proposed Exit Facility reflect this circumstance.

The Debtors cannot provide any assurance, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors. On the Petition Date, the Debtors will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order, and the other conditions to Consummation of the Plan set forth in Article 8.2 of the Plan are satisfied or waived (to the extent permitted under the Plan and applicable law).

## VII.    SUMMARY OF THE PLAN[10]

### A.    General Basis for the Plan

The Debtors have determined that prolonged Chapter 11 Cases would damage severely their ongoing business operations and threaten their viability as a going concern. The prepackaged nature of the Plan (as set forth in the Plan and described herein) allows the Debtors to exit chapter 11 quickly, while the provisions of the Plan allow the Debtors to reduce their debt service obligations and position the Debtors for ongoing growth through, among other things, the issuance of New Common Stock, the implementation of the Equity Incentive Plan, and the continuation of ordinary course treatment with respect to the General Unsecured Claims as if the Chapter 11 Cases had never been commenced.

### B.    Treatment of Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Fee Claims, Priority Tax Claims, statutory fees and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and the holders thereof are not entitled to vote on the Plan.

#### 1.    Administrative Claims (other than Professional Fee Claims)

With respect to each Allowed Administrative Claim other than a Professional Fee Claim, the holder of each such Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which such holder and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable, shall have agreed upon in writing, either (i) on the Effective Date, (ii) if the Administrative Claim is not Allowed as of the Effective Date, by the first Business Day after the date that is thirty (30) calendar days or as soon as practicable thereafter after the date on which such Administrative Claim becomes an Allowed Claim,  or (iii) if the Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases, pursuant to terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holders of such Allowed Administrative Claim.

Requests for payment of Administrative Claims (other than Professional Fee Claims) must be filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date no later than the Administrative Claims Bar Date. Holders of Administrative Claims (other than Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

---

[10]    This Section VII is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents for the full and complete statement of such terms and provisions. The Plan itself (including attachments) will control the treatment of Claims and Interests under the Plan. To the extent there are any inconsistencies between this Section VII and the Plan (including attachments) the latter shall govern.

Objections to such requests, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than the 75th day after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

### 2.    Professional Fee Claims

On the later of (i) the Effective Date and (ii) the date the Bankruptcy Court enters an order approving the fee applications of the applicable Professional, the Debtors shall pay all amounts owing to the Professionals for all unpaid Professional Fee Claims relating to prior periods and for the period ending on the Effective Date, subject to the applicable Holdback Amount. Each Professional shall estimate its Professional Fee Claims due for periods that have not been billed as of the Effective Date.  On or prior to sixty (60) days after the Effective Date, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; provided that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date, without further Bankruptcy Court order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than twenty (20) days after such Professional Fee Claim is filed with the Bankruptcy Court.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Professional Fee Claims. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Reorganized Debtors, and the Reorganized Debtors shall pay any unpaid amounts to each Professional.

### 3.    Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtors, with the consent of Lightship, or by the Reorganized Debtors either (i) on or as soon as reasonably practicable after the Effective Date or the date on which such Priority Tax Claim becomes Allowed, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (ii) treatment in a manner consistent with Bankruptcy Code section 1129(a)(9)(C), or (iii) such different treatment as to which such holder and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable, shall have agreed upon in writing.

### 4.    Payment of Statutory Fees

All quarterly fees payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors on or before the Effective Date.  All such fees payable after the Effective Date shall be paid by the Reorganized Debtors as and when due, until such time as the Chapter 11 Cases are closed, dismissed or converted.

### 5.    DIP Claims

On the Effective Date, the DIP Claims will be deemed Allowed in full and, on the Effective Date, in full satisfaction, settlement, release, and discharge of, and in exchange for such DIP Claims, each holder of a DIP Claim shall receive (i) payment in full in Cash from the proceeds of the Exit Facility or (ii) such other treatment as required under the DIP Order and as to which such holder and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable, shall have agreed upon in writing.

### C.    Classification and Treatment of Claims and Interests

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of the Plan, and making Plan distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings will not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

Pursuant to Bankruptcy Code sections 1122 and 1123, the following table designates the Classes of Claims and Interests and summarizes the treatment of such Claims and Interests under the Plan. A Claim or Interest is in a particular Class for purposes of voting on, and of receiving distributions pursuant to, the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.

| SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | | | |
|---|---|---|---|
| **Class** | **Claims and Interests** | **Plan Treatment** | **Estimated Recovery Under the Plan** |
| Class 1 | Other Priority Claims | On the later to occur of (i) the Effective Date and (ii) the date on which such Other Priority Claim becomes Allowed, each holder of an Allowed Other Priority Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim, either: (a) be paid in full in Cash, (b) receive treatment that otherwise renders the holder of such Allowed Other Priority Claim Unimpaired or (c) receive such other treatment as may be agreed by the holder of such Allowed Other Priority Claim and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable. | 100% |
| Class 2 | Other Secured Claims | On the later to occur of (i) the Effective Date and (ii) the date on which such Other Secured Claim becomes Allowed, each holder of an Allowed Other Secured  Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim, either: (a) be paid in full in Cash (including the payment of any interest required to be paid under Bankruptcy Code section 506(b)), (b) receive delivery of collateral securing such Allowed Other Secured Claim, (c) receive treatment that otherwise renders the holder of such Allowed Other Secured Claim Unimpaired, or (d) or receive such other treatment as may be agreed by the holder of such Allowed Other Secured Claim and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable. | 100% |

| Class 3 | First Lien Claims | The First Lien Claims will be deemed Allowed in an amount consistent with the terms of the First Lien Credit Agreement and either (x) agreed to by the First Lien Agent, the Second Lien Agent, and the Debtors or (y) otherwise ordered by the Bankruptcy Court on or before the Confirmation Hearing.  On the Effective Date, each holder of an Allowed First Lien Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed First Lien Claim, either: (a) be paid in full in Cash or (b) receive such other treatment as may be agreed by the holder of such Allowed First Lien Claim and the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable | 100% |
| Class 4 | Second Lien Claims | The Second Lien Claims will be deemed Allowed in an amount consistent with the terms of the Second Lien Credit Agreement and either (x) agreed to by the First Lien Agent, the Second Lien Agent, and the Debtors or (y) otherwise ordered by the Bankruptcy Court on or before the Confirmation Hearing.  On the Effective Date, each holder of an Allowed Second Lien Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Second Lien Claim, receive its Pro Rata share of 100% of the New Common Stock, subject to dilution on account of the Equity Incentive Program.  Notwithstanding anything to the contrary herein, the distribution of New Common Stock to Lightship, as a holder of Second Lien Claims, will be made to an affiliate of Lightship formed to maintain the Debtors' compliance with the Jones Act following such distribution. | 37%[11] |

---

[11]    Estimated recovery to Second Lien Claims based on the claim balance as of the Petition Date, the Valuation Analysis (as defined in Section VIII) and a projected pro-forma debt balance of $170.2 million as of March 31, 2018.

| Class 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall, to the extent such holder's Allowed General Unsecured Claim has not been previously paid in the ordinary course of business pursuant to an order of the Bankruptcy Court or otherwise, at the option of the Debtors, with the consent of Lightship: (i) if such Allowed General Unsecured Claim is due and payable on or before the Effective Date, receive payment in full, in Cash, of the unpaid portion of its Allowed General Unsecured Claim on the Effective Date; (ii) if such Allowed General Unsecured Claim is not due and payable before the Effective Date, be Reinstated; or (iii) receive treatment that otherwise renders the holder of such Allowed General Unsecured Claim Unimpaired. | 100% |
|---------|--------------------------|-----|------|
| Class 6 | Intercompany Claims | In full satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Intercompany Claim, on the Effective Date, such Allowed Intercompany Claim shall be adjusted, reinstated, discharged, or otherwise settled, in each instance as may be determined by the Debtors, with the consent of Lightship, or the Reorganized Debtors, as applicable. | 100% |
| Class 7 | Existing Preferred Shares of Rand | In full satisfaction, settlement, release, and discharge of, and in exchange for Existing Preferred Shares, on the Effective Date, all Existing Preferred Shares shall be cancelled and of no further force and effect, whether surrendered for cancellation or otherwise and the holders thereof shall not receive or retain any distribution on account of their Existing Preferred Shares. | 0% |
| Class 8 | Existing Common Shares | In full satisfaction, settlement, release, and discharge of, and in exchange for the Existing Common Shares, on the Effective Date all such Existing Common Shares shall be cancelled and of no further force and effect, whether surrendered for cancellation or otherwise and the holders thereof shall not receive or retain any distribution on account of their Existing Common Shares. | 0% |

| | | | |
|---|---|---|---|
| Class 9 | Interests in Debtors other than Rand | On the Effective Date, all Interests in the Debtors other than Rand shall be unaffected and the holders thereof shall retain all legal, equitable and contractual rights to which holders of such Interests are otherwise entitled. | 100% |

### D.    Means for Implementation of the Plan

#### 1.    Transactions Effective as of the Effective Date

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, or their stockholders, or any other person or entity.[12]

#### 2.    Operations between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their business as debtors in possession, subject to all applicable orders of the Bankruptcy Court, including the DIP Order, and any limitations set forth in the RSA.

#### 3.    Continued Corporate Existence

Each of the Reorganized Debtors shall continue to exist as of and after the Effective Date as a legal entity, in accordance with the applicable laws of the State of Delaware or any other state or province under the laws of which such Reorganized Debtor was organized and pursuant to the New Corporate Governance Documents.  The Reorganized Debtors reserve the right to change their names, with any such name change to be mutually acceptable to the Debtors and Lightship, to be announced in the Plan Supplement and to be effective upon the Effective Date.

#### 4.    Certificates of Incorporation and Bylaws

The certificates of incorporation and bylaws of the applicable Debtors shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision prohibiting the issuance of non-voting Equity Securities, but only to the extent required by Bankruptcy Code section 1123(a)(6) and limited as necessary to facilitate compliance with applicable non-bankruptcy federal laws. The New Certificate of Incorporation and the New Bylaws for Rand shall be in substantially the form of such documents included in the Plan Supplement and shall be in full force and effect as of the Effective Date.

#### 5.    Plan Distributions and Working Capital

##### a.    Cash on Hand

All Cash consideration necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments or distributions pursuant to the Plan shall be obtained from Cash on hand, including Cash derived from business operations and loans under the First Lien Credit Agreement, the DIP Credit Agreement and the Exit Facility Credit Agreement.

---

[12]    Any references herein to distributions to be made "on the Effective Date" shall mean that such distribution will be made "on the Effective Date or as soon as reasonably practicable thereafter"; provided, however, that distributions to the holders of First Lien Claims and Second Lien Claims shall be made on the Effective Date.

b.        **Exit Facility**

The post-Effective Date operations of the Reorganized Debtors shall be funded with Cash on hand, revenue from its continued operations, and proceeds of the Exit Facility. The Exit Facility Credit Agreement shall be consistent with the Exit Facility Term Sheet, which is attached hereto as **Exhibit F**, and otherwise in form and substance acceptable to the Debtors and Lightship. Without further notice to or order or other approval of the Bankruptcy Court (other than the Confirmation Order), act or action under applicable law, regulation, order or rule, the Reorganized Debtors shall be authorized to (i) enter into the Exit Facility, (ii) grant any Liens and security interests and incur the indebtedness as required under, and in accordance with the terms and conditions of, the Exit Facility, and (iii) issue, execute and deliver all documents, instruments and agreements necessary or appropriate to implement and effectuate all obligations under the Exit Facility, with each of the foregoing being acceptable to Lightship, and to take all other actions necessary to implement and effectuate borrowings under the Exit Facility. On the Effective Date, the Exit Facility, together with new promissory notes, if any, evidencing obligations of the Reorganized Debtors thereunder, and all other documents, instruments, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, shall become effective. The new promissory notes issued pursuant to the Exit Facility and all obligations under the Exit Facility and related documents shall be paid as set forth in the Exit Facility and related documents.

The Exit Facility Credit Agreement shall constitute a legal, valid, binding and authorized obligation of the Reorganized Debtors, and shall be enforceable in accordance with its terms. The financial accommodations to be extended thereunder are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility (i) shall be deemed to be approved, (ii) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Credit Agreement, (iii) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Credit Agreement, and (iv) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

The persons or entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order).

Notwithstanding anything to the contrary in this Plan, the Bankruptcy Court shall not have jurisdiction over any matters first arising under the Exit Facility after the Effective Date.

c.        **Authorization and Issuance of New Common Stock**

On the Effective Date, Reorganized Rand shall be authorized to issue, without need for any further action, and distribute the New Common Stock consistent with the Plan. In order for the Reorganized Rand to continue to be in compliance with the Jones Act, in no event shall non-U.S. Citizens in the aggregate own more than twenty-four percent (24%) of the total number of shares of New Common Stock to be outstanding as of the Effective Date. On the Effective Date, 10% of the New Common Stock (on a fully diluted basis) issued under the Plan shall be reserved for issuance of equity or equity-based awards in connection with the Equity Incentive Program. The terms of the Equity Incentive Program shall be determined by the New Board and any awards thereunder shall be determined by the New Board in its sole discretion. The Second Lien Claims will be deemed allowed in full and cancelled in exchange for 100% of the New Common Stock subject to dilution on account of the Equity Incentive Program. The issuance and distribution of the New Common Stock pursuant to the Plan shall be exempt from registration under applicable securities laws pursuant to Bankruptcy Code section 1145(a).

6.        **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any note, bond, indenture, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of the Debtors in connection with the Second Lien Claims, the Existing Preferred Shares, and the Existing Common Shares, shall be cancelled, terminated and of no further force or effect, without further act or action, and as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any, indentures or similar documents governing the notes, bonds, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors in connection with the Second Lien Claims the Existing Preferred Shares, and the Existing Common Shares shall be released and discharged.

Notwithstanding the foregoing paragraph, (i) the First Lien Credit Agreement shall continue in effect for the limited purpose of (a) allowing the First Lien Agent to make any distributions on account of the First Lien Claims pursuant to the terms of this Plan, to perform such other necessary administrative or other functions with respect thereto, and for the First Lien Agent to have the benefit of all the rights and protections and other provisions of the First Lien Credit Agreement vis-à-vis the holders of the First Lien Claims, and (b) permitting the First Lien Agent to assert any right to indemnification, contribution, or other claim it may have under the First Lien Credit Agreement, subject to any and all defenses any party may have under the Plan or applicable law to any such asserted rights or claims and (ii) the Second Lien Credit Agreement shall continue in effect for the limited purpose of (a) allowing the Second Lien Agent to make any distributions on account of the Second Lien Claims pursuant to the terms of the Plan, to perform such other necessary administrative or other functions with respect thereto, and for the Second Lien Agent to have the benefit of all the rights and protections and other provisions of the Second Lien Credit Agreement vis-à-vis the holders of the Second Lien Claims, and (b) permitting the Second Lien Agent to assert any right to indemnification, contribution, or other claim it may have under the Second Lien Credit Agreement, subject to any and all defenses any party may have under the Plan or applicable law to any such asserted rights or claims.

7.        **Directors and Officers of the Reorganized Debtors**

Upon the Effective Date, the Debtors' respective board of directors and officers shall be deemed to have resigned and shall be replaced by the New Board. After the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Corporate Governing Documents. In accordance with section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement or otherwise on or before the Confirmation Hearing the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtors. To the extent any such director or officer of the Reorganized Debtors is an "insider" within the meaning of the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer. Upon and after the Effective Date, the New Board shall serve in accordance with the New Corporate Governance Documents, subject to compliance with the Jones Act (such that the Reorganized Rand shall at all times be a U.S. Citizen eligible and qualified to own and operate U.S.-flagged vessels in the U.S. coastwise trade).

8.        **Revesting of Assets**

Except as otherwise provided in the Plan, the property of the Debtors' Estates, together with any property of the Debtors that is not property of their Estates and that is not specifically disposed of pursuant to the Plan, shall revest in the Reorganized Debtors on the Effective Date. Thereafter, the Reorganized Debtors may operate their business and may use, acquire and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court. Except as specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, and all Liens with respect thereto.

9.        **Existing Indemnification Obligations; D&O Insurance Policies**

All Indemnification Obligations currently in place for the current and former directors, officers, employees, attorneys, other professionals and agents of each of the Debtors and such current and former directors' and officers'

respective affiliates shall be continuing obligations of the Reorganized Debtors solely to the extent necessary to permit coverage of all such persons under any Runoff Endorsements; provided that in no event shall any such claim for indemnity be recoverable from the Reorganized Debtors as opposed to under such Runoff Endorsements. The New Corporate Governance Documents shall include provisions to give effect to the foregoing.

D&O Insurance Policies will continue in place for the directors and officers of the Debtors during the Chapter 11 Cases on existing terms.  After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Insurance Policies (including the Runoff Endorsements) then in effect.  Directors and officers of the Reorganized Debtors shall be indemnified by the Reorganized Debtors as provided in the New Corporate Governance Documents and new D&O insurance policies to be obtained by or on behalf of the Reorganize Debtors with the consent of Lightship.  Any modifications, amendments or the procuring of insurance for current or former directors, officers, employees, attorneys other professionals and agents of the Debtors or the Reorganized Debtors, as applicable, shall require the consent of Lightship.

### 10.  Exemption from Certain Transfer Taxes

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (ii) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 11.  Corporate Action; Effectuating Documents

On the Effective Date, the adoption and filing of the New Corporate Governance Documents and all actions contemplated by the Plan shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein or therein involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors, and shall be fully authorized pursuant to applicable state law.

Any chief executive officer, president, chief financial officer, senior vice president, vice president, general counsel, secretary or other appropriate officer of the Reorganized Debtors shall be authorized to execute, deliver, file, or record the documents included in the Plan Supplement and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Any secretary or assistant secretary of the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.  All of the foregoing is authorized without the need for any required approvals, authorizations, or consents except for express consents required under the Plan.

### 12.  Plan Supplement

The Plan Supplement may be filed in parts either contemporaneously with the filing of the Plan or from time to time thereafter, but in no event no later than ten (10) days prior to the Confirmation Hearing.  The Plan Supplement shall be incorporated into the Plan by reference and is a part of the Plan as if set forth in full herein. The Debtors shall file and serve a notice of Plan Supplement on its creditor matrix informing parties that (i) the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours, (ii)

the Plan Supplement will be available for inspection on (a) the website maintained by the Claims and Voting Agent: http://www.kccllc.net/Rand, and (b) the Bankruptcy Court's website: http://www.deb.uscourts.gov, and (iii) holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request in accordance with Article 10.14 of the Plan.

### 13.    Preservation of Retained Causes of Action

In accordance with Bankruptcy Code section 1123(b), and except as otherwise provided in Article 6.4(a) or elsewhere in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Retained Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in interest to the Debtors and the Estates may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not released pursuant to the Plan without notice to or approval from the Bankruptcy Court. The Reorganized Debtors may pursue such retained claims, rights or Causes of Action, suits, or proceedings, but, for the avoidance of doubt, not any claims released pursuant to the Plan.

Unless a Cause of Action against a holder of a Claim or an Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article 6.6 of the Plan and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, all Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order.  **No Entity or Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.**

### 14.    Fees and Expenses of Lightship and the First Lien Agent

On the Effective Date, the Debtors shall pay in Cash in full any and all unpaid reasonable and documented fees and expenses of Lightship (including, without limitation, all reasonable and documented fees, costs and expenses of Lightship's professional and financial advisors) without the need for any such party to file an application or otherwise seek Bankruptcy Court approval for such payment.  The reimbursement of Lightship's professionals and advisors shall be limited to: (i) White & Case LLP, (ii) Houlihan Lokey Capital Inc., (iii) Stikeman Elliot LLP, (iv) Seward & Kissel LLP, (v) Kieselstein Law Firm, PLLC, (vi) RSM US LLP, and (vii) Fox Rothschild LLP, in each case incurred in connection with the Chapter 11 Cases prior to the Effective Date.

On the Effective Date, the Debtors shall pay in Cash in full any and all unpaid reasonable and documented fees and expenses of the First Lien Agent (including, without limitation, all reasonable and documented fees, costs and expenses of the First Lien Agent's professional and financial advisors) owed under the First Lien Credit Agreement without the need for any such party to file an application or otherwise seek Bankruptcy Court approval for such payment.

### 15.    Canadian Subsidiaries

The Canadian Subsidiaries are not Debtors in these Chapter 11 Cases.  Upon Consummation of the Plan, (i) all claims against the Canadian Subsidiaries (including, for the avoidance of doubt, principal, interest, fees, costs and expenses) arising under the First Lien Credit Agreement will be satisfied in cash in full, and (ii) all claims against the Canadian Subsidiaries (including, for the avoidance of doubt, principal, interest, fees, costs and

expenses) arising under the Second Lien Credit Agreement will be released by the Second Lien Agent and the Second Lien Lender in exchange for the New Common Stock distributed pursuant to the Plan.

If at any time prior to Confirmation of the Plan, the Debtors determine, in consultation with Lightship, that it would be necessary or beneficial to commence cases under chapter 11 of the Bankruptcy Code for the Canadian Subsidiaries, the Canadian Subsidiaries may commence such chapter 11 cases. In connection therewith, it is anticipated that the Canadian Subsidiaries would prepare a plan of reorganization that would classify and treat the Claims against, and Interests in, the Canadian Subsidiaries in substantially identical fashion to the classification and treatment accorded to Claims and Interests in the Plan. In particular: (i) all Allowed Claims against the Canadian Subsidiaries (including, for the avoidance of doubt, principal, interest, fees, costs and expenses) arising under the First Lien Credit Agreement will be paid in Cash and in full on the Effective Date; (ii) all Allowed Claims against the Canadian Subsidiaries (including, for the avoidance of doubt, principal, interest, fees, costs and expenses) arising under the Second Lien Credit Agreement will be cancelled in exchange for 100% of the New Common Stock issued under the Plan, subject to dilution on account of the Equity Incentive Program; (iii) all other Allowed Claims against the Canadian Subsidiaries will be Unimpaired; and (iv) the Interests in the Canadian Subsidiaries will be unaffected and Unimpaired.

In advance of any such filing of the Canadian Subsidiaries, it is anticipated that the Canadian Subsidiaries will send to the holder of the Second Lien Claims a copy of such plan of reorganization and an accompanying disclosure statement in form and substance substantially identical to the Disclosure Statement.  Under these circumstances; the Ballot submitted by the holder of the Second Lien Claims with respect to this Plan shall be deemed to also be a vote with respect to a plan filed for the Canadian Subsidiaries.

Promptly upon commencement of such chapter 11 cases, the Canadian Subsidiaries will take such other actions and seek relief from the Bankruptcy Court necessary to protect and maximize the value of their business and assets, including (i) having their cases jointly administered with the Chapter 11 Cases, (ii) making certain relief obtained in the Chapter 11 Cases applicable to the Canadian Subsidiaries, and (iii) setting a hearing on confirmation of their plan of reorganization at the same time as the confirmation hearing on the Plan.

E.    **Conditions Precedent to Effectiveness of the Plan**

1.    **Conditions to the Effective Date.**

Consummation of the Plan and the occurrence of the Effective Date are subject to satisfaction of the following conditions, each of which must be satisfied or waived on or prior to the Effective Date in accordance with Article 8.3 of the Plan:

a.    The Confirmation Order shall (i) have been entered in a form and substance satisfactory to the Debtors and Lightship and (ii) have become a Final Order;

b.    The final version of the Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been filed and be in form and substance acceptable to the Debtors and Lightship;

c.    All actions, documents, certificates and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required; provided, however, that each document, instrument and agreement must be in form and substance acceptable to the Debtors and Lightship;

d.    The affiliate of Lightship designated by Lightship to receive the New Common Stock to be distributed to holders of Second Lien Claims under the Plan shall be a U.S. Citizen as of the Effective Date and shall deliver an affidavit of U.S. Citizenship in form and substance acceptable to the Debtors and Lightship;

e.      All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan shall have been received, waived or otherwise resolved and remaining in full force and effect, and there shall be existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the Consummation of the Plan;

f.      The Debtors shall have paid all fees and expenses set forth in Article 4.14 of the Plan;

g.      The Reorganized Debtors shall have entered into the Exit Facility Credit Agreement, and all conditions precedent to the consummation or effectiveness of the entry into the Exit Facility Credit Agreement have been waived or satisfied in accordance with the terms thereof, and any funding contemplated to be made on the Effective Date shall have been made in accordance with the terms thereof; and

h.      All conditions to the Effective Date in Article 8.2 shall have been satisfied on or before the date that is ninety (90) days from the Petition Date (the "Outside Date"); provided that the Outside Date may be extended by mutual written agreement of the Debtors and Lightship.

### 2.      Waiver of Conditions

Each of the conditions set forth in Articles 8.1 and 8.2 of the Plan may be waived in whole or in part by the Debtors, without any notice to parties in interest or the Bankruptcy Court and without a hearing, provided, however, that such waiver shall not be effective without the consent of Lightship.  Notwithstanding the foregoing, the Debtors and Lightship may not waive entry of the Confirmation Order or the condition set forth in Article 8.2(d) of the Plan.

### 3.      Effect of Failure of Conditions

If the Effective Date does not occur prior to the Outside Date, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Debtors or the holder of any Claim or Interest in the Debtors or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests or any other Entity in any respect.

### F.      Settlement, Release, Injunction and Related Provisions

### 1.      Discharge of Claims

On and after the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or estate; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Bankruptcy Code section 502(g); and (d) all entities shall be precluded from asserting against the Debtors, the Reorganized Debtors, the Estates, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, provided, however, that the foregoing discharge shall not apply to the Retained Causes of Action.

### 2.      General Settlement of Claims and Interests

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and

controversies resolved pursuant to the Plan.  All distributions made to holders of Allowed Claims in any Class are intended to and shall be final.

### 3.    Release of Liens

Except as otherwise provided in the Plan, the Exit Facility Credit Agreement or in any contract, instrument, release or other agreement or document created pursuant to the Plan and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### 4.    Releases

#### a.    Releases by the Debtors

**Pursuant to Bankruptcy Code section 1123(b), and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, the Debtors, the Reorganized Debtors, the Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Plan, the RSA, the DIP Credit Agreement, the Exit Facility Credit Agreement, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan or upon any other act or omission, transaction, agreement, event or occurrence taking place on or before the Effective Date other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (a) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (b) the Retained Causes of Action.**

#### b.    Third-Party Releases

**To the fullest extent permitted by law and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, (i) holders of Claims who vote to accept the Plan, (ii) holders of Claims who are Unimpaired under the Plan, (iii) holders of Claims entitled to vote on the Plan who do not submit a ballot and do not timely object to the releases, if any, and (iv) each of the Released Parties shall be deemed to forever release, waive, and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of**

the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the purchase, sale, or rescission or the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the Plan, the RSA, the DIP Credit Agreement, the Exit Facility Credit Agreement, the Plan Supplement, the Disclosure Statement or related agreements, instruments or other documents and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, actual fraud, or gross negligence as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (a) any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (b) the Retained Causes of Action.

Each Person providing releases under the Plan, including the Debtors, the Estates, and the holders of Claims (regardless of whether such holder is a Released Party), shall be deemed to have granted the releases set forth in those sections notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or Causes of Action actually known or suspected to exist at the time of execution of such release.

5.      Exculpation and Limitation of Liability

Except as otherwise specifically provided in the Plan, each of the Exculpated Parties will not have or incur any liability for any act or omission in connection with, or arising out of, the formulation, negotiation, preparation, dissemination, implementation or pursuit of approval of the RSA, the DIP Credit Agreement, the Exit Financing Agreement, the Disclosure Statement, the Plan, or the solicitation of votes for or Confirmation of the Plan, or the Consummation of the Plan, the Plan Supplement, or the transactions contemplated, implemented and effectuated by the Plan  or the Plan Supplement or the administration of the Plan or the property to be distributed under the Plan, or any other act or omission during the administration of the Debtors' Estates or in contemplation of the Chapter 11 Cases, except for willful misconduct, actual fraud or gross negligence as determined by a Final Order, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that the foregoing exculpation shall not apply to the Retained Causes of Action.

6.      Injunction

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, or other debt or liability that is satisfied, released and discharged pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, liabilities or rights:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or

continuing any action or other proceeding of any kind, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Article VI of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Without limiting the effect of the foregoing provisions of Article 6.6 of the Plan upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth in Article 6.6 of the Plan.

## VIII.    LIQUIDATION ANALYSIS, FINANCIAL PROJECTIONS AND VALUATION ANALYSIS

### A.    Liquidation Analysis

The Debtors believe that the Plan provides a greater recovery for holders of Claims than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the likely erosion in value of the Debtors' vessels in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the liquidation sale of the Debtors' assets and services in which such assets and services could be marketed and sold.

The Debtors, with the assistance of Conway MacKenzie, have prepared the Liquidation Analysis, which is attached hereto as **Exhibit C**, to assist holders of Claims in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

### B.    Financial Projections

The Debtors, with the assistance of Conway MacKenzie, have prepared projected consolidated financial statements (the "Financial Projections"), which are attached hereto as **Exhibit D**, to assist holders of Claims in evaluating the Plan. The Financial Projections include the following: (i) projected income statement, balance sheet and statement of cash flows and (ii) notes and assumptions for the period from FY2018 through FY2022. The Financial Projections incorporate various estimates and assumptions, as set forth in the accompanying notes. Further, the Financial Projections are subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, creditors and other interested parties should see the "Risk Factors" identified in Article IX below for a discussion of certain factors that may affect the future financial performance of the Debtors.

C.      Valuation Analysis

The Debtors, with the assistance of Miller Buckfire, have prepared a valuation analysis (the "Valuation Analysis"), which is attached hereto as **Exhibit E**, to assist holders of Claims in evaluating the Plan. In conjunction with formulating the Plan and satisfying their obligations under Bankruptcy Code section 1129, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Valuation Analysis, based on projections and solely for purposes of the Plan, estimates the value available for distribution to holders of Allowed Claims entitled to receive a distribution under the Plan.

IX.    RISK FACTORS

**Holders of Claims entitled to vote on the Plan should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.**

A.      General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

B.      Certain Bankruptcy Law Considerations

1.      Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Bankruptcy Code section 1122 provides that a debtor may place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests in the Plan complies with the Bankruptcy Code requirements because the Debtors classified Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      The Debtors May Fail to Satisfy Solicitation Requirements Requiring a Re-Solicitation

Bankruptcy Code section 1126(b) provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of votes was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitation or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information" as defined in Bankruptcy Code section 1125.

Additionally, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Bankruptcy Court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for solicitation of creditors or equity security holders to accept or reject the plan, or that the solicitation was not in compliance with Bankruptcy Code section 1126(b).

To satisfy the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b), the Debtors will be delivering the Solicitation Materials to all holders of Second Lien Claims as of the Voting Record Date. Accordingly, the Debtors believe that Solicitation is proper under applicable non-bankruptcy law, rules, and regulations. The Debtors cannot be certain, however, that Solicitation will be approved by the Bankruptcy Court,

and if such approval is not obtained, Confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to re-solicit votes to accept or reject the Plan or solicit votes from one or more Classes not previously solicited. The Debtors cannot provide any assurances that such a re-solicitation would be successful. Re-solicitation could delay or jeopardize Confirmation of the Plan. Non-confirmation of the Plan  could result in protracted cases, which could significantly and detrimentally impact the Debtors' Estates.

### 3.    DIP Facility

As noted above, pursuant to certain provisions in the DIP Facility, if the Debtors do not consummate the Plan by March 16, 2018, (i) the interest rate of the DIP Facility increases from 6.0% to 12.0% and shifts from payable in kind to payable in Cash, and (ii) a $500,000 fee becomes payable in Cash.  In addition, the First Lien Lenders have agreed to reserve their rights with respect to the Debtors' and Non-Debtor Affiliates' use of cash collateral and hold such cash collateral in reserve in a segregated account until March 16, 2018.  Accordingly, there can be no assurance that, if the Plan is not consummated by March 16, 2018, that there will be sufficient funds available under the DIP Facility or an ability by the Debtors to use cash collateral in an amount necessary to continue pursuing a reorganization of the Debtors.

### 4.    Risk of Non-Confirmation, Non-Occurrence or Delay of the Plan.

Because the Plan is proposed as a prepackaged plan, the Debtors will begin soliciting votes before the commencement of the Chapter 11 Cases. If insufficient votes are received, the Debtors may seek to accomplish an alternative to the Plan. There can be no assurance that the terms of an alternative plan would be similar, or as favorable, to the holders of Allowed Claims as those proposed by the Plan. Additionally, if the Plan is not accepted prior to the Petition Date by the requisite number of votes from the holders of Second Lien Claims, then the Debtors may commence the Chapter 11 Cases without the benefit of a prepackaged chapter 11 plan or could pursue other out-of- court restructuring alternatives.

For the Debtors to emerge successfully from the Chapter 11 Cases, the Debtors, like any other chapter 11 debtor, must obtain approval of the Plan from holders of Second Lien Claims and Confirmation of the Plan by the Bankruptcy Court, and then the Reorganized Debtors must successfully implement the Plan. The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, (ii) solicit and obtain acceptances of the Plan, and (iii) fulfill other statutory conditions with respect to the Confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation, or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified. Additionally, by its terms, the Plan will not become effective unless, among other things, the conditions precedent set forth in Article 8.2 of the Plan have been satisfied or waived in accordance with Article 8.3 of the Plan.

### 5.    Risk of Non-Occurrence of the Effective Date

Although the Debtors anticipate that the Effective Date will occur on or before March 16, 2018 (or such later date to which the Debtors and Lightship have consented in writing) in accordance with the terms of the DIP Facility, there can be no assurance as to such timing or that the conditions to the Effective Date contained in the Plan will ever occur. The impact that a prolonging of the Chapter 11 Cases may have on the Debtors' ability to reorganize cannot be accurately predicted or quantified. The continuation of the Chapter 11 Cases, particularly if the Plan is not approved, confirmed, or implemented within the time frame currently contemplated, could adversely affect operations and relationships between the Debtors and their customers and charterers, suppliers, vendors, service providers, and other creditors to the detriment of the Debtors' Estates and result in increased professional fees and similar expenses.

6.      **Impact of the Chapter 11 Cases on the Debtors**

Despite the treatment of holders of General Unsecured Claims under the Plan, the Chapter 11 Cases may affect the Debtors' relationships with, and their ability to negotiate favorable terms with, customers, suppliers, vendors, employees, and other counterparties. While the Debtors expect to continue normal operations during the Chapter 11 Cases, the commencement of the Chapter 11 Cases and the filing of the Plan may affect the Debtors' relationships with, and their ability to negotiate favorable terms with such parties, which could adversely affect the Debtors' ability to reorganize their business and operations in an efficient and value-maximizing manner.

C.      **Industry-Specific Risk Factors to Be Considered**

1.      **Cyclical Nature of the Shipping Industry**

The highly cyclical nature of the shipping industry may lead to volatile changes in vessel values and other variables, which may adversely affect the Debtors' earnings. Factors affecting the supply and demand for vessels are outside of the Debtors' control, and the nature, timing and degree of changes in industry conditions are unpredictable and may adversely affect the values of the Debtors' vessels and result in significant fluctuations in the amounts of charter hire the Debtors may earn, which could result in significant fluctuations in the Debtors' quarterly results and cash flows. The factors that influence the demand for vessel capacity include: (i) demand for and availability of bulk commodities, which affect the need for vessel capacity; (ii) developments in domestic and international trade; (iii) environmental concerns and regulations; and (iv) weather. The factors that influence the supply of vessel capacity include: (a) the scrapping rate of older vessels; (b) the number of vessels that are out of service; and (c) environmental and maritime regulations.

2.      **Market Value of Vessels**

The market value of vessels fluctuates significantly, which could adversely affect the Debtors' liquidity or otherwise adversely affect their financial condition. The market value of vessels fluctuates over time, and the change in market value is based upon several factors, including: (i) age of the vessel; (ii) general economic and market conditions affecting the bulk shipping industry; (iii) number of vessels in the market; (iv) types and sizes of vessels available; (v) changes in trading patterns; (vi) prevailing level of charter rates; (v) competition from other shipping companies; and (vi) technological advances in vessel design. As vessels age, they generally decline in value and the sale of an older vessel could incur a loss.

3.      **Insurance Risks**

Shipping is a business with inherent risks, and the Debtors' insurance may not be adequate to cover losses to their vessels and cargoes that may occur. The Debtors' vessels and cargoes are at risk of being damaged or lost because of events including, but not limited to: (i) marine disasters; (ii) bad weather; (iii) mechanical failures; (iv) human error; (v) war or terrorism; and (vi) other unforeseen circumstances or events. While the Debtors carry insurance to protect against certain risks involved in the conduct of their business, risks may arise against which the Debtors are not adequately insured. Further, even if insurance coverage proves sufficient to carry the Debtors' losses, the Debtors may not be able to timely replace a ship in the event of a loss.

4.      **Currency Exchange Rates**

Because the Company generates more than half of its revenues and expenses in Canadian dollars, exchange rate fluctuations could cause the Company to suffer reduced U.S. dollar earnings. Although the U.S. dollar is the Company's reporting currency, the Company generates a significant portion of its revenues and incurs a significant portion of its expenses in Canadian dollars. Accordingly, fluctuations in currency exchange rates could lead to instability in the Company's operating results due to changes in the value of the U.S. dollar relative to the Canadian dollar.

### D.    Company-Specific Risk Factors to Be Considered

#### 1.    Indebtedness of Reorganized Debtors

It is expected that, after emergence from the Chapter 11 Cases, the Reorganized Debtors will continue to have substantially reduced but still significant amounts of indebtedness. The Reorganized Debtors' indebtedness and interest expense could have important consequences, including: (i) limiting the Reorganized Debtors' ability to use a substantial portion of their cash flow from operations in other areas of their business; (ii) limiting the Reorganized Debtors' flexibility to capitalize on business opportunities and to react to market trends; (iii) hindering the Reorganized Debtors' ability to obtain additional financing for working capital, capital expenditures, debt service requirements, acquisitions or other investments; (iv) placing the Reorganized Debtors at a competitive disadvantage as compared to less leveraged competitors; and (v) limiting the Reorganized Debtors' ability to enter into hedging transactions. The Reorganized Debtors' ability to continue to fund their obligations and to reduce debt may be affected by general economic, financial market, competitive, legislative and regulatory factors, among other things. An inability to fund the debt requirements or reduce debt could have a material adverse effect on the Reorganized Debtors' business, financial condition, results of operations and liquidity.

#### 2.    Cash Generation

The Reorganized Debtors may not be able to generate sufficient cash to service all of their indebtedness. The Reorganized Debtors' earnings and cash flow vary significantly over time due to the cyclical nature of the shipping industry. As a result, the amount of debt that the Reorganized Debtors can manage in some periods may not be appropriate in other periods. Additionally, future cash flow may be insufficient to meet the Reorganized Debtors' debt obligations and commitments. Any insufficiency could negatively impact their business. If the Reorganized Debtors do not generate sufficient cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans.

#### 3.    Jones Act Compliance

The Debtors' business would be adversely affected if the Debtors failed to comply with the Jones Act provisions on coastwise trade, or if these provisions were repealed and if changes in international trade agreements were to occur. The Debtors' business is subject to the Jones Act and other federal laws that restrict maritime transportation between points in the United States to vessels built and registered in the United States and owned and manned by U.S. citizens. The Debtors are responsible for monitoring the foreign ownership of their common stock and other interests to ensure compliance with the Jones Act. If the Debtors do not comply with these restrictions, they would be prohibited from operating their vessels in U.S. coastwise trade, and under certain circumstances would be deemed to have undertaken an unapproved foreign transfer, resulting in severe penalties, including permanent loss of U.S. coastwise trading rights for their vessels, fines or forfeiture of the vessels.

#### 4.    Coasting Trade Act Compliance

The Company's Canadian business is subject to the Coasting Trade Act and other Canadian statutes that restrict maritime transportation between points in Canada to duty-paid vessels registered in Canada, manned by Canadian citizens. The Company's business would be adversely affected if these provisions were repealed and if changes in international trade agreements were to occur to open domestic transportation in the Great Lakes to foreign flag vessels.

E.        **Additional Factors to Be Considered**

1.        **The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.        **No Representations Made Outside this Disclosure Statement Are Authorized**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Except as otherwise provided herein or in the Plan, no representations relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court, the Bankruptcy Code, or otherwise. Any representations or inducements made to secure your acceptance or rejection of the Plan, other than as contained in or included with this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and, if applicable, the U.S. Trustee.

3.        **The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited unless explicitly stated otherwise. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

4.        **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.        **No Admissions Are Made by this Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax

or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests or any other parties in interest. Except as otherwise provided in the Plan, the vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Claim, or recover any preferential, fraudulent, or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 6.        Forward-Looking Statements in this Disclosure Statement

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated environmental liabilities;

- other projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- regulatory changes;

- plans and objectives of Management for future operations;

- contractual obligations;

- off-balance-sheet arrangements;

- growth opportunities for existing services;

- projected price changes;

- projected general market conditions; and

- impacts from new technologies.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. These risks, uncertainties, and factors include:

- the Debtors' ability to confirm, and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, Management and employees and the risks associated with operating the business during the Chapter 11 Cases;

- supplier and partner response to the Chapter 11 Cases;

- inability to have claims discharged or settled during the Chapter 11 Cases;

- general economic, business, and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- currency rate fluctuations;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- ability to implement cost reduction and market share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters; and

- inability to implement the Debtors' business plan.

*See* "Risk Factors" in Rand's Annual Report on Form 10-K for the year ended March 31, 2017 for a list of other risk factors that could have a significant impact on the Debtors' operating performance, and see Rand's filings with the SEC for additional disclosures regarding risks and forward-looking statements.

## X.    SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan (the "Solicitation Procedures"). Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

A.      **The Solicitation Materials**

The following materials constitute the Solicitation materials (the "<u>Solicitation Materials</u>"):

- the appropriate Ballot and applicable voting instructions (the "<u>Voting Instructions</u>"); and

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents.

The sole voting Class, Class 4 (Second Lien Claims), shall be served by overnight mail, with copies of this Disclosure Statement, Plan and the appropriate Ballot. The Solicitation Materials will not be provided to other Classes because all other Classes are either (i) Impaired and deemed to reject the Plan; or (ii) Unimpaired and deemed to accept the Plan, and therefore not entitled to vote. **Any party who desires additional copies of these documents may request them from the Claims and Voting Agent by calling 877-725-7523 (domestic) or 424-236-7237 (international), or by emailing RandLogisticsInfo@kccllc.com.**

B.      **Voting Deadline**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **4:00 p.m. (prevailing Eastern Time) on February 6, 2018** unless the Debtors extend the date until which Ballots will be accepted; <u>provided</u>, that any holder of Claims who casts a Ballot prior to the time of filing of any of the Debtors' chapter 11 petitions shall not be entitled to change its vote or cast new Ballots after the Chapter 11 Cases are commenced. Except to the extent the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

C.      **Voting Instructions**

Only the holders of Second Lien Claims as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them prior to the Voting Deadline. It is important to follow the specific instructions provided on each Ballot. Ballots should be sent to the Claims and Voting Agent on or before the Voting Deadline to the following address: Rand Ballot Processing Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245.

The Debtors have engaged the Claims and Voting Agent to assist in the balloting and tabulation process. The Claims and Voting Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and the Debtors will file the voting report (the "<u>Voting Report</u>") as soon as practicable.

**The deadline by which the Claims and Voting Agent must actually receive your Ballot is 4:00 p.m. (prevailing Eastern Time) on February 6, 2018.**

Any Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

*Note to Voting Class*

By signing and returning a Ballot, each holder of a Second Lien Claim will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the holder has received and reviewed a copy of the Disclosure Statement, the Plan and the remainder of the Solicitation Materials and acknowledges that Solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Disclosure Statement, Solicitation Materials or other publicly available materials;

- the holder has cast the same vote with respect to all Claims in the particular Class;

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked, in accordance with the procedures set forth herein;

- the Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim; and

- only holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims.

As set forth in Article VII of this Disclosure Statement, if the Canadian Subsidiaries commence chapter 11 cases, it is anticipated that the Canadian Subsidiaries would prepare a plan of reorganization that would classify and treat the Claims against, and Interests in, the Canadian Subsidiaries substantially identical fashion to the classifications and treatments contained in the Plan. In advance of any such filing of the Canadian Subsidiaries, it is anticipated that: (i) the Canadian Subsidiaries will (a) send to the holder of the Second Lien Claims a copy of such plan of reorganization and an accompanying disclosure statement in form and substance substantially identical to the Disclosure Statement, and (b) commence solicitation of such holder's vote to accept such plan of reorganization; and (2) the holder of the Second Lien Claims will timely vote to accept such plan by signing and returning a ballot substantially similar to the Ballot.

### D.    Voting Tabulation

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the Solicitation Procedures, a Ballot will be deemed delivered only when the Claims and Voting Agent actually receives the executed Ballot as instructed in the Voting Instructions. No Ballot should be sent to the Bankruptcy Court, the Debtors, the Debtors' agents (other than the Claims and Voting Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of Bankruptcy Code section 1127 and the terms of the Plan regarding modifications).

To the extent a holder holds multiple Claims within a particular Class, the Claims and Voting Agent may, in its discretion, and to the extent possible, aggregate the Claims of any particular holder within such Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under Bankruptcy Code section 1126(e), the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Claims and Voting Agent. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each a "Defective Ballot"), including, but not limited to, those Ballots that: (i) are received after the Voting Deadline unless the Debtors have granted an extension of the Voting Deadline with respect to such Ballot; (ii) are (in whole or in material part) illegible or unidentifiable; (iii) lack signatures; (iv) lack necessary information; (v) are damaged; (vi) are cast by a person or entity that does not hold a Claim in a Class entitled to vote on the Plan as of the Voting Record Date; (vii) does not indicate an acceptance or a rejection or that indicates both an acceptance and a rejection; (viii) are sent to the Bankruptcy Court, the Debtors, the Debtors' agents, advisors or representatives (other than the Claims and Voting Agent); or (ix) partially accept and partially reject the Plan. The Claims and Voting Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such

amount cannot be timely reconciled without undue effort on the part of the Claims and Voting Agent, the amount shown in the Debtors' records shall govern.

## XI.    CONFIRMATION PROCEDURES

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are: (i) the Plan is in the "best interests" of holders of Claims; (ii) the Plan is feasible and (iii) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class of claims and interests, that each holder of an impaired claim or interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan meets the "best interests of creditors" test of Bankruptcy Code section 1129(a)(7). Attached hereto as **Exhibit C** and incorporated herein by reference is the Liquidation Analysis. As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' business would result in significantly reduced recoveries for holders of Impaired Claims as compared to distributions contemplated under the Plan.

### C.    Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following these Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

E.        **Confirmation without Acceptance by All Impaired Classes**

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it. Pursuant to Bankruptcy Code section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

In the event an Impaired Class of Claims does not accept or is deemed to reject the Plan, the Debtors intend to request Confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provision in Bankruptcy Code section 1129(b). The Debtors reserve the right, pursuant to the Plan, to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b).

1.        **No Unfair Discrimination**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. Under the Plan, all Classes are provided treatment that is substantially equivalent to as the treatment that is provided to other Classes that have equal rank.

2.        **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting (or deemed rejecting) class, the test sets different standards depending upon the type of claims or equity interests in the class. A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (a) for each holder of an interest included in the rejecting class to receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such interest holder is entitled, (ii) any fixed redemption price to which such interest holder is entitled, or (iii) the value of such interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors submit that Confirmation of the Plan pursuant to the "cramdown" provisions of Bankruptcy Code section 1129(b) is proper, as the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

F.        **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under Bankruptcy Code section 1129, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Based on the projections and solely for the purposes of the Plan, the Debtors' Valuation Analysis estimates the value available for distribution to holders of Allowed Claims entitled to receive a distribution under the Plan. The Valuation Analysis is set forth in **Exhibit E** attached hereto and incorporated herein by reference.

### G.        Other Available Information

Rand files with the SEC its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all required amendments to those reports, proxy statements and registration statements. You may read and copy any material Rand files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may also obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an internet site at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers, including Rand, that file electronically.

All of Rand's reports and materials filed with the SEC are available free of charge through its website, http://www.randlogisticsinc.com, as soon as reasonably practical, after Rand electronically files such material with the SEC.

Rand's consolidated financial statements for the year ended March 31, 2017, together with other financial information for prior reporting periods, are included in its Form 10-K for the fiscal year ended March 31, 2017, filed with the SEC on July 6, 2017. Such information was prepared assuming that Rand will continue as a going concern and contemplate the realization of assets and the satisfaction of liabilities in the normal course of business. The Plan similarly contemplates that the Debtors will reorganize their business and operations in order to maximize value for all stakeholders.

## XII.    SECURITIES LAW MATTERS

### A.        New Common Stock

The Plan provides for Reorganized Rand to issue the New Common Stock to the holders of the Second Lien Claims. The Debtors believe that the New Common Stock will constitute "securities" as defined in section 2(a)(1) of the Securities Act, Bankruptcy Code section 101 and applicable state securities laws ("Blue Sky Laws").

### B.        Issuance of New Common Stock under Plan and Resale

The Debtors are relying on the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of the New Common Stock in connection with the Plan.  The New Common Stock to be issued under the Plan (a) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors or the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. An initial recipient of New Common Stock under the Plan that is such an affiliate or underwriter as described in the preceding sentence may not be issued freely transferable securities and may be limited in its ability to resell such New Common Stock.

### C.        Listing of New Common Stock

Reorganized Rand shall not be obligated, and does not intend, to list the New Common Stock on a national securities exchange.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the

Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the restructuring transaction. No representations are being made regarding the particular tax consequences of the Confirmation and Consummation of the Plan to the Debtors or any holder of a Claim. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, regulated investment companies, real estate investment trusts, small business investment companies, employees, persons who receive their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Claims hold such Claims as "capital assets" within the meaning of Tax Code section 1221.

This summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and holders of Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, estate, gift, non-U.S. or any other applicable tax law.

For purposes of this summary, a "U.S. Holder" means a holder of a Claim that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust, or (b) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a holder of a Claim that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds a Claim, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the Plan.

***The U.S. federal income tax consequences of the Plan are complex. The following summary is for informational purposes only and is not a substitute for careful tax planning and advice based on the individual circumstances pertaining to a holder of a Claim. All holders of Claims are urged to consult their own tax advisors as to the consequences of the restructuring described in the Plan under federal, state, local, non-U.S. and any other applicable tax laws.***

A.      **Recent Tax Legislation**

Recently enacted U.S. tax legislation known colloquially as the "Tax Cuts and Jobs Act," among other things, makes significant changes to the rules applicable to the taxation of corporations, such as changing the corporate tax rate to a flat 21% rate, introducing a capital investment deduction in certain circumstances, placing certain limitations on the interest deduction, modifying the rules regarding the usability of certain net operating losses ("NOLs"), and making extensive changes to the U.S. international tax system. The Debtors are currently in the process of analyzing the effects of this new legislation on the Debtors. The impact of these new rules is uncertain and could be adverse.

### B.    U.S. Federal Income Tax Consequences to the Debtors Under the Plan

Rand and its U.S. corporate subsidiaries (the "Rand Consolidated Group") have U.S. consolidated estimated NOL carryforwards as of March 31, 2017 of approximately $69 million. However, the Rand Consolidated Group's NOLs are subject to audit and possible challenge by the IRS.  Accordingly, the amount of the Rand Consolidated Group's NOLs ultimately may vary from the amounts set forth above.

Under the Tax Cuts and Jobs Act, the ability to utilize net operating losses is determined by when such losses arose. NOLs arising in tax years ending on or before December 31, 2017, may be carried back two years and carried over 20 years to offset taxable income in such years. NOLs arising in taxable years beginning after December 31, 2017 can be carried forward indefinitely, but cannot be carried back. Further, with respect to NOL carryforwards arising in taxable years beginning after December 31, 2017, the NOL deduction is limited to 80 percent of taxable income (determined without regard to the deduction).

### 1.    Cancellation of Indebtedness Income

Generally, a corporation will recognize cancellation of debt ("COD") income upon satisfaction of its outstanding U.S. indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income, in general, is the excess of (a) the adjusted issue price of the U.S. indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.  This summary does not discuss any tax consequences that may arise under any Canadian tax laws with respect to Canadian indebtedness.

A corporation will not, however, be required to include any amount of COD income in gross income if the corporation is a debtor under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Section 108(a) Bankruptcy Exception").  Instead, as a consequence of such exclusion, the debtor must reduce its tax attributes by the amount of COD income excluded from gross income.  Under Tax Code section 108(b), a debtor that excludes COD income from gross income under the Section 108(a) Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income.  In general, tax attributes are reduced in the following order: (a) NOLs and NOL carryforwards, (b) general business and minimum tax credit carryforwards, (c) capital loss carryforwards, (d) basis of the debtor's assets, and (e) foreign tax credit carryforwards.  A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness.  NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under Tax Code section 108(b)(5) (the "Section 108(b)(5) Election") to reduce its basis in its depreciable property first.  If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply.

COD income is determined on a company-by-company basis.  If a debtor with excluded COD income is a member of a consolidated group, Treasury regulations address the application of the rules for the reduction of tax attributes (the "Consolidated Attribute Reduction Rules").  If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member.  If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction.  Finally, if the attribute reduction is less than the amount of COD income and a member of the Rand Consolidated Group has an excess loss account (an "ELA") (i.e., negative basis in the stock of another member of the consolidated group), the Rand Consolidated Group will recognize taxable income to the extent of the lesser of such ELA or the amount of the COD income that was not offset by tax attribute reduction.

We expect to realize COD income as a result of transactions under the Plan.  The amount of COD income will depend upon, among other things, the fair market value of the New Common Stock, which may not be determined until after the Effective Date.  Pursuant to the Section 108(a) Bankruptcy Exception, we expect that we will not recognize any of this COD income in gross income.  Instead, we will be required to reduce our tax attributes in accordance with the Consolidated Attribute Reduction Rules after determining the taxable income (or loss) of the

Rand Consolidated Group for the taxable year of discharge. Under the Consolidated Attribute Reduction Rules, our excluded COD income will be applied to reduce our NOLs and, if necessary, other tax attributes, including our tax basis in our assets. In addition, the tax attributes (and, in particular, NOLs) that accrue between the Effective Date and the end of the Reorganized Debtors' taxable year are available to offset taxable income.  Basis reduction applies to assets owned by a debtor at the beginning of the tax year following the discharge.

## 2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Under Tax Code section 382, if a "loss corporation" (generally, a corporation with NOLs and/or built-in losses) undergoes an "ownership change," the amount of its pre-change losses (including certain losses or deductions which are "built-in," i.e., economically accrued but unrecognized as of the date of the ownership change) that may be utilized to offset future taxable income generally are subject to an annual limitation.  Similar rules apply to a corporation's capital loss carryforwards and tax credits.

Our issuance of New Common Stock pursuant to the Plan is expected to result in an ownership change for purposes of Tax Code section 382.  Accordingly, remaining pre-change NOLs following attribute reduction may be subject to an annual limitation.  This limitation applies in addition to, and not in lieu of, any other limitation that may already or in the future be in effect and the attribute reduction that may result from COD.

### a.    General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the loss corporation (or, in the case of a consolidated group, generally the stock of the common parent) immediately before the ownership change (with certain adjustments) and (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 1.97% for ownership changes occurring in February 2017).  If a corporation (or a consolidated group) in bankruptcy undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change, after giving effect to the discharge of creditors' claims but subject to certain adjustments.  In no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  If a loss corporation has a net unrealized built-in gain ("NUBIG") immediately prior to the ownership change, the annual limitation may be increased as certain gains are recognized (or are treated as recognized pursuant to the safe harbors provided in IRS Notice 2003-65) during the five-year period beginning on the date of the ownership change (the "Recognition Period").  If a loss corporation has a net unrealized built-in loss ("NUBIL") immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of pre-change NOLs that could be used by the loss corporation during the Recognition Period.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, unless the corporation qualifies for certain bankruptcy exceptions, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains ("RBIGs").  In addition, if a redemption or other corporate contraction occurs in connection with the ownership change of the loss corporation (or the consolidated group), or if the loss corporation (or the consolidated group) has substantial nonbusiness assets, the annual limitation is reduced to take the redemption, other corporate contraction or nonbusiness assets into account.  Furthermore, if the corporation (or the consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never a greater) annual limitation with respect to any losses that existed at the time of the first ownership change.

### b.    Built-in Gains and Losses

A NUBIG or NUBIL is generally the difference between the fair market value of a loss corporation's assets and its tax basis in the assets, subject to a statutorily defined threshold amount.  The amount of a loss corporation's NUBIG or NUBIL must be adjusted for built-in items of income or deduction that would be attributable to a pre-

change period if recognized during the Recognition Period. The NUBIG or NUBIL of a consolidated group generally is calculated on a consolidated basis, subject to special rules.

If a loss corporation has a NUBIG immediately prior to an ownership change, any RBIGs will increase the annual limitation in the taxable year the RBIG is recognized. An RBIG generally is any gain (and certain income) with respect to an asset held immediately before the date of the ownership change that is recognized (or deemed to be recognized) during the Recognition Period to the extent of the fair market value of the asset over its tax basis immediately prior to the ownership change. However, the aggregate amount of all RBIGs that are recognized (or deemed to be recognized) during the Recognition Period may not exceed the NUBIG. On the other hand, if a loss corporation has a NUBIL immediately prior to an ownership change, any recognized built-in losses ("RBILs") will be subject to the annual limitation in the same manner as pre-change NOLs. An RBIL generally is any loss (and certain deductions) with respect to an asset held immediately before the date of the ownership change that is recognized during the Recognition Period to the extent of the excess of the tax basis of the asset over its fair market value immediately prior to the ownership change. However, the aggregate amount of all RBILS that are recognized during the Recognition Period may not exceed the NUBIL. RBIGs and RBILs may be recognized during the Recognition Period for depreciable and amortizable assets that are not actually disposed.

### c.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation under the jurisdiction of a court in a chapter 11 case receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed plan (the "Section 382(l)(5) Exception"). Under the Section 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis, but instead NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the Section 382(l)(5) Exception applies and a debtor undergoes another ownership change within two years after the effective date of the plan of reorganization, then the debtor's pre-change losses effectively are eliminated in their entirety. For purposes of the Section 382(l)(5) Exception, a "qualified creditor" generally consists of certain long-term creditors (who held the claims continuously for at least 18 months prior to the filing of the bankruptcy petition), ordinary course creditors (e.g., trade creditors) and creditors receiving less than 5% of the stock of the debtor in a bankruptcy case. If a debtor qualifies for the Section 382(l)(5) Exception, the exception applies unless the debtor affirmatively elects for it not to apply.

Where the Section 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the Section 382(l)(5) Exception), a second special rule will generally apply (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The Section 382(l)(6) Exception also differs from the Section 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years of the Effective Date without triggering the elimination of its pre-change losses.

### C.    U.S. Federal Income Tax Consequences to U.S. Holders under the Plan

The U.S. federal income tax consequences of the Plan to U.S. Holders of Claims (including the character, amount and timing of income, gain or loss recognized) generally will depend upon, among other factors: (i) the manner in which the U.S. Holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether a Claim was acquired at a discount; (iv) whether the U.S. Holder has taken a bad debt deduction in the current or prior years; (v) whether the U.S. Holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the U.S. Holder's method of tax accounting; and (vii) whether we reorganize as is expected. Therefore, U.S.

Holders of Claims are urged to consult their tax advisors for information that may be relevant to their specific situation and circumstances and the particular tax consequences to such holders as a result thereof.

### 1.     Treatment of U.S. Holders of Second Lien Claims

A U.S. Holder of Second Lien Claims should be treated as exchanging such Claims in a fully taxable exchange and should recognize gain or loss equal to the excess of (i) the fair market value of the New Common Stock received over (ii) such holder's adjusted tax basis in its Second Lien Claim surrendered in the exchange.

Subject to the discussions below regarding accrued interest and market discount, the gain generally would be long-term capital gain if the U.S. Holder held its Second Lien Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations discussed below. A U.S. Holder's tax basis in the New Common Stock should equal the fair market value of such interests on the date of the exchange. A U.S. Holder's holding period for the New Common Stock received would begin on the day following the Effective Date.

### 2.     Other Considerations for U.S. Holders

a.      Accrued Interest

A portion of the consideration received by U.S. Holders of Allowed Second Lien Claims may be attributable to accrued but untaxed interest on such Claims. Any such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on the Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is uncertain. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by U.S. Holders should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

b.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain recognized by a U.S. Holder upon the disposition of a debt instrument of an Allowed Second Lien Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of market discount on the debt constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with market discount if it is acquired other than at original issue and if the U.S. Holder's adjusted tax basis in such instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a de minimis amount (equal to the product of 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, and the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the disposition of debt instruments that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless such U.S. Holder elected to include market discount in income as it accrued). To the extent that debt instruments that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such debt instruments (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property

received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

c.       Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses will be subject to limits on their use of capital losses.  For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income, though losses from the sale or exchange of capital assets may only be used to offset capital gains.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year.  Non-corporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

d.       Net Investment Income Tax

Certain U.S. Holders that are individuals, estates or trusts are required to pay an additional 3.8% Medicare tax on "unearned" net investment income (i.e., income received from, among other things, the sale or other disposition of certain capital assets).  Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

e.       Special Rules for Certain Accrual Method Taxpayers

Under recently enacted legislation, certain U.S. Holders that use an accrual method of accounting for tax purposes generally will be required to include certain amounts in income no later than the time such amounts are reflected on certain financial statements, which may be earlier than would be the case under the rules described above.  This rule generally will be effective for tax years beginning after December 31, 2017 or, for debt instruments issued with original issue discount, for tax years beginning after December 31, 2018.  U.S. Holders that use an accrual method of accounting should consult with their tax advisors regarding the potential applicability of this legislation to your particular situation.

**D.       Consequences of Ownership and Disposition of the New Common Stock**

**1.       Distributions on New Common Stock**

Cash distributions made by the Reorganized Debtors in respect of New Common Stock will constitute a taxable dividend when such distribution is actually or constructively received, to the extent such distribution is paid out of the current and accumulated earnings and profits of the Reorganized Debtors (as determined under U.S. federal income tax principles).  To the extent the amount of any distribution received by a U.S. Holder in respect of New Common Stock exceeds the current or accumulated earnings and profits of the Reorganized Debtors, the distribution (1) will be treated as a non-taxable return of the U.S. Holder's adjusted tax basis in that New Common Stock and (2) thereafter will be treated as capital gain.

**2.       Dispositions of New Common Stock**

Sales or other taxable dispositions by U.S. Holders of New Common Stock generally will give rise to gain or loss equal to the difference between the amount realized on the disposition and the U.S. Holder's tax basis in such New Common Stock.  In general, gain or loss recognized on the sale or exchange of New Common Stock will be capital gain or loss and, if the U.S. Holder's holding period for such New Common Stock exceeds one year, will be long-term capital gain or loss.  Certain U.S. Holders, including individuals, are eligible for preferential rates of U.S.

federal income tax in respect of long-term capital gains realized. The deduction of capital losses against ordinary income is subject to limitations under the Tax Code, as discussed above.

### E.    Information Reporting and Backup Withholding

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends and other reportable payments may be, under certain circumstances, subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if a holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct TIN and that it is a U.S. person not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and if the appropriate information is supplied to the IRS. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### F.    U.S. Federal Income Tax Considerations for Non-U.S. Holders

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the restructuring transaction to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. Holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of Claims, and the ownership and disposition of New Common Stock.

#### 1.    Gain Recognition

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the U.S. for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S. in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### 2.    Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest, if any, generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person. Interest income, however, may be subject to U.S. withholding if:

(i)        the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the stock of Reorganized Rand entitled to vote;

(ii)        the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Rand (each, within the meaning of the Tax Code); or

(iii)        the Non-U.S. Holder is a bank receiving interest described in Tax Code section 881(c)(3)(A).

A Non-U.S. Holder that does not qualify for the portfolio interest exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to such interest or accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

### G.        U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock

#### 1.        Dividends on New Common Stock

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Rand's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the U.S.) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the U.S.) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder. In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

#### 2.        Sale, Redemption, or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock, unless:

(i)        such Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the U.S.;

(ii)       such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the U.S.); or

(iii)      Reorganized Rand is or has been a "United States real property holding corporation" for U.S. federal income tax purposes (a "USRPHC") at any time during the shorter of the Non-U.S. Holder's holding period for the New Common Stock and the five year period ending on the date of disposition.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder; and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

While we have not performed a detailed analysis, we believe, based on our current business plans and operations, that Reorganized Rand is not and should not become a USRPHC in the future. However, there is no assurance that the IRS will agree with such position.

3.        **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules apply to U.S.-source payments of dividends or interest, and to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S.-source interest or dividends that occurs after December 31, 2018. Although administrative guidance and Treasury regulations have been issued, the exact scope of these rules remains unclear and potentially subject to material changes.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Stock.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S. OR OTHER APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION AND CONCLUSION

The Debtors believe that Confirmation of the Plan is in the best interests of all stakeholders and urge all holders of Class 4 Second Lien Claims to vote in favor of the Plan.

Dated: January 29, 2018

**RAND LOGISTICS, INC.**
**on behalf of itself and all other Debtors**

By: _____
Name: Mark Hiltwein
Title: Chief Financial Officer of Rand Logistics, Inc.