## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RAND LOGISTICS, INC., *et al.*, [1] | ) | Case No. 18-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363
AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SECOND LIEN SECURED PARTIES,
(III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Order"), pursuant to sections 105, 361, 362, 363, 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 and 9018-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) authorizing the Debtors to obtain post-petition financing pursuant to a debtor-in-possession financing facility on the terms described herein; (ii) granting adequate protection liens and super priority administrative claims to the Prepetition Second Lien Secured Parties (as defined below); (iii) scheduling a preliminary hearing (the "Interim Hearing") on the Motion to consider entry of the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Rand Logistics, Inc. (5343); Lower Lakes Transportation Company (5364); Grand River Navigation Company, Inc. (5146); Black Creek Shipping Company, Inc. (5474); Rand LL Holdings Corp. (6352); Rand Finance Corp. (1847); and Black Creek Shipping Holding Company, Inc. (5313).  The service address for each of the above Debtors is 333 Washington Street, Suite 201, Jersey City, NJ 07302.

Interim Order pursuant to Bankruptcy Rule 4001; (iv) scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of the Final Order authorizing on a final basis, *inter alia*, the debtor-in-possession financing facility; and (v) granting related relief. In support of this Motion, the Debtors submit the declaration of Kevin Haggard (the "Haggard Declaration"), filed contemporaneously herewith and incorporated by reference as if fully set forth herein, and the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      As more fully described in the *Declaration of Mark S. Hiltwein in Support of Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), the Debtors have commenced these Chapter 11 Cases to implement a consensual, deleveraging restructuring transaction. Through the debtor-in-possession financing facility sought herein (the "DIP Facility"), the Debtors will have access to the necessary funding to continue their operations and fund these Chapter 11 Cases to effectuate the restructuring, including providing the liquidity necessary to fund the administrative costs of these Chapter 11 Cases, minimize disruptions to the business, and to pay, among others, critical vendors, suppliers and customers in the ordinary course. Importantly, the DIP Facility is being provided to the Debtors on a junior basis and will be subordinated to the liens and claims of the Debtors' Prepetition First Lien Secured Parties. This will allow the Debtors to move expeditiously through the Chapter 11 Cases and avoid a priming fight.

2.      The DIP Facility is being provided by the sole lender under the Debtors' Prepetition Second Lien Facility, Lightship Capital LLC ("Lightship" or, in such capacity, the "DIP Lender"), pursuant to the Debtor-in-Possession Credit Agreement attached hereto as

---

[2]      Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the Motion.

2

**Exhibit B** (the "<u>DIP Credit Agreement</u>").  The DIP Facility will provide up to $25,000,000 of financing (the "<u>DIP Financing</u>") to the Debtors upon approval of the Court and entry of the proposed Interim Order.  As described more fully below, the terms of the DIP Facility are favorable to the Debtors and provide the funding necessary for these Chapter 11 Cases.

3.     Moreover, despite the efforts detailed below, the Debtors were unable to obtain alternative financing on terms more favorable than those set forth in the DIP Facility.  As such, the Debtors believe that entry into the DIP Facility is in the best interests of the Debtors' estates and the DIP Facility provides the funding needed to maximize the value of the Debtors' estates and consummate the Plan.

4.     Additionally, the terms of the DIP Credit Agreement and the proposed Interim Order reflect an agreement among the Debtors, the Prepetition First Lien Secured Parties, and the DIP Lender regarding the use of cash collateral.  In sum, the parties have agreed that the Debtors' cash collateral will be held in reserve by the Prepetition First Lien Agent until March 16, 2018 and the DIP Lender has agreed to fund all necessary expenses for the Debtors' operations and these Chapter 11 Cases pursuant to the Budget through this time period.  All parties have reserved their rights with respect to the use of cash collateral after March 16, 2018, but the Debtors believe that they will be able to move expeditiously through the Chapter 11 Cases to consummate the Plan before such date.

5.     For the reasons set forth herein, the Debtors believe it is appropriate and a sound exercise of business judgment to enter into the DIP Facility.

## JURISDICTION

6.     The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware,

#47286099 v2

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-l(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The statutory bases for the relief requested herein are sections 105, 107, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Rules 2002 and 4001 of the Bankruptcy Rules, and Rules 4001-2 of the Local Rules.

## BACKGROUND

9.      As of the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10.     The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

11.     On the Petition Date, the Debtors filed the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "<u>Plan</u>") and the related *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated January 29, 2018 (the "<u>Disclosure Statement</u>").

12.     A detailed description of the Debtors' business and the events leading to the Chapter 11 Cases is fully set forth in the First Day Declaration filed contemporaneously herewith and incorporated by reference as if fully set forth herein.

4

## I.     The Debtors' Capital Structure

### A.     Prepetition Secured Debt

13.     As of December 31, 2017, the Debtors have total debt outstanding of at least $235.9 million, which is comprised of amounts outstanding under the Prepetition First Lien Credit Agreement (defined below) of approximately $149 million and the Prepetition Second Lien Agreement (defined below) of approximately $86.9 million.  As of January 22, 2018, the Debtors also had approximately $3 million of unsecured debt and trade debt.  The significant liabilities of the Debtors are described in more detail below.

### i.     Prepetition First Lien Facility

14.     On March 27, 2015, Rand Logistics Inc. ("Rand") and certain of its subsidiaries, including Lower Lakes Towing Ltd. (a non-Debtor affiliate), Lower Lakes Transportation Company, Grand River Navigation Company, Inc., and Black Creek Shipping Company, Inc., as borrowers, and certain of its other direct and indirect subsidiaries, as guarantors, entered into a certain Credit Agreement (as amended, restated, supplemented or otherwise modified through the Petition Date, the "Prepetition First Lien Credit Agreement" and, collectively with all other agreements, documents and instruments executed and/or delivered with, to, or in favor of the Prepetition First Lien Secured Parties in connection with the Prepetition First Lien Credit Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, the "Prepetition First Lien Documents") with Bank of America, N.A. as administrative agent (the "Prepetition First Lien Agent") and the lenders party thereto (the "Prepetition First Lien Lenders" and, together with the Prepetition First Lien Agent, the "Prepetition First Lien Secured Parties").  Pursuant to the Prepetition First Lien Loan Documents, the Prepetition First Lien

5

Secured Parties were granted first priority liens on, and security interests in, substantially all of the Debtors' and their direct and indirect subsidiaries' assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, including all cash and non-cash proceeds thereof, collectively, the "Prepetition Collateral").

15.     The Prepetition First Lien Credit Agreement provides a revolving credit facility with a U.S. tranche of which the Debtors may borrow up to USD $90 million and a Canadian tranche of which Lower Lakes Towing Ltd. may borrow up to USD $80 million.[3] As of December 31, 2017, the Debtors were indebted and liable to the Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents, in the aggregate principal amount of not less than $149 million plus accrued and unpaid interest thereon, and fees, expenses and all other obligations under the Prepetition First Lien Loan Documents (collectively, the "Prepetition First Lien Secured Obligations").

ii.        Prepetition Second Lien Facility

16.     On March 11, 2014, Lower Lakes Towing Ltd., Grand River Navigation Company, Inc., Black Creek Shipping Company, Inc., and Lower Lakes Transportation Company, as borrowers, Rand and certain of its other direct and indirect subsidiaries, as guarantors, Lightship as successor administrative agent (the "Prepetition Second Lien Agent"), and the lenders party thereto (the "Prepetition Second Lien Lenders" and, together with the Prepetition Second Lien Agent, the "Prepetition Second Lien Secured Parties"), entered into a certain Term Loan Credit Agreement (as amended, restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Second Lien Agreement" and, collectively with all

---

[3] Lower Lakes Towing Ltd. and Lower Lakes Ship Repair Company Ltd., non-Debtor indirect subsidiaries of Rand incorporated in Canada, are obligated solely with respect to the Canadian tranche of the Prepetition First Lien Credit Agreement.

other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Second Lien Secured Parties with the Prepetition Second Lien Credit Agreement, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, the "Prepetition Second Lien Documents").  Pursuant to the Prepetition Second Lien Documents, the Prepetition Second Lien Secured Parties (together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties") were granted second priority liens on, and security interests in, the Prepetition Collateral.

17.    The Prepetition Second Lien Credit Agreement provided for a term loan facility with a U.S. tranche in the amount USD $38.3 million, a Canadian tranche of USD $34.2 million, and an incremental term loan term loan facility of up to USD $32.5 million.[4]  As of December 31, 2017, the Debtors were indebted and liable to the Prepetition Second Lien Agent and the Prepetition Second Lien Secured Parties under the Prepetition Second Lien Documents, in the aggregate principal amount of not less than $87.1 million plus accrued and unpaid interest thereon, and fees, expenses and all other obligations under the Prepetition Second Lien Documents (collectively, the "Prepetition Second Lien Secured Obligations" and, collectively with the Prepetition First Lien Secured Obligations, the "Prepetition Obligations").

iii.    Prepetition Intercreditor Agreement

18.    In connection with the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Agreement described above, on March 27, 2015, the Debtors entered

---

[4] Lower Lakes Towing Ltd. and Lower Lakes Ship Repair Company Ltd., non-Debtor indirect subsidiaries of Rand incorporated in Canada, are obligated solely with respect to the Canadian tranche of the Prepetition Second Lien Credit Agreement.

into an intercreditor agreement (as amended, restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Intercreditor Agreement") by and among the Prepetition First Lien Agent and Prepetition Second Lien Agent, and acknowledged by Rand and certain of its direct and indirect subsidiaries.

### B.    Unsecured Obligations

19.    As of January 22, 2018, the Debtors had outstanding principal unsecured indebtedness of approximately $3 million consisting of (i) accounts payable of approximately $650,000, (ii) capital expenditures of approximately $1.4 million and (iii) accrued expenses and other liabilities of approximately $960,000.  The Debtors also have regular and recurring compensation and benefit obligations to their employees, which are current and are paid in the ordinary course of business.

## II.    The Debtors' Immediate Need for Liquidity

20.    As described in the First Day Declaration, a number of factors have contributed to the Debtors' liquidity constraints, including, among other issues, volatility in the valuation of the U.S. dollar relative to the Canadian dollar, increased costs of repairing, maintaining and certifying vessels, and the current economic environment surrounding the bulk shipping industry – all of which combined have created a situation of limited liquidity and made the Debtors' capital structure unsustainable.  Such challenges have caused the Debtors to struggle to satisfy certain leverage-related covenants under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement.  Although the Debtors obtained waivers from the Prepetition Secured Parties for a period of time, such waivers expired on July 14, 2017 and the Prepetition First Lien Agent exercised control and dominion rights over the Debtors' cash receipts.  The Prepetition First Lien Lenders permitted discretionary borrowing up through the Petition Date and the Debtors now require additional liquidity to maintain operations.

8

### III.    The Debtors' Efforts to Obtain Financing

21.    As described in the First Day Declaration, the Debtors engaged in extensive prepetition negotiations with Lightship regarding a consensual deleveraging transaction that resulted in execution of a Restructuring Support Agreement on November 17, 2017 (the "RSA"). The RSA contemplated that the Debtors and Lightship would use commercially reasonable efforts to negotiate with the Prepetition First Lien Lenders regarding the terms of debtor-in-possession financing facility and exit facility to support the Debtors' restructuring.  The Debtors and their advisors undertook such efforts following execution of the RSA and through the months of December 2017 and January 2018.[5]

22.    Concurrently with the negotiations with the Prepetition First Lien Lenders, the Debtors, with the assistance of Miller Buckfire and Company, LLC ("Miller Buckfire") engaged in a robust DIP financing process seeking DIP financing proposals with the option of rolling over into exit financing.  Miller Buckfire contacted over 40 financial institutions to solicit first round proposals and over 20 parties executed non-disclosure agreements.  The parties that executed non-disclosure agreements were provided a confidential information memorandum and access to a virtual data room.[6]

23.    As a result of the marketing process, the Debtors received two proposals for post-petition financing from third party financing sources.  The Debtors also received a proposal from the Debtors' Prepetition First Lien Lenders.  After evaluating the proposal from the Prepetition First Lien Lenders, Lightship decided to offer junior post-petition financing of its own.  The Debtors evaluated all of the DIP financing proposals and, as described in the Haggard

---

[5] See Haggard Declaration at ¶ 9.

[6] See id. at ¶ 10.

#47286099 v2

Declaration, concluded that the proposal from Lightship provided the Debtors with the most cost-effective financing alternative. Thereafter, the Debtors and Lightship engaged in extensive, arms'-length negotiations and ultimately agreed to the terms of the DIP Facility described herein.[7]

24.    The Debtors submit that there are no DIP financing proposals available to the Debtors that are superior to the DIP Facility. The DIP Facility is favorable for the Debtors for multiple reasons, including: (a) the DIP Facility is being provided on a junior subordinated basis and will avoid a "priming fight" with the Prepetition Frist Lien Lenders; (b) the DIP Facility contains a favorable interest rate that is payable in kind and only increases if the Debtors fail to consummate the Plan by March 16, 2018; and (c) the Debtors are not being charged a fee for the DIP Facility unless the Debtors fail to consummate the Plan by March 16, 2018. In addition, the DIP Facility will provide the Debtors with enough liquidity to facilitate the administration of the Chapter 11 Cases and continue operations in the ordinary course of business.[8]

25.    For these reasons, and for the reasons set forth below, in the Haggard Declaration and in the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request that the Court approve the DIP Facility.

## **RELIEF REQUESTED**

26.    By this Motion, the Debtors seek entry of the Interim Order:

(a)    Authorizing the Debtors to obtain postpetition financing from the DIP Lender as set forth below and in the DIP Credit Agreement with funds thereunder available for use in accordance with the Budget and the terms of the DIP Credit Agreement;

---

[7] *See* id. at ¶¶ 11 – 17.

[8] *See* id. at ¶¶ 13 - 15.

(b)     Authorizing the Debtors to grant security interests, liens and super-priority claims (including a super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2), (c)(3), and (d)(1) of the Bankruptcy Code) on the DIP Collateral (as defined in Interim Order) (collectively, the "DIP Liens"); provided, however, that the DIP Liens and super-priority administrative claim shall be subordinated to the Carve-Out (defined below) and the Prepetition First Lien Secured Obligations;

(c)     Scheduling an Interim Hearing on the Motion to consider entry of the Interim Order pursuant to Bankruptcy Code 4001; and

(d)     Scheduling of a Final Hearing and that notice procedures with respect to the Final Hearing be established by this Court to consider entry of the Final Order authorizing on a final basis entry into the DIP Credit Agreement.

## MATERIAL TERMS OF THE DIP FACILITY

27.     Bankruptcy Rule 4001(c)(1)(B) requires that a motion for authority to obtain credit lists or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions.  The principal terms of the DIP Facility are as follows:[9]

| Required Disclosures | Summary of Material Terms |
|---|---|
| **Parties to Post-Petition Financing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Borrower: Lower Lakes Transportation Company<br><br>DIP Lender: Lightship Capital LLC<br><br>Debtor Guarantors: Grand River Navigation Company, Inc., Black Creek Shipping Company, Inc., Black Creek Shipping Holding Company, Inc., Rand Finance Corp., Rand LL Holdings Corp., and Rand Logistics, Inc.<br><br>Non-Debtor Guarantor: Conneaut Creek Ship Repair, Inc. |

---

[9]     This summary is qualified, in its entirety, by the provisions of the DIP Credit Agreement and the Interim Order. Unless otherwise defined within this Motion, capitalized terms used within this summary only shall have the meanings ascribed to them in the DIP Credit Agreement as modified by the Interim Order, as applicable.

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | *See* DIP Credit Agreement § 1 |
| **Amount**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Aggregate maximum principal amount not to exceed $25,000,000.<br><br>*See* Interim Order ¶ 2(b) |
| **Availability**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Lender will provide the Borrower with access to the full $25,000,000 upon entry of the Interim Order through the Termination Date, with $10,000,000 to be funded immediately.<br><br>*See* DIP Credit Agreement § 2(a) |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | All proceeds of the DIP Loans shall be used only for working capital and other general corporate purposes of the Loan Parties and their respective subsidiaries in accordance with, and subject to the limitations set forth in, the Budget and the DIP Order.<br><br> *See* DIP Credit Agreement § 3(i) |
| **Interest Rate and Default Interest**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | <u>Applicable Rate</u>: prior to the Outside Plan Consummation Date, 6.00% per annum payable-in-kind and on and after the Outside Plan Consummation Date, 12.00% per annum payable in cash.<br><br><u>Default Rate</u>: the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to the DIP Loans plus 2.00% per annum.<br><br>*See* DIP Credit Agreement § 2(e)(i),(ii)<br><br>"<u>Outside Plan Consummation Date</u>" means March 16, 2018 (or such later date as agreed to by the DIP Lender in its sole discretion). |
| **DIP Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | If the Plan is not consummated on or prior to March 16, 2018, the Borrower shall pay a fee equal to $500,000, which shall be paid-in-kind in arrears by being added to the principal balance of the DIP Loans.<br><br>*See* DIP Credit Agreement § 2(e)(iii) |
| **Payment of Fees and Expenses**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Prepetition Second Lien Agent (on behalf of the Prepetition Second Lien Secured Parties) shall receive from the Debtors, upon entry of the Interim Order, immediate cash payment of all legal and advisory fees and expenses owing to the Prepetition Second Lien Agent and the Prepetition Second Lien Secured Parties under the |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
|  | Prepetition Second Lien Documents, whether such amounts were incurred prior to, on or after the Petition Date.<br><br>*See* Interim Order ¶ 4(c).<br><br>Upon entry of the Interim Order, the Debtors shall pay all legal and advisory fees owing to the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties under the Prepetition First Lien Documents, whether such amounts were incurred prior to, on or after the Petition Date.<br><br>*See* Interim Order ¶ 13.<br><br>Thereafter, the Debtors shall pay (i) all accrued and unpaid interest owed under the Prepetition First Lien Credit Agreement in accordance with the terms of the Prepetition First Lien Credit Agreement (through March 16, 2018) and (ii) all reasonable and documented professional and advisory fees, costs and expenses of the Prepetition First Lien Agent (through March 16, 2018), the Prepetition Second Lien Agent and the DIP Lender within five (5) business days of presentment of reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information) to the Office of the U.S. Trustee and the Debtors, unless an objection is raised prior to such five (5) business day period.<br><br>*See* Interim Order ¶¶ 13, 14(b) |
| **Maturity Date and Termination**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Maturity Date shall be the 90th day after the Petition Date (or such later date as the DIP Lender may approve in writing in its sole discretion).<br><br>The Termination Date shall mean the earliest to occur of (i) March 16, 2018 (or such later date if agreed to by the DIP Lender in its sole discretion) if the Final Order has not been entered by such date, (ii) the occurrence of an Event of Default, (iii) the Maturity Date and (iv) the Interim Order ceasing to be in full force and effect for any reason.<br><br>*See* DIP Credit Agreement § 2(d),(h); Interim Order ¶ 11 |
| **Mandatory Prepayments**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Anything contained in the DIP Credit Agreement to the contrary notwithstanding, (A) in no event shall the aggregate principal amount of the DIP Loans at any time outstanding exceed the amount permitted to be outstanding pursuant to the DIP Order, in each case as the foregoing limits may be in effect from time to time and (B) the Borrower agrees to immediately prepay the DIP Loans in the amounts |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | and at the times as may be necessary to comply with the foregoing clause (A).<br><br>*See* DIP Credit Agreement § 2(i) |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Credit Agreement contains customary events of default (the "<u>Events of Default</u>") (subject to certain cure periods, exceptions, qualifications and thresholds), including the following:<br><br><ul><li>Nonpayment of principal when due, or any installment of interest or other amount payable under the DIP Credit Agreement within three business days of the date when due;</li><li>Breach of representations and warranties;</li><li>Noncompliance with covenants or other agreements under the DIP Credit Agreement;</li><li>Customary bankruptcy-related defaults;</li><li>Occurrence of a Material Adverse Effect;</li><li>Any of the Chapter 11 Cases shall be dismissed, converted to a case under chapter 7 of the Bankruptcy Code or an examiner with expanded powers or a trustee are appointed;</li><li>Any debtor-in-possession financing is entered into by any Debtor other than the DIP Facility or any Debtor seeks authorization from the Bankruptcy Court to enter into such facility without the prior written consent of the DIP Lender; and</li><li>Any Loan Party, or any of their Affiliates, taking any action that would reasonably be expected to frustrate the confirmation of the Plan by the Outside Plan Consummation Date, including, without limitation, withdrawing the Plan or filing any other plan in the Chapter 11 Cases without the prior written consent of the DIP Lender.</li></ul><br>*See* DIP Credit Agreement § 6 |
| **DIP Liens**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i), (xi) | Subject to the Carve-Out, the DIP Obligations shall be secured by valid, binding, perfected, continuing, enforceable and non-avoidable security interests and liens (all liens and security interests granted to the DIP Lender pursuant to the DIP Order and the other DIP Loan |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | Documents, the "<u>DIP Liens</u>"), which DIP Liens shall be automatically perfected upon the entry of the Interim Order without the need for any further action by the DIP Lender or the Borrower, including the filing of any financing statements or the recording of any mortgages.<br><br>The DIP Collateral shall (x) not include any assets or property of the Non-Debtor Affiliates, (y) be subject to the limitation that no more than sixty-five percent (65%) of the Canadian Equity shall constitute DIP Collateral and (z) not include causes of action for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions.<br><br>The DIP Liens shall (i) pursuant to section 364(c)(2) of the Bankruptcy Code, be senior to all other liens with respect to DIP Collateral that was unencumbered as of the Petition Date and (ii) pursuant to sections 364(c)(3) and (d)(1) of the Bankruptcy Code, be subordinated only to the Prepetition First Liens and any other liens on the DIP Collateral that were valid, perfected, and unavoidable senior priority liens and security interests existing as of the Petition Date securing valid, binding and unavoidable debt specifically permitted under the Prepetition Second Lien Documents.<br><br>*See* DIP Credit Agreement § 2(j), Interim Order ¶¶ 2(d), (e) |
| **Superpriority Administrative Claim Status**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The DIP Obligations shall at all times constitute (without the need to file a proof of claim or to take any further action or file any further document or pleading with the Bankruptcy Court or another court or governmental office) an allowed joint and several superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") of the DIP Lender against each of the Debtors' estates, with priority over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now existing or hereafter arising or incurred, of any kind whatsoever, but shall in any event be subordinated to the Carve-Out and the Prepetition First Lien Secured Obligations.<br><br>*See* Interim Order ¶ 2(g) |
| **Carve-Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | There shall be a carve-out from the DIP Liens, DIP Superpriority Claims, Prepetition Second Liens, Second Lien Adequate Protection Liens, and Second Lien Adequate Protection Superpriority Claim (the "<u>Carve-Out</u>") in an amount equal to: |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | i.    All fees required under 28 U.S.C. § 1930(a); |

    ii.    To the extent allowed by the Court at any time, pursuant to a fee application on notice, or other procedure permitted by any Court order allowing interim compensation or the payment of fees of ordinary course professionals, whether by interim order, final order, procedural order or otherwise, as the same may be due and payable, all reasonable and documented unpaid fees and expenses (the "Allowed Professional Fees") incurred by estate professionals retained by the Debtors pursuant to section 327 or 328 of the Bankruptcy Code (collectively, the "Professionals") at any time before the delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and

    iii.    The Allowed Professional Fees of the Professionals (which shall not include any success fee, transaction fee or bonus) incurred beginning on and after the date of delivery by the DIP Lender of the Carve-Out Trigger Notice in an aggregate amount not to exceed $1,500,000 (the amounts set forth in this clause (iii) being the "Post Carve-Out Trigger Notice Cap"); provided that the Post Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses subject to the Post Carve-Out Trigger Notice Cap which are paid to the applicable Professionals (whether from the proceeds of the DIP Facility or otherwise) following delivery of the Carve-Out Trigger Notice.

*See* Interim Order ¶ 7(a)

| Required Disclosures | Summary of Material Terms |
|---|---|
| **Adequate Protection**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The Prepetition Second Lien Secured Parties shall be entitled to adequate protection of their interests in the Prepetition Collateral as follows:<br><br>Adequate Protection Liens:  To the extent of, and in an amount equal to, the aggregate Diminution in Value, replacement security interests in and liens upon all Prepetition Collateral, which Second Lien Adequate Protection Liens shall be junior and subject to any Senior Third Party Liens, the DIP Liens, the Prepetition First Liens and the Carve-Out.<br><br>Adequate Protection Superpriority Claim:  To the extent of the aggregate Diminution in Value, subject to the payment of the Carve-Out, an allowed joint and several superpriority administrative expense |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
|  | claim against each of the Debtors' estates as provided for in sections 503(b) and 507(b) of the Bankruptcy Code, which shall be subordinated to the Prepetition First Lien Secured Obligations and the DIP Superpriority Claim.<br><br>*See* Interim Order ¶ 4 |
| **Representations and Warranties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Credit Agreement includes representations and warranties of a kind usual and customary for a facility of this type.<br><br>*See* DIP Credit Agreement § 3 |
| **Waiver of Any Applicable Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to the Interim Order.<br><br>*See* Interim Order ¶ 14(k) |
| **DIP Budget and Other Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The use of DIP proceeds is subject to a customary budget.  The Borrower shall provide to the DIP Lender (i) rolling 13-week cash flow projections and forecasts, in form and substance acceptable to the DIP Lender (the "<u>Budget</u>"), (A) prior to the Closing Date and (B) on an updated basis by the third Business Day of every week, which shall replace the prior Budget for all purposes, (ii) by 12:00 noon (New York time) on the third Business Day of each week, a reconciliation of actual receipts and disbursements, cash receipts, cash balance and loan balance against such figures set forth in the Budget for (A) the one-week period which ended on the immediately preceding Friday and (B) the four-week period which ended on the immediately preceding Friday, in each case, with written explanations of material variances and (iii) such other information or documents (financial or otherwise) with respect to the Loan Parties and their Affiliates as the DIP Lender may reasonably request.<br><br>Additional Covenants:<br><br>• The Budget is subject to a 10.0% permitted variance for each 4 week period.<br>• Unused expenditures shall carry forward to successive 4-week Budget periods on a cumulative basis.<br>• The Budget shall be tested on cumulative basis for the 4-week period then ended. |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | • The fees, costs and expenses owed by the Loan Parties to the DIP Lender's professionals and the professionals of the Prepetition Agents and the Prepetition Lenders payable under the DIP Order shall not be taken into account in connection with testing compliance with the Budget.<br>• Any use by the Loan Parties of Cash Collateral or the cash proceeds of Prepetition Collateral (as defined in the DIP Order) shall be taken account in connection with measuring compliance with the Budget.<br><br>In addition, the DIP Credit Agreement requires compliance with affirmative and negative covenants that are usual and customary for DIP financings.<br>*See* DIP Credit Agreement §§ 5, 6. |
| **Conditions Precedent to Closing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The availability of the financing under the DIP Credit Agreement is subject to the satisfaction of customary conditions for DIP financings, including, but not limited to the following conditions precedent:<br><br>• <u>Credit Agreement</u>.  Execution and delivery of the DIP Credit Agreement.<br><br>• <u>Bankruptcy Case Conditions</u>:<br>    o The Petition Date shall have occurred.<br>    o The Interim Order shall have been entered by the Bankruptcy Court authorizing and approving, among other things, the DIP Facility and the granting of the DIP Liens with the priority contemplated therein.<br>    o The Interim Order shall be in full force and effect.<br>    o The DIP Lender shall have received an initial Budget, in form and substance reasonably satisfactory to the DIP Lender.<br>    o An order setting an expedited schedule for confirmation of the Plan by the Outside Plan Consummation Date shall have been entered by the Court.<br>    o The Debtors shall have filed (i) the Plan, (ii) a related disclosure statement and (iii) a motion seeking approval of the solicitation materials in respect of the Plan in form and substance reasonably acceptable to the DIP Lender.<br>    o The Debtors shall have commenced solicitation of the Plan.<br>    o The Debtors shall be in compliance with the terms of the Interim Order, the First Day Orders and any other |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | orders issued in these Chapter 11 Cases.<br><br>• <u>No Default or Event of Default</u>.  No Default or Event of Default shall exist at the time of, or after giving effect to, the making of the DIP Loans on the Closing Date.<br><br>• <u>Notice of Borrowing</u>.  Delivery of a customary Notice of Borrowing shall be made pursuant to the DIP Credit Agreement.<br><br>• <u>Representations and Warranties</u>. The representations and warranties of each Borrower and each Loan Party set forth in the DIP Credit Agreement shall be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) immediately prior to, and after giving effect to, the makings of the DIP Loans on the Closing Date.<br><br>• The making of the DIP Loans on the Closing Date shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.<br>*See* DIP Credit Agreement § 4 |
| **Conditions Precedent to Each Borrowing After the Closing Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The funding of DIP Loans on each date of Borrowing after the Closing Date shall be subject to satisfaction of customary conditions for DIP financings, including, but not limited to the following conditions precedent:<br><br>• <u>Representations and Warranties</u>.  The representations and warranties of the Borrower and each Loan Party set forth in the DIP Credit Agreement shall be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) immediately prior to, and after giving effect to, the making of such DIP Loans.<br><br>• <u>No Default or Event of Default</u>.  No Default or Event of Default shall exist at the time of, or after giving effect to, the making of the DIP Loans.<br><br>• <u>Notice of Borrowing</u>.  Delivery of a customary Notice of Borrowing shall be made pursuant to the DIP Credit Agreement.<br><br>• <u>Interim Order and Final Order</u>.  The Interim Order and, after its entry, the Final Order, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been |

#47286099 v2

| Required Disclosures | Summary of Material Terms |
|---|---|
| | amended, supplemented or otherwise modified without the prior written consent of the DIP Lender. <br><br> • The making of the DIP Loans on the Closing Date shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. <br><br> • The Loan Parties shall be in compliance with the terms of the DIP Order and any other orders issued in the Chapter 11 Cases. <br><br> • The Plan shall not be withdrawn and no other action has been taken by any Loan Party or any of its Affiliates in these Chapter 11 Cases that would reasonably be expected to frustrate the consummation of the Plan by the Outside Plan Consummation Date. <br><br> *See* DIP Credit Agreement § 4 |
| **Claims Stipulations** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | Within ten (10) Business Days of entry of the Interim Order, the Debtors, the Prepetition First Lien Agent and the Prepetition Second Lien Agent shall file with the Court a stipulation (A) acknowledging the validity and enforceability of the Prepetition Agents' liens on and security interests in the Prepetition Collateral, and (B) setting forth the agreement of such parties of (i) the amount of accrued Prepetition First Lien Obligations owed to the Prepetition First Lien Secured Parties pursuant to the Prepetition First Lien Documents, without objection, defense, counterclaim or offset of any kind as of the day of such stipulation, (ii) a per diem amount by which the Prepetition First Lien Obligations increase from the date of such stipulation, (iii) the amount of accrued Prepetition Second Lien Obligations owed to the Prepetition Second Lien Secured Parties pursuant to the Prepetition Second Lien Documents, without objection, defense, counterclaim or offset of any kind as of the day of such stipulation, and (iv) such other stipulations with respect to the Prepetition Secured Obligations as may otherwise be mutually agreed upon by the parties.  If the Debtors, the Prepetition First Lien Agent and the Prepetition Second Lien Agent cannot agree as to such amounts within ten (10) Business Days of entry of this Interim Order, the Debtors will seek an emergency hearing by the Court to resolve such dispute. <br><br> *See* Interim Order ¶ 17 |
| **Indemnification** <br><br> Fed. R. Bankr. P. | The Borrower, jointly and severally with the other Loan Parties, shall indemnify, pay and hold the DIP Lender, and the shareholders, officers, directors, employees and agents thereof, harmless from and against any and all claims, liabilities, losses, damages, costs and |

| Required Disclosures | Summary of Material Terms |
|---|---|
| 4001(c)(1)(B)(ix) | expenses (whether or not any of the foregoing persons is a party to any litigation), including, without limitation, reasonable attorneys' fees and costs (including, without limitation, the reasonable estimate of the allocated cost of in-house legal counsel and staff) and costs of investigation, document production, attendance at a deposition, or other discovery, with respect to or arising out of the DIP Credit Agreement or the other DIP Loan Documents or any use of proceeds hereunder or the Chapter 11 Cases or any transactions contemplated hereby or thereby, or any claim, demand, action or cause of action being asserted against the Borrower or any other Loan Party (collectively, the "<u>Indemnified Liabilities</u>").<br><br>The Borrower shall have no obligation hereunder with respect to Indemnified Liabilities with respect to a particular indemnified person arising from the gross negligence or willful misconduct of any such indemnified person or its shareholders, officers, directors, employees and agents.<br><br>*See* DIP Credit Agreement § 8(b) |

## <u>REQUIREMENTS UNDER LOCAL RULE 4001-2</u>

28.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the DIP Facility be highlighted and that the Debtors provide justification for the inclusion of such highlighted provisions.  The Debtors hereby identify and discuss the following provisions of the DIP Facility and the relevant portions of the Interim Order:

29.    <u>Local Rule 4001-2(a)(i)(A)</u> requires disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the pre-petition secured creditors (i.e., clauses that secure pre-petition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its pre-petition security agreement or applicable law).  As of and prior to the Petition Date, the Prepetition Secured Parties had valid liens on substantially all of the Debtors' assets.  As such,

#47286099 v2

the Debtors submit the DIP Facility does not provide a lien in postpetition assets that would not otherwise inure to the benefit of the Prepetition Secured Parties.

30.    Local Rule 4001-2(a)(i)(B) requires disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's pre-petition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.  The Interim Order provides for the filing of a stipulation among the Debtors, the Prepetition First Lien Agent and the Prepetition Second Lien Agent with respect to the validity, perfection or amount of the liens or claims of the Prepetition Secured Parties within 10 Business Days of entry of the Interim Order.  These stipulations are not contemplated to be binding on any other party.  Accordingly, the Debtors submit that all such stipulations are entirely consensual and appropriate.

31.    Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c). This is inapplicable because the Debtors do not seek such relief by this Motion.

32.    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtors immediately grant the pre-petition secured lenders liens on the Debtors' claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (the "Avoidance Actions").  The DIP Collateral does not include Avoidance Actions, but includes the proceeds of Avoidance Actions subject to the entry of a Final Order.  Because this grant only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtors respectfully submit that parties

22

in interest will have an opportunity to be heard and, as such, the grant will not be "immediate," but the Debtors discuss and disclose the provision for the convenience of the Court.

33.    <u>Local Rule 4001-2(a)(i)(E)</u> requires a movant to describe provisions of the proposed debtor-in-possession facility that deem pre-petition secured debt to constitute post-petition debt.  This is inapplicable because the Debtors do not seek such relief by this Motion.

34.    <u>Local Rule 4001-2(a)(i)(F)</u> requires a movant to describe provisions of the proposed debtor-in-possession facility that provide disparate treatment for professionals retained by a creditors' committee with respect to a professional fee carve-out.  This is inapplicable because the Carve-out proposed in the Interim Order is applicable to all estate retained professionals.

35.    <u>Local Rule 4001-2(a)(i)(G)</u> requires a movant to describe provisions of the proposed debtor-in-possession facility that contemplate a priming of any secured lien without the consent of that lien creditor.  The only lien creditors being primed by the DIP Facility are the Prepetition Second Lien Secured Parties, who have consented to such priming.  Thus, such priming is consensual and appropriate.

36.    <u>Local Rule 4001-2(a)(i)(H)</u> requires a movant to describe provisions of the proposed debtor-in-possession facility that seek to affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  This is inapplicable because the Debtors do not seek such relief by this Motion.

#47286099 v2

**BASIS FOR RELIEF**

**I.    Approval Under Section 364(c) of the Bankruptcy Code**

37.    As described above, it is essential that the Debtors obtain access to sufficient post-petition financing to avoid immediate and irreparable harm to their businesses.  The preservation of the estate assets, the Debtors' continuing viability and their ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested herein.

38.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  *See* 11 U.S.C. § 364.  If a debtor in possession cannot obtain post-petition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to super priority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.  *See* 11 U.S.C. § 364(c).[10]

39.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under §503(b)(1) of the [Bankruptcy

---

[10]    Section 364(c) of the Bankruptcy Code provides as follows:

> (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Code] as an administrative expense."  11 U.S.C. §364(c); *see In re Ames Dep't Stores*, 115 B.R.

34, 40 (Bankr. S.D.N.Y. 1990) ("a debtor must show that it has made a reasonable effort to seek

other sources of credit under sections 364(a) & (b)" of the Bankruptcy Code) (citation omitted);

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit

under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured

credit pursuant to section 364(b) of the Bankruptcy Code), *modified on other grounds*, 75 B.R.

553 (Bankr. E.D. Pa. 1987).

40.     Courts have articulated a three-part test to determine whether a debtor may obtain

financing under section 364(c) of the Bankruptcy Code:

i.      the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

ii.     the credit transaction is necessary to preserve the assets of the estate; and

iii.    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See*, *e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying

these factors); *In re Aqua Assocs*., 123 B.R. 192, 195 (Bankr. E.D. Pa. 1991) (same); *Ames Dep't*

*Stores*, 115 B.R. at 39.

**C.      The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis**

41.     To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by a good faith effort that credit was not available without" the

protections of section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan*

*Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is

unavailable."  *Id.*; *see also In re Ames Dep't Stores*, 115 B.R. at 37 (holding that debtor made a

reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the] Debtor to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

42.     As set forth above and in the Haggard Declaration, the Debtors engaged in a robust prepetition process to secure debtor-in-possession financing.  The Debtors' management, with the assistance of their advisors, explored various alternative sources of capital and financing as a part of this process, but determined that financing was unavailable on an unsecured basis. The Debtors' extensive efforts to seek the necessary post-petition financing from sources within the Debtors' existing capital structure and from third parties were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.  *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (a debtor seeking financing under section 364(c) of the Bankruptcy Code made an acceptable attempt to obtain less onerous financing by speaking to several lenders that denied the loan request); *Ames Dep't Stores*, 115 B.R. at 40 (same).

**D.      The DIP Facility is Necessary to Preserve and Protect the Assets of the Debtors' Estates**

43.     It is essential the Debtors immediately obtain the financing necessary to preserve and protect the value of their estates.  As described above and in the First Day Declaration, the Debtors have minimal cash on hand and require immediate access to the DIP Facility.  Among other working capital needs, the Debtors require such liquidity in order to meet accruing payroll

obligations.   The Debtors' inability to pay their employees would threaten the stability of the Debtors' workforce and would result in significant disruptions to the operation of the Debtors' businesses, which, in turn, could have a negative impact on the Debtors' ability consummate the Plan in an expedited manner.   Accordingly, the DIP Facility is necessary to ensure that the Debtors are able to maintain their businesses, and thus maximize the value of their estates.   *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (debtors-in-possession have a duty to maximize their estates' assets).

### E.   The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances

44.   In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and potential lender.   *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

45.   The Debtors negotiated the DIP Facility and the proposed Interim Order in good faith and at arm's-length, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to continue as a going concern, maximize the value of the Debtors' estates, and complete the consensual restructuring contemplated by the Plan.   As described in the Haggard Declaration, the DIP Facility is favorable for the Debtors for multiple reasons, including: (a) the DIP Facility is being provided on a junior subordinated basis and will avoid a "priming fight" with the Prepetition First Lien Lenders; (b) the DIP Facility contains a favorable interest rate that is payable in kind and only increases if the Debtors fail to consummate the Plan by March 16, 2018; and (c) the Debtors are not being charged a fee for the DIP Facility unless the Debtors fail

to consummate the Plan by March 16, 2018.   In addition, the DIP Facility will provide the

Debtors with enough liquidity to facilitate the administration of the Chapter 11 Cases, fund all

payments contemplated by the Debtors' "first day motions" and ensure that the Debtors have the

funds to consummate the Plan.   For these reasons, in the Debtors' business judgment, the terms

of the DIP Facility are fair and reasonable in light of the circumstances of these cases.

**F.    The DIP Facility is in the Best Interests of the Debtors' Estates and Creditors**

46.    The Debtors believe that the approval of the DIP Facility is in the best interests of

the Debtors' estates and their creditors.   The Debtors, in the exercise of their sound business

judgment, believe that they have negotiated for the best possible terms for the DIP Facility,

which would permit the Debtors to continue operating as a going concern and effectuate the

terms of the Plan.

**II.    Approval Under Section 364(d) of the Bankruptcy Code**

47.    Section 364(d)(1) provides that a debtor may incur debt "secured by a senior or

equal lien on property of the estate that is subject to a lien only if" this Court finds, after notice

and hearing, that the debtors in possession are "unable to obtain such credit otherwise" and

"there is adequate protection of the interest of the holder of the lien on the property of the estate

on which such senior or equal lien is proposed to be granted."   *See Shaw Indus., Inc. v. First*

*Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where

debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit without

a priming lien, it had met its burden under section 364(d)); *495 Cent. Park*, 136 B.R. at 630-31

(holding that debtor must make an effort to obtain credit without the requirement of a priming

lien but is not required to seek credit from every possible lender); *In re Dunes Casino Hotel*, 69

B.R. 784, 791 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under

section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted

unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a super priority lien).

48.    As fully described above and in the Haggard Declaration, the Debtors conducted a robust solicitation process and no other post-petition credit was available to the Debtors on terms better than the DIP Facility.  Since the DIP Facility is being provided on a junior basis, the only parties that are being primed are the Prepetition Second Lien Secured Parties.  The Prepetition Second Lien Secured Parties have consented to the DIP Facility and are being provided adequate protection in accordance with the Interim Order.  Thus, the requirements of Bankruptcy Code section 364(d)(1) have been fulfilled and the proposed DIP Facility should be approved.

## III.    Application of the Business Judgment Standard

### A.    Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

49.    As described above and in the Haggard Declaration, after appropriate diligence and analysis, the Debtors have concluded that entering into the DIP Facility to fund these Chapter 11 Cases is the best option available under the circumstances.  Bankruptcy courts routinely defer to a debtors' business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing") (citation omitted); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors").  In fact, "[m]ore exacting scrutiny would slow the administration of the

29

debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (citation omitted).

50.     The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Financing.  In light of the Debtors' overall circumstances, the Debtors' decision to enter into the DIP Facility is a sound exercise of the Debtors' business judgment, including, as discussed below, the following aspects of the DIP Facility: (a) the Carve-Out; (b) the Budget; and (c) the payment of certain fees under the DIP Facility.  Accordingly, the Court should grant the Debtors authority to enter into the DIP Facility and obtain funds from the DIP Lender on the basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

**B.      The Scope of the Carve-Out is Appropriate**

51.     The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender, as well as the Second Lien Adequate Protection Liens, to the Carve-Out.  Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See Ames*, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of professional fees of the

30

Debtors and any official committees, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

52.     Given the likelihood that the Debtors' professionals will be necessary to effect any wind-down following an event that causes delivery of a Carve-Out Trigger Notice, the Carve-Out provides for the Allowed Professional Fees of the Professionals at any time before the delivery by the DIP Lender of a Carve-Out Trigger Notice and the Allowed Professional Fees incurred beginning on and after the date of delivery by the DIP Lender of the Carve-Out Trigger Notice in an aggregate amount not to exceed $1,500,000.  In addition, the Carve-Out also includes the fees to be paid to this Court and the U.S. Trustee, and the reasonable expenses of any trustee appointed under section 726(b) of the Bankruptcy Code, and does not impair the ability of any party to object to such fees, expenses, reimbursement or compensation. Accordingly, the Debtors submit that the proposed Carve-Out is appropriate in these circumstances and comports with the standard set forth in this Court's Local Rules.

### C.     The Budget is Appropriate

53.     As described above, the Debtors' access to borrowings under the DIP Facility will be subject to the Budget, attached to the proposed Interim Order as <u>Exhibit 2</u>.  After diligent consideration of all known circumstances, and upon consultation with their advisors, the Debtors believe, in their reasonable business judgment, that the proposed Budget (including the variances permitted thereunder pursuant to the DIP Credit Agreement) is achievable and will allow the Debtors to operate in chapter 11 without the accrual of unpaid liabilities.  Accordingly, the Debtors submit that the proposed Budget is appropriate.

### D.     The Payment of Fees Under the DIP Credit Agreement is Appropriate

54.     Courts routinely authorize debtor-in-possession lenders to impose fees beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  Moreover, such fees

#47286099 v2

are often permitted where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates. *See*, *e.g.*, *In re TSAWD Holdings, Inc. f/k/a Sports Authority Holdings, Inc.,* No. 16-10527 (MFW) (Docket No. 1699) (Bankr. D. Del. May 3, 2016) (approving fees payable in connection with the DIP financing agreements, including a revolving fee of 1.25% of the amount of the aggregate revolving commitments and a closing fee of 1.25% of the amount of the aggregate credit facility, among others); *In re Quiksilver, Inc.*, No. 15-11880 (BLS) (Docket No. 382) (Bankr. D. Del. Oct. 28, 2015) (approving various facility fees, including a closing fee of 1.50% of the revolving commitment for the credit facility); *In re CWC Liquidation Inc. f/k/a Coldwater Creek, Inc.*, No. 14-10867 (BLS) (Docket No. 573) (Bankr. D. Del. June 12, 2014) (approving miscellaneous fees paid in connection with the credit facility, including a closing fee in the amount of $750,000 payable on the closing date, letter of credit fees, and a commitment fee, among others); *In re Exide Techns.*, No. 13-11482 (KJC)  (Docket No. 427) (Bankr. D. Del. July 25, 2013) (approving various fees to underwriters, arrangers and lenders, including an unused line fee in the amount of 0.50% times the undrawn amount of the credit facility).

55.    Here, the fees and charges to be paid to the DIP Lender, as expressly provided in the DIP Credit Agreement, are reasonable and appropriate under the circumstances.  Specifically, the DIP Facility provides that no fee will be payable unless the Plan is not consummated by March 16, 2018, in which case the Debtors would incur a $500,000 fee payable in kind.  In this case, the proposed fee is 2% of the commitments under the DIP Facility and well within the realm of reasonableness.  Moreover, the Debtors are unlikely to have to pay any fee since the Debtors believe that they have the requisite support to consummate the Plan prior to March 16, 2018.

## RESERVATION OF RIGHTS REGARDING USE OF CASH COLLATERAL

56.     This Motion does not seek authority to use Cash Collateral.  Pursuant to the proposed Interim Order and an agreement between the Debtors and Prepetition Secured Parties, the Prepetition First Lien Agent will hold all Cash Collateral in reserve in a segregated account from the Petition Date through the earlier of (i) March 16, 2018 or (ii) the Termination Date of the DIP Facility.  Thereafter, the Debtors may seek authority to use any Cash Collateral, but only after the DIP Facility has been fully funded and all proceeds of the DIP Facility have been fully spent.  The Debtors and the Prepetition Secured Parties reserve all of their respective rights with respect to the use of Cash Collateral.

## MODIFICATION OF THE AUTOMATIC STAY

57.     The Debtors seek a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to the extent contemplated by the provisions of the Interim Order as described above.

58.     Such stay modification provisions are customary features of post-petition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  Accordingly, the Debtors respectfully request that this Court modify the automatic stay to the extent contemplated by the proposed Interim Order.

## GOOD FAITH

59.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  Therefore, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR HEARING AND AUTHORITY TO
## MAKE INTERIM BORROWINGS UNDER THE DIP FACILITY

60.     Rule 4001(c) of the Bankruptcy Rules provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(c).  Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g., In re Simasko*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); *see also In re Ames Dep't Stores*, 115 B.R. at 38.  After the 14-day period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *See, e.g.*, *Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

61.     Pursuant to Rule 4001(c) of the Bankruptcy Rules, the Debtors respectfully request that this Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry of the Interim Order until the Final Hearing to obtain access to up to $25,000,000 over such period under the terms contained in the DIP Facility and the Interim Order.  The Debtors require access to the full amount available under the DIP Facility because the Debtors will not have access to Cash Collateral through March 16, 2018 subject to the agreement with the Prepetition First Lien Secured Parties described above.  The Debtors intend to consummate the Plan by March 16, 2018 and to accomplish all of the tasks necessary to achieve that result within that timeframe.  Thus, the Debtors seek access to the full $25,000,000 of the DIP Facility on an interim basis.

#47286099 v2

## SCHEDULING FINAL HEARING

62.     The Debtors respectfully request that the Court schedule the Final Hearing on the same date to consider confirmation of the Plan, and set a deadline to object to entry of the Final Order as set forth in the proposed Interim Order.

## NOTICE

63.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) Bank of America, N.A., as the First Lien Agent; (d) counsel to the Prepetition First Lien Agent, (i) Otterbourg P.C., 230 Park Avenue, New York, NY 10169, and (ii) Womble Bond Dickinson (US) LLP, 222 Delaware Avenue, 15th Floor, Wilmington, DE 19801; (e) Lightship Capital LLC, as the Prepetition Second Lien Agent and Prepetition Second Lien Lender; (f) counsel to the Prepetition Second Lien Agent and Prepetition Second Lien Lender, (i) White & Case LLP, 1221 6th Avenue, New York, NY 10020, and (ii) Fox Rothschild LLP, 919 N Market St #300, Wilmington, DE 19899; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the office of the attorneys general for the states in which the Debtors operate; (j) the Securities and Exchange Commission; and (k) any other party entitled to notice pursuant to Local Rule 9013-1(m).  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m)(iv).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## <u>NO PRIOR REQUEST</u>

64.     No prior motion for the relief requested herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order substantially in the form attached hereto as Exhibit A, granting: (a) the relief requested herein on an interim basis; (b) scheduling the Final Hearing; and (c) such other and further relief to the Debtors as this Court may deem proper.

Dated:  January 29, 2018
Wilmington, Delaware

/s/ David B. Stratton
**PEPPER HAMILTON LLP**
David B. Stratton (No. 960)
David M. Fournier (No. 2812)
Evelyn J. Meltzer (No. 4581)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899
Telephone: (302) 777-6500
Facsimile: (302) 421- 8390

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Meredith A. Lahaie (*pro hac vice* admission pending)
Kevin Zuzolo (*pro hac vice* admission pending)
Zach Lanier (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036
Telephone:    (212) 872-1000
Facsimile:    (212) 872-1002

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

#47286099 v2